# In The United States Court of Federal Claims

|  |  |  |
|---|---|---|
| C.H. GUERNSEY & COMPANY, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. ___26-828 C___ |
| THE UNITED STATES, | ) ) | Judge _____ |
| Defendant. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Plaintiff, C.H. Guernsey & Company ("Guernsey"), filed a timely bid protest at the United States Government Accountability Office ("GAO"), on May 7, 2026, challenging the April 27, 2026 award of Contract No. SP0600-26-F-8381 (the "Contract") by the Defense Logistics Agency Energy ("DLA Energy" or the "Agency") to ScottMadden, Inc. ("SMI"). Ex. A at 1.

2. Guernsey's timely bid protest triggered the 100-day automatic stay of performance required by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3), for the pendency of the GAO protest. *Id.*

3. GAO notified the Agency as such the same day to ensure the Agency complied with this congressional mandate. *Id.* at 3.

4. FAR 33.104(c) requires that when the Agency receives notice of a protest from GAO, the contracting officer "shall immediately suspend performance or terminate the awarded contract," and contract performance then may not be authorized until the Agency issues its "written finding" justifying performance.

5. Here, the Agency did not "immediately suspend performance" when it received notice of Guernsey's protest from GAO on May 7. The Agency did not issue a stop work order to suspend contract performance until four days after receiving notice of the protest, on May 11. *Id.*

6. On May 19, 2026, DLA notified GAO that the Agency had decided to override the automatic stay and authorized SMI to begin performance under the Contract, notwithstanding Guernsey's pending protest. *See generally* Ex. A; *see also* Ex. D.

7. Guernsey, by and through counsel, seeks declaratory and injunctive relief to prohibit DLA from unlawfully proceeding with the performance of the Contract during the pendency of its GAO protest because the Agency's reasoning behind its conclusion to override the automatic CICA stay is arbitrary and capricious, constitutes an abuse of discretion by the Agency, and is otherwise not in accordance with the law.

8. The Court should thus hold the Agency's decision to disturb the status quo of non-performance during a GAO protest to be unlawful and set aside that decision.

## INTRODUCTION

9. Guernsey is the incumbent contractor for services to support DLA Energy in its administration of three utility privatization contracts on behalf of the United States Air Force and Army. *See generally* Exs. B, C.

10. Part of this work includes supporting DLA Energy's three contracts with a private utility service provider, Doyon Utilities ("DU"). *Id.*

11. DLA Energy currently contracts with DU to provide privatized electric, natural gas, heat, water, and wastewater services to three military installations in Alaska: Fort Greely, Fort Wainwright, and Joint Base Elmendorf-Richardson. Ex. A at 1.

12. DLA Energy has historically procured the services of expert technical assistance and consultants that, among many other utility-related expert services, help DLA Energy negotiate its utility rates and pricing with DU. *Id.*

13.     DLA Energy's contracts with DU are generally broad in scope and highly complex. The specific contracts at issue here (pertaining to the three military installations in Alaska) are among the most complicated utility contracts in DLA Energy's entire portfolio, and potentially across the whole Department. Ex. C. ¶ 16.

14.     On April 27, 2026, DLA Energy awarded the Contract to SMI to provide these services, based on its determination that SMI provided a more advantageous quote to the Government than Guernsey, the incumbent contractor. Ex. A at 2.

15.     In the post-award brief explanation that DLA Energy provided to Guernsey, the Agency emphasized ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████

16.     After Guernsey filed a timely bid protest at GAO challenging the Agency's flawed evaluation, the Agency was legally required under CICA to immediately stay performance of the new contract until the GAO protest is resolved. FAR 33.104(c).

17.     Instead, the Agency decided to override the automatic stay, arguing that continuing SMI's performance of the Contract while the GAO protest is pending is justified under one of the two narrow exceptions for overriding the automatic CICA stay, specifically that doing so "will be in the best interest of the United States." 31 U.S.C. § 3553(d)(3)(C)(i)(I); *see generally* Ex. A.

18.     In its May 18, 2026 written Determination and Findings ("D&F") the Agency claims that overriding the CICA stay is in the best interest of the Government because a 100-day stay would coincide with certain upcoming administrative deadlines that the Agency wishes to meet: namely, a 60-day deadline to review and negotiate a new utility rate increase proposed by

DU. The Agency also cites the "procedural schedule" for its participation in the Regulatory Commission of Alaska's ("RCA") subsequent review of that rate, both of which, the Agency claims, will require immediate technical expertise, consultancy, and support from the awardee. *Id*. at 4.

19. The Agency's reasoning behind its decision to override this stay, as captured in the D&F, however, fails to establish that overriding the stay is indeed in the best interests of the United States.

20. Instead, it exhibits arbitrary and capricious reasoning to manufacture a crisis by citing the urgency of deadlines that the Agency could have controlled (and can even control now), absent an override of the stay.

21. The Agency's reasoning also exhibits the Agency's abuse of discretion in managing the procurement at issue in a manner that invited the exact emergencies it now uses as an excuse to override CICA's automatic 100-day stay; it also provides direct evidence that the Agency's decision to override the stay was contrary to law and procedure, and should, therefore, be set aside.

## JURISDICTION AND STANDING

22. The United States Court of Federal Claims has jurisdiction over an agency override of a post-award CICA stay under the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (establishing "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."); *see also RAMCOR Servs. Grp. Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

23. Plaintiff has standing to bring this action because Guernsey has "interested party" status as an actual bidder that timely protested DLA's award of the Contract to SMI at GAO and maintains a direct economic interest in the underlying procurement. *See PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 348 (2010) (finding that standing inquiry is the same in CICA stay override cases as bid protest cases, requiring actual bidder status and direct economic interest); *see also* 28 U.S.C. § 1491(b)(1).

24. As a highly qualified offeror that served as the incumbent contractor for nearly eighteen years, Guernsey has a substantial chance of winning the contract award and performing the services that the Agency is unlawfully permitting SMI to perform after improperly overriding the statutory CICA stay.

25. SMI's continued performance during the pendency of the GAO protest will diminish the financial value of the contract to Guernsey, even if Guernsey ultimately prevails at GAO, and will therefore harm Guernsey's competitive advantage during the stay period.

## VENUE

26. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1) because this action seeks relief against the United States and a substantial part of the events giving rise to the claims occurred within this venue. Venue is also proper pursuant to 28 U.S.C. § 1402(c).

## THE PARTIES

27. The Defendant is the United States of America acting by and through the Department of Defense's Defense Logistics Agency.

28. Plaintiff, C.H. Guernsey & Company, is an Oklahoma-based company organized under the laws of Oklahoma with its principal place of business at 5555 North Grand Blvd., Oklahoma City, OK 731112-5507. Guernsey is a longtime provider of consultant services

specializing in U.S. Department of Defense utility privatization and utility services contract support services to the U.S. Government, dating back to 1993 with some of the first utility privatization actions by the U.S. Army. Guernsey has successfully performed hundreds of government contracts in partnership with numerous government agencies, including the Departments of Defense/War, Transportation, Energy, Homeland Security, the National Aeronautics and Space Administration, and many others.

## FACTUAL BACKGROUND

A.    *Over the past eighteen years, Guernsey has developed an exceptional track record in administering, on behalf of DLA Energy, one of the most complicated utility privatization contracts across the Government.*

29.    DLA Energy is party to utility contracts with DU for the provision of diverse utility services at multiple military installations in Alaska. Ex. A at 1.

30.    Given the complexity and scope of these contracts, DLA Energy procures Alaska Technical, Price, and Regulatory support services through task orders awarded under the General Services Administration ("GSA") Multiple Award Schedule. *Id.*

31.    The support services sought under the solicitation at issue in this case involve assisting DLA Energy with administering its utility contracts with DU. *Id.*

32.    The Contract requirements include providing support services to DLA Energy in the form of technical assistance and recommendations for contract management, helping with the management of utilities inventories, reporting and documentation, providing utility-related economic and financial expertise, and, as relevant here, using that developed technical and financial understanding to advise DLA in its interactions with DU to negotiate and advocate for fair utility rates through rate case litigation before the state's utility regulatory commission. *See generally* Ex. D.

6

33.     This work demands not only an intimate familiarity with DLA's utility-services contracts with DU, but also with the utility infrastructure of the region, and the particular stakeholders at each installation. Ex. B ¶9; Ex. C. ¶16.

34.     Before SMI was awarded the Contract at issue, Guernsey was the incumbent contractor providing these services to DLA for nearly 18 years. Ex. ¶10.

35.     While other companies may have general surface-level familiarity with utility rate negotiations, few companies combine that experience with a deep understanding of Federal Acquisition Regulation ("FAR")-based contracting, which can significantly impact a contractor's ability to effectively negotiate fair utility rates on behalf of the Government. Ex. C ¶16,17.

36.     Guernsey possesses and has leveraged this unique experience to successfully support DLA with navigating the complex utility rate negotiation process with DU and servicing DLA Energy's utility privatization consulting needs for decades. *Id.*

37.     This work involves receiving and reviewing, on a cyclical basis, DU's proposed utility rate changes and the justification for those changes, representing DLA Energy in its negotiations with DU to seek agreement on a fair rate during what is referred to as "pre-filing period" (a minimum of 60 days), and subsequently advocating on behalf of DLA Energy before the Regulatory Commission of Alaska ("RCA") which settles rate disputes in what is referred to as a "rate case" (normally within 450 days). Ex. A at 3-4; Ex. A ¶14.

38.     The period of performance for Guernsey's most recent contract to provide these services for DLA Energy, comprising a single base year and two one-year options, ended on January 8, 2026.  DLA then extended Guernsey's performance for an additional two months, through March 8, 2026, pursuant to FAR 52.217-8, Option to Extend Services, which provides for extensions of up to six months.  Ex. A at 3; Ex. B ¶5.

39.     Because of significant investments in new utility infrastructure projects in the region during the recent years, fiscal year ("FY") 2025 was expected to be a "test year," in which utility providers such as DU closely monitor their capital investment, operating, and other financial data to track costs incurred to serve its customer rates and usage, review their expenses, and then proceed to propose a rate change. Ex C. at 18; Ex. A at 4.

40.     In anticipation of DU proposed rate changes for its twelve utility systems (and the litigation that typically follows) Guernsey was already preparing for a FY2025 rate case—including the work involved during the pre-filing period—before its period of performance under the incumbent contract ended in March 2026. Ex. C ¶ 21.

**B.      *DLA Energy elects to let Guernsey's performance lapse, leaving a support gap for handling a prefiling period with DU.***

41.     While DLA Energy could have extended Guernsey's performance period for up to six months, DLA Energy elected to modify the incumbent contract to allow for only two months of additional performance. FAR 52.217-8; Ex. A ¶6.

42.     Guernsey's performance therefore ceased on March 8, 2026, at the Agency's sole discretion. For reasons undisclosed to Guernsey, DLA Energy elected to proceed with a gap in utility support services until a new award was issued.  The Agency proceeded in this way, even with a FY2025 rate case clearly on the horizon and with the option to extend the incumbent Contract for up to six months (instead of two), into July 2026. Ex. C ¶ 13, 18.

43.     When DLA Energy issued Request for Quotation SP0600-26-Q-0810 (the "RFQ" or "Solicitation") on October 27, 2025, the solicited support services were still being performed by Guernsey at the time, under the incumbent contract. Ex A at 3.

44.    DLA Energy issued the RFQ to vendors holding contracts under GSA's Professional Service Category, thereby subjecting the procurement to the provisions of FAR Subpart 8.4. *Id.* at 1.

45.    The RFQ stated that offers would be evaluated using "Performance-Price Tradeoff procedures pursuant to FAR 15.101-1," whereby DLA Energy would award a firm-fixed price contract to the quotation that is "the most advantageous to the Government." *Id.* at 2.

46.    The RFQ incorporated a three-factor evaluation for purposes of determining which quotation was most advantageous to the government.  The three evaluation factors were: Technical Acceptability, Performance Confidence Assessment, and Price.  The RFQ provided that the two non-price factors were more important than the price factor. Ex. D at 70.

47. After amendments to the RFQ, the Agency set the closing date for receiving offers in response to the RFQ for December 1, 2025. Ex. A at 2.

48.    Guernsey submitted a timely quotation in response to the RFQ on November 26, 2025.  Ex. E at 7.

49.    Six other companies, including SMI, submitted offers by the closing date. Ex. A at 2.

C.    *The Agency awards the Contract to SMI, triggering a GAO protest and an automatic CICA stay.*

50.    DLA Energy awarded Task Order No. SP0600-26-F-8381 to SMI on April 27, 2026, and notified Guernsey on April 28, 2026, of the Agency's award decision. Ex A at 2.

51.    The Agency's post-award notice indicated that the Contract was awarded for the total price of $10,309,884.00. *Id.*

52.     On April 28, 2026, Guernsey requested a debriefing, in accordance with FAR 52.212-1, which was expressly incorporated in the RFQ. Ex. E at 11; *see also* Ex. D at 17.

53.     The Agency initially responded to Guernsey's request on April 30, 2026, offering to provide Guernsey with a formal debriefing approximately two weeks later on May 13, a date that fell well after the May 7 deadline for filing a timely protest at GAO.  Ex. E at 7.

54.     The Agency then abruptly changed course after Guernsey advised DLA that it was evaluating whether to exercise its right to protest the award to SMI. DLA inexplicably withdrew its offer to provide Guernsey with a debriefing, claiming that even though FAR 52.212-1 had been expressly incorporated into the RFQ, and despite its initial offer to provide a formal debriefing, it would no longer do so as none was required for this FAR Subpart 8.4 contract.  The Agency instead provided Guernsey with a scant brief explanation by email on May 5, 2026. *Id.* at 11; Ex. A at 2.

55.     The Agency stated in its brief explanation that ██████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ Whereas the Government found ScottMadden Inc.'s quote to be the most advantageous, ████████████ factors considered." *Id.*

56.     Guernsey filed a timely protest at GAO on May 7, 2026. *Id.* at 3.

57.     GAO notified DLA Energy of Guernsey's protest on the same day. *Id.*

58.     The GAO protest, docketed as file number B-424484.1 is currently pending before the GAO, with a final decision due on August 15, 2026. Ex. A at 1.

59.     In its GAO protest, Guernsey asserts, among other things, that DLA Energy unreasonably rated SMI's quotation under the RFQ's Technical Acceptability factor because ████████████ was indicative of heightened performance risk by a less experienced offeror ███████████████████████████████████████████

10

unqualified to perform the highly specialized work required under the Performance Work Statement. Ex. E at 13-15.

60. Guernsey also protested that SMI should have received a lower Performance Confidence Assessment rating because, unlike, Guernsey—an offeror with significant incumbent experience—SMI lacks any recent or relevant past performance to justify a favorable rating under this factor. *Id*. at 19-25.

61. Based on these flaws in the Agency's Technical Acceptability and Performance Confidence Assessment evaluation, Guernsey asserts in its protest that the Agency's best-value decision lacked a rational basis. Specifically, Guernsey asserts that SMI's ▬▬▬▬ quotation presented materially greater performance risk and inferior qualifications, as compared the Guernsey's quote, and yet SMI was selected for award, in direct contradiction to the RFQ's express

62. On May 27, 2026, the Agency submitted a Request for Dismissal of Guernsey's protest to GAO. Ex. F at 2.

63. Guernsey responded to DLA's dismissal request on June 1, 2026. *Id*.

64. GAO promptly denied the Agency's Request for Dismissal of the GAO protest, noting that Guernsey had raised challenges requiring an answer on the merits. *Id*.; Ex. H.

**D.** ***The Agency issues a D&F, overriding the automatic CICA stay and citing an urgent need to address the support gap that the Agency itself created and that Guernsey, and not SMI, is best suited to address.***

65. On May 19, 2026, the Agency provided GAO with a Notice of CICA Stay Override, informing GAO that it had authorized performance of the Contract, notwithstanding Guernsey's protest, based on a determination that contract performance was in the best interest of the United States. Ex. G.

11

66.     The Agency's Notice was deficient, however, in that it failed to include a copy of the Determination and Findings ("D&F") supporting the stay override or any statement from the approving official explaining the statutory basis for the override as required under 4 C.F.R. § 21.6. *Id*.

67.     On May 20, 2026, Guernsey requested that GAO direct the Agency provide the required D&F. Ex. F at 1. GAO granted Guernsey's request and directed DLA to do so. *Id*.

68.     Two days later, on May 22 (and three days after the Agency notified GAO that it had overridden the CICA stay) the Head of the Contracting Activity for DLA Energy finally issued a D&F. Ex. A.

69.     The D&F states that GAO notified DLA Energy counsel of the protest on May 7, 2026, but the Contracting Officer did not issue a Stop Work Order to SMI until May 11, 2026. Ex. A at 3.

70.     The D&F further states that the Agency found that continuing performance of the awarded task order during the pendency of GAO protest is "in the best interests of the United States," because "[t]here are no viable alternatives to meet the Government's needs." Ex. A at 5.

71.     The Agency further claims in the D&F that overriding the stay is in the best interest of the Government because continued performance of the awarded contract will ensure "uninterrupted support" to DLA Energy to (1) negotiate a fair and reasonable utility rate with DU for the three military installation in Alaska, and (2) defend the Government's interest in expected utility rate proceedings before the Regulatory Commission of Alaska ("RCA" or the "Commission") when DU presents its proposed rates to RCA for review. Ex A at 8.

72.     The D&F goes on to state that unless the Agency overrides the CICA stay, "critical requirements," under the awarded contract will not be fulfilled such that "the only logical

conclusion" is that "authorizing continued performance is in the best interest of the United States notwithstanding the protest." *Id.* at 3.

73.    The Agency's conclusion, however, rests on presumptions that are either unsupported or directly contradicted by fact.

74.    The D&F, for example, fails to adequately establish that the contracted services DLA Energy claims are actually "needed immediately" or that they actually qualify as "critical requirements" such that the "only logical conclusion" for addressing them is by overriding the CICA stay and authorizing SMI's performance. *Id.* at 3.

75.    The Agency's assertions about the critical nature of these requirements is belied by the Agency's own failure to prepare for the upcoming deadlines when it still had contractually authorized support from Guernsey through March 2026—support that could have continued for an additional four months pursuant to FAR 52.217-8, which provides for extensions of up to six months instead of the mere two months DLA allotted.  Ex. B ¶13-16.

76.    In raising alarm bells about upcoming deadlines and emphasizing their importance, the D&F provides no reasoning as to why the Agency failed to prepare for these deadlines which were foreseeable since last year. *See generally* Ex. A.

77.    The D&F also asserts that DLA Energy negotiates proposed utility prices with DU "as a negotiated contractual term," for a period of 60 days, and uses the impending expiration of that deadline (on June 16) to assert that there is an immediate need for the performance of consultancy services.  According to the D&F, the Agency is facing an immovable obstacle in the 60-day pre-filing period. Ex. A at 3.

78.    The D&F, however, does not reference or cite the negotiated DU contractual terms to establish that the prefiling period cannot be extended; nor does the D&F provide any details

13

about the Agency's effort to extend this deadline by mutual agreement to ensure it could comply with the statutory requirement to stay performance of the protested contract award under CICA. In fact, the D&F does not provide any evidence that DU has even been informed about the ongoing GAO protest and the CICA stay requirement as a basis for extending the pre-filing period. The D&F also fails to acknowledge whether DLA Energy and DU have ever previously engaged in prefiling negotiations that lasted longer than 60 days. Ex. C at 26 (noting that based on Guernsey's professional experience and prior dealings with DU it commonly requests that pre-filing negotiations last longer than 60 days).

79. The D&F, therefore, fails to establish that DLA Energy actually lacks the ability to extend the 60-day deadline to allow DLA Energy to address its legal obligation to comply with CICA's statutory mandate of suspending contract performance during the pendency of a GAO protest.

80. The Agency feigns concern in the D&F that a 100-day GAO stay (of which nearly 30 days have already passed) could interfere with the ultimate 450-day deadline to resolve anticipated, but as of yet unfiled, rate case litigation before RCA. Here, again, the D&F provides no evidence that the rate case deadline cannot be extended, and in fact, the evidence before the Agency in the form of RCA's own statutory authority shows that RCA can expand that deadline beyond 450 days. *See* Al. Stat. § 42.05.175(f)(3) (allowing RCA to extend its deadlines for 90 days or less upon finding of good cause even if it all parties of record do not consent). Due to the parties' unique "One Utility (DU) One Customer (DoD)," relationship, historically RCA has allowed the parties to work such issues out between themselves and present a joint position to RCA while extending the 450 days deadline. *See* Ex. C ¶14 (noting that Guernsey has experience with RCA proceedings that lasted longer than 450 days and in some cases up to 1,259 days).

81.     Even if the D&F could sufficiently establish that the aforementioned deadlines are pressing enough to justify overriding the statutory mandate to preserve the status quo, the D&F provides little to no support to justify a conclusion that it is in the best interests of the United States to have SMI take over these responsibilities while its contract award is actively being protested at GAO instead of exercising one of several "viable alternatives to meet the Government's needs," which the Agency claims in the D&F do not exist.

82.     But there are multiple viable alternatives available to meet the Government's needs, including: (1) exercising a bridge contract to allow Guernsey, the highly-experienced, longtime incumbent contractor to perform the work, (2) negotiating an extension of the DU pre-filing deadline to allow GAO to decide whether the Contract was properly awarded to SMI; or (3) utilizing alternate rate case support consultants that are readily available and accessible under other existing contract vehicles, namely the United States Army Corps of Engineers' Commercial Utilities Program ("CUP") which routinely provides utility rate case support to the military services across all fifty states.

83.     Beyond the Agency's proffered deadlines, the D&F fails to consider several important aspects of the scenario presented.

84.     First, it is Guernsey—*not* SMI—that has direct, relevant experience with handling the exact deadlines the Agency deems to be critical.

85.     Second, onboarding a new, inexperienced contractor to handle the critical services that Guernsey has historically provided risks additional costs to the United States. SMI's inexperience and lack of familiarity with the work involved invites errors in both the prefiling period and the rate case litigation that would later visit upon Guernsey, should Guernsey prevail in the GAO protest and take over the rate negotiations. Ex. C ¶ 25, 27.

86.    Moreover, the D&F is bereft of any analysis supporting the claim that SMI, if authorized to do the work, can effectively meet the pre-filing deadline, as the record evidence (provided by the Agency itself in its post-award brief explanation) confirms that SMI was awarded the contract ███████████████████████████████████████████████ not because of any superior expertise on SMI's part.

87.    Thus, without any critical or objective consideration of all the foregoing issues, the Agency's conclusion that overriding the CICA stay during the pendency of Guernsey's protest is in the best interest of the United States is flawed because it lacks a rational basis.

## COUNT ONE

**(Arbitrary and Capricious Override of CICA Stay in Violation of the Administrative Procedure Act, 5 U.S.C. §706(2)(A))**

88.    Plaintiff incorporates all preceding paragraphs.

89.    The Agency's decision to override the automatic CICA stay, as reflected in the D&F, relies on factors which Congress has not intended it to consider, entirely fails to consider many important aspects of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

90.    Specifically, the D&F fails to sufficiently establish (1) that the Agency is facing impending immovable deadlines; (2) that a 100-day stay during the pendency of the GAO protest would severely undermine the United States' best interest in meeting those deadlines; (3) that SMI has sufficient capabilities to deliver the result the Agency claims would be in the best interest of the United States; or (4) that authorizing SMI's performance during the pendency of the stay will not cause downstream issues that undermine the United States' best interest in the long term.

91. The Agency's determination that overriding the automatic CICA stay is in the best interest of the Government, as explained in the D&F is, therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

92. Proceeding with the override will impose a significant cost on Guernsey, particularly if Guernsey ultimately prevails at GAO, as Guernsey's current competitive advantage will be diminished, and Guernsey will likely have to expend additional resources to address SMI's partial, inexperienced and likely flawed performance. Ex. B ¶ 18,19.

93. Regardless of the outcome of the GAO protest, proceeding with the override also impose negative effects on competition and the integrity of the procurement system, which are interests that Congress sought to protect by enacting the Competition in Contracting Act, because CICA incorporates Congress's default presumption that contract performance during an ongoing protest undermines the United States' interest in fair competition and jeopardizes the GAO protestors' statutory rights. *See Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) *aff'd*, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) (finding that "[o]nce the statutory entitlement has been lost, it cannot be recaptured.").

94. So long as the stay remains in place, SMI also enjoys an unearned competitive advantage by gaining insight and exposure into the history of critical negotiations on utility pricing that have been historically handled by Guernsey. Ex. B ¶ 21.

95. Finally, the Agency's arbitrary and capricious decision to authorize performance by SMI, inevitably casts doubts about Guernsey's continued performance of these services, which in turn, impacts Guernsey's ability to retain and later mobilize the necessary workforce and resources to prepare for performance once the GAO protest is resolved in its favor. *Id*. Ex. 9, 18.

96.    The balance of hardships also favors granting an injunction, as the Government has the ability to negotiate an extension to the deadlines cited as the primary basis for overriding the stay, which would preserve the status quo for all parties involved with no significant hardship.

97.    Granting injunctive relief would also be in the public interest because such relief would ensure compliance with CICA's mandates and preserve both the integrity of the procurrent process and GAO's review process. *See Am. Signature v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) (finding that "[t]he public interest is served by ensuring that governmental bodies comply with the law."); *see also URS Fed. Servs., Inc. v. United States*, 102 Fed. Cl. 674, 677 (2012) ("Congress has determined that the public interest is served by the imposition of an automatic stay to allow the GAO an opportunity to ascertain the merits of a bid protest.").

## PRAYERS FOR RELIEF

For the reasons stated in this Complaint, Plaintiff, C. H. Guernsey & Company, requests that this Court enter judgment in Plaintiff's favor and against the Government as follows:

I.    A declaratory judgment that DLA's decision to override the automatic CICA stay is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

II.    A temporary restraining order and preliminary injunction barring the performance of the contract awarded to SMI under Solicitation No. SP0600-26-F-8381 until GAO issues a decision in the pending GAO protest;

III.    An order awarding Plaintiff its reasonable attorneys' fees and costs to the extent authorized by law; and

IV.    Such further relief as the Court deems appropriate, fair, and just.

Dated: June 5, 2026

Respectfully submitted,

/s/ *Kendra Perkins Norwood*
Kendra Perkins Norwood, Esq.
**Fluet**
1751 Pinnacle Drive, Suite 1000,
Tysons, VA 22102
T : (703) 590-1234
F : (703) 590-0366
knorwood@fluet.law
e-file@fluet.law

*Counsel for Plaintiff*

*Of Counsel*:

Kia Rahnama
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
krahnama@fluet.law

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Federal Claims by using the CM/ECF system and under seal. I also certify that the foregoing sealed document is being served on Defendant's counsel of record and that service will be accomplished by other appropriate means as provided by Rule 5(b)(2) of the Rules of the United States Court of Federal Claims (RCFC).

/s/ *Kendra Perkins Norwood*
Kendra Perkins Norwood, Esq.

# Exhibit A



**DEFENSE LOGISTICS AGENCY**
**ENERGY**
**8725 JOHN J. KINGMAN ROAD**
**FORT BELVOIR, VIRGINIA 22060-6222**

May 18, 2026

**DETERMINATION AND FINDINGS**
**TO PROCEED WITH PERFORMANCE UNDER CONTRACT**
**SP0600-26-F-8381**
**NOTWITHSTANDING BID PROTESTS**

On the basis of the following findings, and pursuant to 31 U.S.C. § 3553(d)(3)(C) and Federal Acquisition Regulation (FAR) 33.104(c)(2)(i), I determine that contract performance under contracts SP0600-26-F-8381 should proceed notwithstanding Government Accountability Office (GAO) protest number B-424484.1 filed by C.H. Guernsey & Company (Guernsey). I determine, pursuant to 31 U.S.C. § 3553(d)(3)(C) and FAR 33.104(c)(2)(i), that contract performance will be in the best interests of the United States and that those interests of the United States will not permit waiting for GAO's decision. Continued performance of the awarded contract will ensure uninterrupted support to the Defense Logistics Agency Energy (DLA Energy) in defending the Government's interests in utility rate proceedings before the Regulatory Commission of Alaska (RCA), without which the Government may experience unfair and unreasonable utility rate increases across three installations in Alaska. Therefore, it is important to the United States' national defense and budgetary interests to have the awardee, listed below, continue performance under the contract.

All references to the FAR and its supplements in this procurement, the resultant contract, and this document refer to the legacy regulations preceding the Revolutionary FAR Overhaul (RFO).

**FINDINGS**

1.   DLA Energy awards and administers Utilities Privatization (UP) contracts for the United States Air Force, Army and Navy, which includes three 2007 contracts with Doyon Utilities, LLC (DU) covering twelve privatized utility systems at Fort Greely, Fort Wainwright, and JBER, AK. These UP contracts are immense in scale due to the robust, strategic missions and sprawling geographic footprints of these installations, which were historically engineered for total self-sufficiency in power, heat, and water services to survive the sub-arctic environment. These UP contracts have a combined value of $5.4B. Their scope and complexity have historically necessitated the services of expert consultants to support the Contracting Officers and their representatives with administering the contracts. Therefore, DLA Energy procures Alaska Technical, Price, and Regulatory support services via Task Orders awarded off the General Services Administration (GSA) Multiple Award Schedule (MAS).

As the prior task order for these support services was expiring, DLA Energy issued Request for Quotation (RFQ) SP0600-26-Q-0810 on October 27, 2025, in accordance with FAR 8.404 via the GSA eBuy tool on an unrestricted basis. Amendment 1 was executed on November 12, 2025, which updated the Performance Work Statement (PWS), the Quote Preparation Instructions, and the Basis for Contract Award criteria. Amendment 2 was executed on November 20, 2025, which extended the RFQ's closing date from November 26, 2025 to December 1, 2025.

The RFQ's PWS included the provision ███████████████ pport services, which included support for:

- Technical Assistance/Recommendations
- Utilities Inventories
- Reporting and Documentation
- Utility Related Economic & Financial Expertise, and
- Regulatory Commission Interaction and Rate Case Litigation

2.  As provided by the RFQ, DLA Energy evaluated quotes using the Performance-Price Tradeoff procedures pursuant to FAR 15.101-1. The evaluation factors used were Technical Acceptability, Performance Confidence, and Price.

To demonstrate Technical Acceptability, quoters were required to demonstrate its proposed technical/management approach to complying with the Government's PWS, its overall approach and application of quality management in completing all PWS tasks, and the risks the Government deem present in its proposed technical approach.

To demonstrate Performance Confidence, quoters were required to submit no more than six (6) recent and relevant performance references from which the Government could ascertain a performance confidence assessment.

To demonstrate its Price, quoters were requested to complete an RFQ Attachment pricing matrix, wherein quoters would input their proposed labor mix, hourly rates, costs for travel, and discounts if proposed.

3.  DLA Energy received timely quotes from seven (7) different companies by the RFQ's December 1, 2025, closing date. DLA Energy determined ScottMadden, Inc. (SMI)'s quote as being the most advantageous for the Government and awarded Task Order No. SP0600-26-F-8381 on April 27, 2026.

4.  On April 28, 2026, the Contracting Officer issued a post-award notice to the six other quoters informing them 1) that their quote was unsuccessful, 2) the number of quotes received, 3) the name of the awardee, and 4) the total contract price, $10,309,884.00 (base plus four option years).

5.  ██████████████████████████ However, debriefings do not exist using the GSA MAS, and FAR 8.405-2(d) provides that "[i]f an unsuccessful offeror requests information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided." Accordingly, the Contracting Officer provided brief explanations via email to these ███ quoters on May 5, 2026. Relevant to this action, quoter Guernsey was informed it was not selected because: *"Guernsey's quote was technically acceptable; however, it did not present advantages that would merit its price premium over ScottMadden Inc.'s notwithstanding the Government's high expectation that it would be able to successfully perform the required effort. Whereas the Government found ScottMadden Inc.'s quote to be the most advantageous, price and other factors considered."*

Page 2 of 5

6. Guernsey filed a timely protest directly with the GAO on May 7, 2026. GAO notified DLA Energy counsel of the protest on the same day, file number B-424484.1 Guernsey's protest alleges, among other things, that DLA Energy unfairly and inappropriately rated SMI as being Acceptable under Technical Acceptability because it perceives SMI's price as being too low to provide the required resources to fulfill the PWS, and further that SMI should have been rated Neutral under Performance Confidence because Guernsey is not aware of SMI's past performance experience.

7. Pursuant to FAR 33.104(c), the Contracting Officer issued a Stop Work Order to SMI via issuance of Modification P00001 on May 11, 2026. Absent authorization to continue with performance, the Stop Work Order will remain in effect until the GAO issues a decision, which is required by 31 U.S.C. § 3554(a)(1) to be issued within 100 days.

## CONTINUED PERFORMANCE OF THE AWARDED CONTRACT IS IN THE BEST INTEREST OF THE UNITED STATES

8. GAO's decision in protest B-424484.1 is due on August 15, 2026. ███████████ ███████████████████ In the meantime, critical requirements under the awarded contract will not be fulfilled directing the only logical conclusion that authorizing continued performance is in the best interest of the United States notwithstanding the protest.

9. Guernsey is the incumbent contractor for these requirements; however, the prior contract expired on March 8, 2026.

10. The contracted services are needed immediately to support DLA Energy's evaluation, negotiation, and intervention efforts in DU's "Test Year 2025" (TY25) rate case. Specifically, the following two PWS elements are critical:

- Utility Related Economic & Financial Expertise, and
- Regulatory Commission Interaction and Rate Case Litigation

11. █████████████████████████ DLA Energy—in coordination with Service regulatory counsel—intervenes in DU's rate-setting proceedings before the RCA. As a negotiated contractual term, DU provides the Government with a 60-day prefiling period during which it defers its rights for rate relief while affording DLA Energy an opportunity to evaluate and possibly negotiate changes to the rates before formal proceedings begin, which can avoid prolonged litigation for both parties. DU submitted its Test Year 2025 pre-filing materials to DLA Energy on April 17, 2026, and we are in the pre-filing period now.

12. DU's TY25 pre-filing materials show it intends to seek a ███████ increase to rates across the three UP contracts. This annual increase would represent an approximate ███████ increase to the contract's total value over the remaining 32 years of contract performance. DLA Energy achieving even a minor reduction would yield substantial long-term savings.



14. When considering the best interests of the United States, and authorization of work to continue notwithstanding the protest, the agency must consider the full statutory timeline for GAO's final decision of 100 days. That timeline will fully envelop the rest of the pre-filing period and potentially lead deep into the rate case's procedural schedule.

The pre-filing period ends on June 16, 2026, after which the Government will have lost its bargained for right to negotiate or influence DU's rate case before it is filed with the RCA. Authorizing continued performance enabling SMI's support to DLA Energy will mitigate this loss and potentially permit a settlement on rate increases before litigation.

If the rate case is filed, and proceedings begin, it is likely the 100-day GAO review will envelop the first, significant steps of the procedural schedule, to include the Government's allotted period of serving discovery on DU for facts related to their filed rates, and possibly also the deadline for the Government's filed testimony and last opportunity to propound evidence in the case.

15. DU's rate case will proceed without regard to DLA Energy's posture to participate and intervene. DU has informed it will file this case upon conclusion of the pre-filing period, and Alaska statute requires the RCA to issue its final decision and close the dockets no later than 450 days after the date of the filing. The RCA will not permit procedural extensions because the Government isn't ready to support its intervention without DU's stipulation, and there should be no expectation DU would defer resolution of its filing on those grounds. Not having expert support for the beginning phases of these proceedings will effectively render the Government completely unable to support an intervention and defend against unfair and unreasonable rate increases.

16. The costs associated with the Task Order awarded to SMI are ███████ per month, which is insignificant in comparison with the financial risks of not having the necessary support through DU's rate case proceedings. Further, SMI's deliverables are the Government's property, and in the unlikely event Guernsey prevails in its protest, the analyses and conclusions SMI develops can be used by Guernsey in furtherance of the Government's interests.

17. Additionally, while this analysis is focused on only two elements of the Task Order's PWS as driven by DU's rate case filings, the other three PWS elements are also on hold through the Stop Work Order, which can have adverse effects. Of note, significant utility projects and capital planning are underway at Fort Wainwright, as the Army investigates its options for recapitalizing the Combined Central Heat and Power Plant (CHPP) and its Water Treatment Plant in a turbulent energy and water regulatory environment. Additionally, significant growth at JBER with several new facilities and mission sets underway require new utility connection construction. The Stop Work Order is preventing expert support to the installations and the UP Contracting Officers in evaluating various business case analyses and DU's planned approach and cost estimates. While these efforts in and of themselves might be able to withstand the 100-

day GAO timeline, their needs compound the adverse impacts the Stop Work Order presents to the United States.

**GUERNSEY IS UNLIKELY TO PREVAIL BASED ON THE MERIT OF ITS PROTEST**



**DETERMINATION**

I make this determination as the Head of the Contracting Activity for DLA Energy for purposes of stay overrides. There are no viable alternatives to meet the Government's needs. Pursuant to 31 U.S.C. § 3553(d)(3)(C) and FAR 33.104(c)(2)(i), I determine that it is in the best interests of the United States to continue performance of the awarded Task Order. The circumstances require continued performance of contract SP0600-26-F-8381, for which I authorize.



EARHARDT.GABRIE LLA.M[____] Digitally signed by EARHARDT.GABRIELLA.M. Date: 2026.05.18 17:43:41 -04'00'

GABRIELLA M. EARHARDT
Acquisition Executive

Page 5 of 5

# Exhibit B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| C.H. GUERNSEY & COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| THE UNITED STATES OF AMERICA | ) Judge _____ |
| | ) |
| Defendant. | ) |

**<u>DECLARATION OF</u>** ▇▇▇▇▇▇▇

I, ▇▇▇▇▇▇▇, declare as follows:

1. I am over the age of 18 and am competent to make this declaration based on my personal knowledge of the facts stated herein.

2. I serve as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of C.H. Guernsey & Company ("Guernsey"). I was appointed ▇▇▇▇ in January of 2019 and have been employed by the company since 1999.

3. Throughout my career with Guernsey, my work has focused on the company's provision of support services in connection with public-private partnerships between the U.S. Department of Defense, Defense Logistics Agency ("DLA") and utilities providers, including Utilities Privatization Support Services ("UPSS") at Fort Wainwright, Alaska ("FWA"), Fort Greely, Alaska ("FGA"), and Joint Base Elmendorf Richardson ("JBER"), also located in Alaska.

4. Guernsey has performed UPSS work at these three Alaska military installations under DLA contracts since 2007. In doing so, Guernsey has served as DLA's right-hand and subject matter expert on all aspects of Utility Services contract management by monitoring and assessing the work of the three installations' Utility Systems Owner, Doyon Utilities, LLC ("DU"). This

includes interfacing with the various utility stakeholders in the region and assisting the federal government in achieving its long and short-term utility management and energy use goals.

5.    Most recently, Guernsey performed UPSS work under Contract No. 47QRAA1900DM, Task Order No. SP0600-23-F-8353 (the "incumbent contract"), which was executed on January 9, 2023, and provided for a period of performance ending on January 8, 2026.

6.    On January 7, 2026, DLA and Guernsey executed Modification No. 14 to the incumbent contract. Through this modification, DLA exercised its right to extend the task order's period of performance for an additional two months, through March 8, 2026.  In sum, Guernsey performed for more than three years under the incumbent award.

7.    In my role at the company, I oversaw and directed Guernsey's preparation and submission of solicitation materials, including Guernsey's response to DLA Energy's Request for Quotation ("RFQ") No. SP0600-26-Q-0810. That RFQ sought UPSS work under a new task order for three above-referenced Alaska military installations: FWA, FGA, and JBER.

8.    As part of my duties, I oversaw Guernsey's provision of support services to DLA under the incumbent contract as well as Guernsey's other prior DLA Energy contracts for UPSS work.

9.    Based on my professional experience and having overseen Guernsey's work under both the incumbent contract and prior UPSS contracts, I have first-hand knowledge that supporting DLA's management of the DU contract is uniquely difficult given the geographically remote place of performance and severe climate conditions. These factors required Guernsey to bear significant workforce mobilization costs to leverage the requisite subject matter expertise and experience for performing in Alaska's harsh environment.

10.    Guernsey has successfully provided rate negotiation and rate case litigation support services to DLA since 2007 under three separate utility service contracts—one for each of the three installations. For example, in rate case settlements in 2014 and 2017, Guernsey provided critical support to DLA in obtaining one-year cost savings of over $1.5 million and $3.09 million, respectively. While those savings diminish over time, Guernsey projects that these one-year cost savings alone will amount to over $35 million in lifetime cost savings for the U.S. Government.

11.    Based on my professional experience, and having served as Guernsey's ██████ ███████ for the past seven years, as well as my own knowledge of the Alaska utility industry and market, it is highly unlikely at this moment in time that ScottMadden, Inc. ("SMI"), the awardee under RFQ No. SP0600-26-Q-0810—and an unknown entity in the local industry—possesses the requisite experience, subject matter expertise, and institutional knowledge to successfully support DLA in its rate negotiations and rate case litigation for the current filings. Guernsey spent over two years under the incumbent contract developing underlying information and analysis to resist the current utility rate increases proposed by DU, and I understand the level of experience, effort, and expertise needed to prepare for these engagements. There is simply insufficient time available for SMI to instantly develop an understanding to meaningfully support DLA in resisting DU's current filings.

12.    To the best of my knowledge and upon information and belief, SMI has never specifically performed UPSS work in Alaska or another similarly harsh environment. While it has supported the Alaska Gasline Development Corporation with reviews and strategy related to liquefied natural gas ("LNG") and energy infrastructure projects, SMI has never engaged in rate negotiation with DU or rate case litigation before the Regulatory Commission of Alaska ("RCA"), a quasi-judicial state government agency that gives final approval for increased utilities rates.

Moreover, SMI has not previously contracted directly with DLA or any U.S. Department of Defense agency.

13. Based on my prior dealings with DU and my knowledge of significant utility projects in the immediate region in 2025, Guernsey—and by extension, DLA—was well aware that 2025 would almost certainly be a "test year," which is the timeframe in which DU would evaluate its utility service costs to support DU's proposal of twelve new utility rates in 2026.

14. In fact, before Guernsey's performance concluded under the incumbent UPSS contract in March 2026, Guernsey personnel had already predicted and communicated to DLA on March 5, 2026 that DU would likely present DLA with a new rate proposal, thereby initiating a 60-day "pre-filing period," at some point between March and August of 2026.

15. To the best of my knowledge, DLA knew that DU intended to propose new rates in 2026, as a result of the 2025 "test year" activity, and that new rate negotiations were imminent.

16. Based on my professional experience and prior dealings with DU, these pre-filing period negotiations take time. It is common to request extensions for submitting information to DU—which Guernsey successfully did for the test years of 2023, 2020, and 2017, for example— prior to DU's submission of its proposed rates to RCA and triggering the 450-day window for the rate case to proceed.

17. In my experience, the pre-filing period allowing discussions and negotiations between DLA and DU have always taken significantly more than 60 days. The last three rate cases have seen over 100 days between DU's pre filing submission and its formal rate case filings with the RCA, with an average span of 144 days between pre filing with DLA and formal filing with the RCA. To the best of my knowledge, during and after Guernsey's performance under the incumbent UPSS contract, DLA did not consider alternative solutions to ensure continuity of the

known ongoing effort or avail itself of any procedural flexibilities or scheduling accommodations in the rate case process. Moreover, DLA did not prepare for the likely, potential event that it would experience an interruption in support services, such as if the task order award under RFQ No. SP0600-26-Q-0810 were challenged through a bid protest that required a stay of performance.

18.     Guernsey will face challenges in mobilizing a workforce to its work sites in Alaska and can lose critical personnel resources while the U.S. Government Accountability Office ("GAO") is pending and the ongoing work is stayed, without some continuing level of effort supporting the DoD requirements for these installations. In that vein, if Guernsey succeeds in its GAO protest in light of the continued work pursuant to the override, it would be forced to incur significant workforce remobilization costs and administrative costs due to FWA, FGA, and JBER's geographically remote locations, and these costs may be passed on to the U.S. government.

19.     Because DLA elected to allow Guernsey's incumbent contract to expire in March 2026, Guernsey is currently performing no work under the Alaska UPSS requirement. During the pendency of the GAO protest, Guernsey nevertheless must continue to maintain relationships with and retain personnel possessing the specialized knowledge and experience necessary to support DLA's utility rate negotiations and rate case litigation in Alaska. If Guernsey prevails in its GAO protest and is returned to performance of this requirement, Guernsey will be required to rapidly remobilize those resources to support DLA's ongoing needs. The longer performance proceeds with another contractor during the protest period, the greater the risk that Guernsey will lose access to key personnel and institutional resources necessary to resume performance efficiently, thereby increasing remobilization costs and creating avoidable transition costs that may ultimately be borne by the Government.

20.     In other words, based on my professional experience, including overseeing and directing Guernsey's work under both the incumbent contract as well as Guernsey's prior DLA UPSS contracts, authorizing SMI's performance—which is irreversible and most likely subpar— during the pendency of the GAO protest will create adverse downstream consequences that in turn, will inevitably undermine the United States' best interest in the long term. Additionally, permitting SMI to continue its performance of the UPSS work will impair Guernsey's ability to support DLA, if its protest is sustained.

21.     Moreover, SMI's continued performance of the UPSS contract work would result in an unfair competitive advantage if the GAO protest results in a re-competition. If SMI is allowed to continue performance, it will be given access to non-public information that would allow it — but not Guernsey—to tailor its proposal for a re-competition.

I declare under penalty of perjury that the foregoing is true and correct.



Date: June 5, 2026

# Exhibit C

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| C.H. GUERNSEY & COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| THE UNITED STATES OF AMERICA | ) Judge _____ |
| | ) |
| Defendant. | ) |

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮, declare as follows:

1.     I am over the age of 18 and am competent to make this declaration based on my personal knowledge of the facts stated herein.

2.     I serve as a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at C.H. Guernsey & Company ("Guernsey") and have been employed by the company since 2008.

3.     I hold a PhD in Electric and Electronic Engineering, conferred by the University of Alaska Fairbanks in 2006. I am also a Certified Energy Manager, Certified Energy Auditor, Certified Measurement and Verification Professional, Certified Demand-Side Management Professional, and hold other energy and utilities-related professional credentials.

4.     As Guernsey's ▮▮▮▮▮▮▮▮▮▮▮▮, I have led the company's provision of long-term energy planning and energy support services to U.S. government customers, including Utilities Privatization Support Services ("UPSS") under U.S. Department of Defense, Defense Logistics Agency ("DLA") contracts at Fort Wainwright, Alaska ("FWA") and Fort Greely, Alaska ("FGA") and Joint Base Elmendorf Richardson ("JBER").

5.     Guernsey has provided such UPSS work for these Alaska military installations since 2007. Most recently, Guernsey performed UPSS work under Contract No.

1

47QRAA1900DM, Task Order No. SP0600-23-F-8353 (the "incumbent contract"), which was executed on January 9, 2023, and provided for a period of performance ending on January 8, 2026.

6.      I have been involved with the UPSS work for the three Alaska military installations since October 2008 when Guernsey hired me and I served as Guernsey's ███████████ for our most recent contract that ended on March 8, 2026.

7.      Until August 2014, I was stationed full-time at Fort Wainwright, embedded with the Fort Wainwright Utilities Privation team under the Department of Public Works. After August 2014, I continued to support the UPSS project and was appointed Guernsey's ███████████ on this project in October 2019.

8.      Throughout my career with Guernsey, supporting the UPSS contracts in Alaska, Guernsey has received several accolades for our support to Alaska military installations. The most prestigious one is the Award of Excellence coin from the, then, Assistant Secretary of the Army for Installation, Energy and Environment, Honorable Rachel Jacobson in May 2023 during her visit to Alaska ███████████████████ about the energy challenges and opportunities at Fort Wainwright and Fort Greely. I was also awarded the ███████████████████ ████████████ for our contributions to the energy and water projects at Fort Wainwright.

9.      On January 7, 2026, DLA and Guernsey executed Modification No. 14 to the incumbent contract. Through this modification, DLA exercised its right to extend the task order's period of performance under FAR 52.217-8 and as a result, the period of performance was extended for an additional two months, through March 8, 2026. Thus, Guernsey performed for more than three years under the incumbent contract.

10. Guernsey was informed by DLA on April 28, 2026, that it was not selected for the task order award under RFQ No. SP0600-26-Q-0810, which sought the same UPSS work that Guernsey had performed under the incumbent contract.

11. In my role, I have overseen Guernsey's provision of professional and technical services in support of DLA energy rate negotiation and litigation activities with the installations' Utility Systems Owner ("SO"), Doyon Utilities, LLC ("DU"). Rate negotiation refers to the process through which DLA and DU attempt to establish a new, mutually acceptable utilities rate. Irrespective of the outcome of rate negotiations, DU must still submit its proposed new rate to the Regulatory Commission of Alaska ("RCA"), a quasi-judicial state government agency, for final approval through the rate case litigation process. The rate negotiation period that precedes DU's submission of the new rate to RCA is referred to as the "pre-filing period."

12. Since beginning UPSS work in 2007, Guernsey has actively participated in six rate cases and accumulated and applied substantial institutional knowledge in conjunction with its personnel's subject matter expertise in providing rate case consulting support. Guernsey's deep institutional knowledge includes that of prior negotiations between DLA and DU as well as the RCA's workings and procedures.

13. On multiple occasions, including for the most recent 2023 test year rate case, Guernsey has assisted DLA in negotiating and securing extensions of time and other scheduling accommodations from DU, which are deviations from the response timelines set out in DLA and DU's contract.

14. Under the applicable Alaska regulations, rate cases are to be heard within 450 days of RCA's receipt of proposed new rates, although the regulations allow for extensions. The 2011 test year rate case that DU filed on 22 May 2012 was the most contentious of the six, and RCA

made the final ruling on 3 Nov 2015. It took a total of 1,259 days to settle this rate case. To the best of my knowledge the 2012 test year and the 2014 test year rate cases were also extended beyond the 450-day statutory limit.

15.    In my professional experience, having supported the incumbent contract for more than three years, successful coordination between DLA and DU is crucial for obtaining the best rate case results.

16.    To the best of my knowledge, the DU contract with the U.S. Government is the most complicated utilities contract in the DLA portfolio, if not the entire U.S. Department of Defense portfolio of utilities contracts, given the distinct nuances and complexities of the Alaska energy landscape, geographic location, and climate as well as the fact that the rates are determined by a hybrid Federal Acquisition Regulation (FAR)-based and regulated process.  The related rate negotiations with DU and rate case litigation before RCA are similarly complex.

17.    Of the at least six rate cases in which Guernsey has supported DLA since 2007, each one of them resulted in continued savings and improved energy management outcomes for the U.S. Government.

18.    Based on my prior dealings with DU and my knowledge of significant utility projects in the immediate region in 2025, Guernsey—and by extension, DLA—was aware that 2025 would likely be a "test year," which is the timeframe in which DU would evaluate their total cost to support DU's proposal of a new rate in 2026.

19.    There are several factors that drive cost increases for a utility. For this particular contract, the most important factor is the investment made in the utility system by DU. The utility must recover this investment, along with profits, from the customer and the only way to recover this investment is to file a rate case. For this particular contract, to ensure funds are programmed

in the defense budget, DU is required to obtain permission from the Government before making any new investment in the system.

20.    On July 8, 2020[1], DLA had approved at least one major project, requiring over $37.7 million in new capital investment, for the 2025 construction year. This one project alone would increase the rates by about $5.5 million per year on this contract. At the time of approval, DLA knew that 2025 would almost certainly be a rate case year and that DU would file a rate case as soon as practical after December 31, 2025.

21.    In fact, as part of Guernsey's monthly submittal report to DLA in March 2025, we advised DLA that 2025 would almost certainly be a test year and the Government team should start preparing for it. So, since March 2025, the 2025 test year discussion has been part of the weekly meeting agenda between DLA, Guernsey, and JBER and was covered in our monthly submittals to DLA from that point onward. Before Guernsey's performance concluded under the incumbent UPSS contract in March 2026, Guernsey personnel, as part of our weekly meetings, communicated to DLA on  March 5, 2026 that DU would likely provide DLA with a new rate proposal, thereby initiating a 60-day "pre-filing period," at some point between March and August of 2026.

22.    To the best of my knowledge, DLA knew that DU would propose a new rate in 2026, as a result of the 2025 test year activity, and that new rate negotiations were imminent.

23.    Based on my professional experience and prior dealings with DU, these pre-filing period negotiations take time beyond the minimum 60 days contemplated in the relevant agreement

---

[1] In 2020, the project was originally approved for about $20.4 million but over years as the project moved forward with design and refinements the budgeted cost kept increasing. The most recent budget for the project is $37.7 million. Doyon utilities kept DLA Energy informed and received their approval about project timeline and working budgets.

among the parties. It is common to request extensions for information sharing between the Government and DU—which Guernsey successfully did in prior rate cases—for example, 104 days for test year 2023, 184 days for test year 2020, and 145 days for test year 2017—prior to DU's submission of its proposed rates to RCA and triggering the 450-day window for the rate case to proceed.

24. To the best of my knowledge, during and after Guernsey's performance under the incumbent UPSS contract, DLA did not consider alternative solutions to ensure continuity of the known ongoing effort or avail itself of any procedural flexibilities or scheduling accommodations in the rate case process. Moreover, DLA did not prepare for the likelihood that it would experience an interruption in support services, such as if the task order award under RFQ No. SP0600-26-Q-0810 were challenged through a bid protest.

25. If DU's rate proposal had been transmitted to DLA while Guernsey was still performing its support services, Guernsey would have immediately begun preparing a response to DU to achieve the optimal negotiating position for the U.S. government.

26. In fact, as covered in our monthly submittals to DLA since March 2025, DLA knew Guernsey had already begun pre-negotiation work in anticipation of DU's submission of the new proposed rate prior to March 8, 2026, the date on which the incumbent contract ended.

27. Given the inherent complexities of rate negotiation with DU, and based on my extensive experience with the work required under the current UPSS contract, I estimate that ScottMadden, Inc. ("SMI"), the awardee under RFQ No. SP0600-26-Q-0810, will need at least two to four months alone to familiarize itself with DLA's past negotiations with DU. This ramp-up period will result in delay and will invariably compromise DLA's ability to proactively, versus reactively, negotiate with DU and achieve a favorable rate case outcome.

28.     Had Guernsey been responsible for the current pre-filing period, based on our prior experience in interfacing with DU, Guernsey could have successfully negotiated a sixty-day extension of the pre-filing period with DU to allow DLA a longer negotiation timeline.  Since DLA did not have Guernsey available after its contract concluded on March 8, 2026, DLA itself could have negotiated an extension of the pre-filing period to accommodate contract transition. This time would have likely allowed DLA to achieve a more favorable proposed rate for DU to submit to RCA, thereby reducing downstream costs associated with outstanding disputes or other issues inherent in a rate proposal that is not acceptable to both DLA and DU.

29.     In my professional experience and having supported the incumbent contract for more than nineteen years, I believe that successful coordination between DLA and DU, achieved within the pre-filing period, is critical to achieving cost savings and favorable utility services outcomes for the U.S. Government customers.

30.     In my professional experience and having supported the incumbent contract for more than nineteen years, I believe that the current stay override could cause significant cost impacts to the Department of Defense because any failure to mitigate scheduling with DU during the pre-filing period will necessarily place DLA at a disadvantage and make it less likely to obtain an optimal rate case settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 5, 2026

# Exhibit D

SP0600-26-Q-0810

PERFORMANCE-PRICE TRADE OFF
REQUEST FOR QUOTATION

FOR ACQUISITION MANAGEMENT SUPPORT SERVICES

GSA PROFESSIONAL SERVICES CATEGORY 541611

OCTOBER 17, 2025

**TECHNICAL, PRICE, AND REGULATORY SUPPORT
FOR UTILITIES PRIVATIZATION IN ALASKA**

DEFENSE LOGISTICS AGENCY ENERGY
UTILITY SERVICES
FORT BELVOIR VA 22060

TABLE OF CONTENTS

## Table of Contents

PERFORMANCE WORK STATEMENT ...................................................................................................3

CONTRACT LINE ITEMS ...............................................................................................................................10

FAR & DFARS CLAUSES INCOPORATED BY REFERENCE .........................................................10

FAR & DFARS CLAUSES AND PROVISIONS INCORPORATED IN FULL TEXT ...................................12

FAR PROVISION 52.212-1 INSTRUCTIONS TO OFFERORS – COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (SEP 2023) ...............................................................................................................................12
FAR 52.212-2 EVALUATION—COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (NOV 2021).......................16
FAR 52.212-3, OFFEROR REPRESENTATIONS AND CERTIFICATIONS—COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (MAR 2025) (DEVIATION 2025-O0003 & 2025-O0004) ...............................................................17
FAR 52.212-5 -- CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS—COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (MAR 2025) (DEVIATION 2025-O0003 & O0004) ...............................................................................................................................37
FAR 52.216-1 – TYPE OF CONTRACT (APR 1984).......................................................................44
FAR 52.217-5 -- EVALUATION OF OPTIONS (JUL 1990) ...............................................................44
FAR 52.217-8 -- OPTION TO EXTEND SERVICES (NOV 1999).......................................................45
FAR 52.217-9 -- OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000) ......................45
FAR 52.233-2 – SERVICE OF PROTEST (SEP 2006)......................................................................45
FAR 52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)........................................46
DFARS 252.204-7012 SAFEGUARDING COVERED DEFENSE INFORMATION AND CYBER INCIDENT REPORTING (MAY 2024) ...............................................................................................................................46
DFARS 252.204-7019 NOTICE OF NISTSP 800-171 DOD ASSESSMENT REQUIREMENTS (NOV 2023) ...................52
DFARS 252.204-7020 NIST SP 800-171 DOD ASSESSMENT REQUIREMENTS (NOV 2023) ...................54
DFARS 252.232-7003 ELECTRONIC SUBMISSION OF PAYMENT REQUESTS AND RECEIVING REPORTS (DEC 2018) 58
DFARS 252.232-7006 WIDE AREA WORKFLOW PAYMENT INSTRUCTIONS (JAN 2023) .......................60
DFARS 252.232-7007 LIMITATION OF GOVERNMENTS OBLIGATION (APR 2014)......................................63
DLAD 52.233-9001 DISPUTES AGREEMENT TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (JUN 2020)......65

QUOTE PREPARATION INSTRUCTIONS ................................................................................................66

BASIS FOR CONTRACT AWARD ...............................................................................................................69

ADDITIONAL INFORMATION TO OFFERORS .......................................................................................74

RFQ ATTACHMENTS LIST ...........................................................................................................................75

## PERFORMANCE WORK STATEMENT

### BACKGROUND

The Government has a requirement for Utilities Privatization Support Services (UPSS) for Fort Greely (FGA), Fort Wainwright (FWA), and Joint Base Elmendorf Richardson (JBER), Alaska. These support services will aid in the administration of existing Utility Services (US) contracts at each installation.

### SCOPE OF WORK

1.  **Overview** – The Contractor shall furnish the necessary personnel, material, and equipment (except as otherwise specified) to perform the following work. All professional and technical services shall be provided in a manner that assures timely completion of all assigned tasks.

    a)  **Parties:** The Contractor shall support the Contracting Officer (KO) and the Contracting Officer's Representative (COR) during the term of this task order. The KO function is performed by the Defense Logistics Agency Energy (DLA Energy). The Installation's COR assists the KO with Installation-specific requirements.

    b)  **Installations:** All services under this task order will be fully provided in support of the KOs and CORs for FGA, FWA, and JBER. Separate US contracts have been awarded at each installation. The Contractor may perform work remotely provided it is still responsible for being onsite for meetings that require in-person engagement. The local Installation will provide office space, workstations, and telephone service for the Contractor for any event that may require its on-site presence.

    c)  **Contract Term:** This task order consists of a base year that begins January 9, 2026 and includes four (4) one-year option periods. All services of this task order shall be provided during the base year and during any subsequently awarded option periods.

    d)  **Purpose:** The purpose of this task order is for the Contractor to provide support to the KO and CORs at each installation for all aspects of contract administration, to include but not limited to: reconciliation of Regulatory Commission of Alaska (RCA) rate filings, rate-based accounting, technical support, pricing support, cost estimating support, energy master planning, and litigation support (as necessary) of the US contracts awarded to the Installations' Utility Systems Owner (SO), Doyon Utilities, LLC (DU).

    e)  **US Contract Background:** The FAR Part 41 US contracts were awarded pursuant to 10 U.S.C § 2688. Performance under the 50-year contracts began on 15 August 2008 and encompasses the following services via privatized utility systems:

        1)  **FGA:** Electric distribution and emergency power generation; water production, treatment, and distribution; heating plant operation, steam distribution and

condensate collection systems; wastewater collection and treatment system.

2) **JBER:** Electric distribution, operation of Landfill Gas electric generation plant, emergency standby diesel power generation units; water dam and intake structure, treatment, and distribution system; natural gas distribution system; and wastewater collection system.

3) **FWA:** Operation of Central Heating and Power Plant, electric distribution system, steam distribution and condensate collection systems, water production, treatment, and distribution system; and wastewater collection system on cantonment and training areas.

**2. Support Services Requirements** – The scope of services consists of expert: technical, economic and financial analyses of the utility services contracts and tariffs; regulatory commission rate case analyses; utilities regulation and regulatory commission interaction; contract and rate case litigation support, analyses of asset transfers, future capital upgrades (FCU), renewals and replacements (R&R), new service connections, operations and maintenance activities, and energy related master planning and execution methodology.

All analyses, reports, and deliverables shall be free of any significant weaknesses, and provided timely 90% of the time. If the Contractor exceeds these performance measures, the Government will report a positive performance rating in procurement tools such as the Contractor Performance Assessment Reporting System (CPARS). If the Contractor fails to meet this timely reporting measure, the Government will report negative performance.

Support services shall include, but are not limited to, the tasks listed below. To aid offerors in developing proposals, each listed task provides the Government's estimate of the Contractor's level of effort relative to the task (e.g., relatively high, moderate, or low). Additionally, the Government is providing, as an attachment to this solicitation, a pricing matrix for offerors' input that contains the Government's estimated man-hour Level of Effort (LOE) for this requirement. However, these are only Government estimates. The Contractor will be responsible for proposing and providing an adequate amount of labor to meet all requirements of the task order as needed.

a) **Technical Assistance/Recommendations.**

1) **Project Review:** Perform technical review of FCU, R&R, and new service connections, including installation interface issues, design reviews, and master planning support. Provide consultation and recommendations to the Installation Department of Public Works (DPW) or Civil Engineer Squadron (CES) in review of RFP responses and five-year Annual Capital Upgrade Renewals and Replacements Plans (ACURRP) submitted by the SO.

The Government anticipates the level of effort for this task to be relatively moderate.

2) **Utility-Related Energy Master Plan:** Support the COR as needed in their inputs to

the installations regarding utility-related energy master plans to meet the federally mandated energy goals, strategic initiatives, policy changes, and long-term energy conservation, security, resiliency, and redundancy requirements for FWA, FGA and JBER. This process shall include assistance to FWA, FGA and JBER at meetings and conferences with stakeholders, installation leadership, SO, etc. This effort also includes but is not limited to technical analysis, preparation of various reports and papers to support master planning and execution efforts, and subject matter expertise to provide recommendations and courses of action as needed. Assist with the COR and KO's review of the SO's planned capital projects as they pertain to the implementation of various energy and water plans, assessments and vulnerability analysis, security, resiliency, and reliability plans. Assist the Installations in review of various energy alternatives including but not limited to fossil fuels, renewable energy, and alternative energy sources.

The Government anticipates the level of effort for this task to be relatively low.

3) **Utility Metering Control Data Acquisition, Information Management, Quality Assurance Tracking and Storage (For JBER Only):** Provide expertise in support of metering programs by reviewing meter applications, interpreting meter data, researching meter anomalies, and tracking of meter performance for industrial operations and housing utility services. Provide expertise in SCADA implementation and operability by evaluating, reviewing, and validating system design approach, cost, and functionality. GIS data quality control, tracking of annual submittal data versions, and active data retrieval to validate FCUs as well as R&R assets and equipment retirements.

The Government anticipates the level of effort for this task to be relatively low.

b) **Utilities Inventories.**

1) **Capital Improvements:** Provide necessary technical and pricing support for contract modifications resulting from system inventory changes associated with FCUs and R&R changes, and new connections.

The Government anticipates the level of effort for this task to be relatively low.

2) **Asset Transfers and Inventory Tracking:** Provide financial and technical support for analysis of SO's proposal for asset transfers to include Fair Market Value assessments, inventory validation, GIS submittal review, validation and information coordination and liaison services between the Government and the SO, ensuring data integrity and functionality.

The Government anticipates the level of effort for this task to be relatively low.

c) **Reporting and Documentation.**

1) **In-Process Review:** Participate in the monthly In-Process Review meetings at each Installation, as required. Participate in Periodic Management Review meetings, held on a semi-annual basis. Participate in weekly and monthly telephonic conferences, as needed.

The Government anticipates the level of effort for this task to be relatively moderate.

2) **Contract Data Requirements:** The contractor will advise the CORs and KOs in the oversight and evaluation of the SO's performance regarding the UP-contract's metrics, deliverables, and any SO proposed changes. The contractor shall also assist in ensuring the SO's annual GIS deliverables and Continuing Plant Inventory Records (CPIR) submittals, among others, comply with the National Association of Regulatory Utility Commissioner's (NARUC) Uniform System of Accounts (USOA).

The Government anticipates the level of effort for this task to be relatively moderate.

3) **Summary Reports:** Prepare monthly Summary Reports memorializing UP related activities, achieved milestones, and other important parameters. This report is intended to tie the contract administrative requirements with the technical "on the ground" requirements to ensure that the utility service contractor requirements and the Government requirements are being met.

   a) This report serves to identify any areas that may need closer scrutiny to ensure that both regulatory and statutory requirements are met as well as providing a technically effective result on the ground. Identifying problem areas early and documenting them helps to expedite resolution of issues quickly and prevent small problems from magnifying.

   b) The Contractor shall submit this report to the KO no later than one work week after the final working day of the preceding month.

The Government anticipates the level of effort for this task to be relatively low.

d) **Utility Related Economic & Financial Expertise.**

1) **Cost Estimating:** Advise and provide all necessary support to the COR and KO on all aspects of should-cost estimation and price analysis, as required, such that the KO has the information necessary to make determinations regarding price reasonableness. Provide financial validation of utility proposals and final costs, as well as financial impacts on tariff rates in future rate filings.

The Government anticipates the level of effort for this task to be relatively moderate.

2) **Invoice Review:** Provide occasional assistance to the COR and KO in reviewing invoices submitted by the SO to verify appropriate segregation of contract line items and to assure that charges are based upon prudent utility practices.

The Government anticipates the level of effort for this task to be relatively low.

3) **Business Case Analysis:** Occasionally analyze and advise on proposed modifications to existing US contracts. Evaluate business cases developed by the SO, and make recommendations to the COR, KO, and the Installation. Occasionally assist the Installations in developing independent business case analysis for various courses of action for potential utility changes or additions to the utility systems; provide recommendations and prepare technical analyses.

The Government anticipates the level of effort for this task to be relatively moderate.

4) **Tariff Review & Modification:** Provide financial analyses, cost verification and consulting services in support of any utility tariff modifications at all three installations, to include tariff impacts resulting from capital upgrades financed by the Government and those financed by the SO.

The Government anticipates the level of effort for this task to be relatively moderate.

5) **Specialized Project Financing:**

   a) Assist the Installation with analysis of SO-financed Utility Energy Saving Contracts (UESC) and power purchase agreements (PPA).

   b) Provide technical and financial analysis of projects and initiatives involving the SO and other statewide utility service providers.

The Government anticipates the level of effort for this task to be relatively low.

6) **Utility Business & Corporate Strategy Analysis:** To assist the Government in ensuring prudent utility management, assist the KOs in monitoring the SO's practices related to its financial management of its business to include reconciliation with current market, regulatory, and business environments and requirements. The contractor shall provide specialized, expert support and recommendations on these concepts as needed, which include, but are not limited to:

   a) Utility plant accounting
   b) Depreciation studies
   c) CPIR Updates
   d) Limited Liability Company (LLC) implications for a regulated utility's revenue requirements

**e)** Member Distributions
**f)** Corporate Tax strategies
**g)** Bonus Depreciation
**h)** Contribution In Aid of Construction (CIAC) payments and practices
**i)** Unique tax situations to include unique letter rulings

The Government anticipates the level of effort for this task to be relatively high.

e) **Regulatory Commission Interaction and Rate Case Litigation. The contractor must have a history of demonstrated subject matter expertise in the following areas:**

1) **Pre-Filing Expertise:** Provide estimates of possible range of rate increase and/or decrease, including analysis of causes and contributing factors. Supporting tasks include, but are not limited to:

   **a)** Assist KO and CORs with analysis and evaluation of the results of any audits performed under the US contracts.

   **b)** Provide specialized experts that are brought onboard to assist the Army and Air Force with regulatory rate cases with competencies in the areas of utility business and regulatory accounting principles, applicable FAR clauses, and tax requirements (Federal, State and local), among others.

   **c)** Support and attend meetings between the RCA, DPW/CES and regulatory attorneys.

The Government anticipates the level of effort for this task to be relatively moderate.

2) **Filing Expertise:** Plan and prepare court testimony and documentation. Supporting tasks include, but are not limited to:

   **a)** Working knowledge of all filings.

   **b)** Provide recommendations for discovery items, topics for interrogatory and depositions. Provide assistance drafting questions. Provide assistance in preparing and witnesses for interrogatory and deposition.

   **c)** As expert witnesses, provide written and oral testimony to the RCA on issues identified during the regulatory process. The UPSS contractor shall be staffed with expert witnesses on the topics of rate of return, cost of capital, cost of service, prudency of utility construction and practice, reasonableness of utility construction and practice, taxation, continuing property records, depreciation, cash working capital, overhead allocation, overhead analysis, and standard and accepted industry practices.

**d)** Attend meetings and discuss RCA filings with consumer advocates office.

The Government anticipates the level of effort for this task to be relatively low during periods when the SO does not have an active rate case pending before the public utility commission.  However, when a rate case is pending, the Government anticipates the level of effort for this task to be relatively high.

3) **Post Filing Expertise:** Provide an annual report on the rate case process addressing the following at a minimum: lessons learned; analyses of the strengths and weaknesses of the Government position; identification of issues on which the SO and the Government disagree; and identification of issues for litigation in Contract Claims Court.

The Government anticipates the level of effort for this task to be relatively low during periods when the UP Contractor does not have an active rate case pending before the public utility commission.  However, when a rate case is pending, the Government anticipates the level of effort for this task to be relatively high.

**3. Training.**  Contractor will complete all required annual Government trainings as well as any new trainings required to maintain Common Access Card privileges and/or DoD Contractor Card privileges, as required.  In addition to annual training requirements, the follow training are required but not limited to:

a) <u>Anti-Terrorism Level I Training</u>: All Contractor employees, to include subcontractor employees, requiring access to Army installations, facilities, and controlled access areas shall complete AT Level I awareness training within 30 **calendar** days after contract start date, effective date of incorporation of this requirement into the contract, or Contractor employee new hire, whichever is applicable.  The Contractor shall submit certificates of completion for each affected Contractor employee and subcontractor employee to the COR within ten (10) calendar days after completion of training by all employees and subcontractor personnel. https://jkodirect.jten.mil/Atlas2/page/login/Login.jsf

b) <u>iWATCH Training</u>: The Contractor shall brief all employees on the local iWATCH program (training standards provided by the requiring activity ATO).  This local developed training will be used to inform employees of the types of behavior to watch for and instruct employees to report suspicious activity to the COR.  This training shall be completed within 30 calendar days of contract award and within five (5) calendar days of new employees commencing performance with the results reported to the COR NLT ten (10) calendar days after contract award.  Slides can be obtained from the COR.

c) <u>OPSEC (Annually)</u>: Per AR 530-1, (Operations Security) Contractors for defense systems acquisition programs, as well as other types of Army contracts, shall practice OPSEC to protect classified, critical, and sensitive information for government contracts.  The RA OPSEC Officer has imposed that all contractor employees, to include subcontractor

employees, requiring a 90-day access or more to Army installations, facilities and controlled access areas shall complete the annual OPSEC awareness training (OPSEC Level 1). This annual training shall be completed within 30 calendar days after contract award and within 30 calendar days of new employees commencing performance. The contractor shall submit certificates of completion for each affected contractor and subcontractor employee to the COR or to the contracting officer (if a COR is not assigned), within 5 calendar days after completion of training. OPSEC awareness training is available at the following websites: https://securityawareness.usalearning.gov/ opsec/index.htm

d) <u>Automation Systems Access:</u> The Contractor shall provide competent individuals responsible for tasks related to electronic management systems as specified in this Contract. All personnel operating **Automated** Data Processing (ADP) equipment to process information shall meet the provisions of AR 25-2. Upon approval and prior to being allowed access to the system, Contractor personnel must have a valid security background check before being granted Common Access Card (CAC) to be issued Pacific LAN War Network (PLWN) ADP Log On credentials. Contractor personnel required to use Government computers will also be required to annually complete Government-defined Information Assurance Awareness User Training. The Contractor shall take the necessary actions through KO to gain the ADP access required to perform the work specified in this Contract.

## CONTRACT LINE ITEMS

Contract Line Items (CLIN)s can be found at Attachment 1.

## FAR & DFARS CLAUSES INCOPORATED BY REFERENCE

The terms and conditions of an Offeror's base contract are applicable to any resultant task order under this RFQ. The following clauses are in addition to the terms and conditions of the base contract and are incorporated by reference. Full text versions can be accessed at URL: http://www.acquisition.gov

| Clause Number | Title |
|---|---|
| 52.202-1 | Definitions (Jun 2020) |
| 52.203-11 | Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions (Sep 2024) |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions (Jun 2020) |
| 52.203-16 | Preventing Personal Conflicts of Interest (Jun 2020) |
| 52.204-13 | System for Award Management Maintenance (Oct 2018) |
| 52.204-16 | Commercial and Government Entity Code Reporting (Aug 2020) |

| 52.204-17 | Ownership or Control of Offeror (Aug 2020) |
| 52.204-18 | Commercial and Government Entity Code Maintenance (Aug 2020) |
| 52.204-19 | Incorporation by Reference of Representations and Certifications (Dec 2014) |
| 52.204-21 | Basic Safeguarding of Covered Contractor Information Systems (Nov 2021) |
| 52.204-22 | Alternative Line Item Proposal. (Jan 2017) |
| 52.204-23 | Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab Covered Entities (Dec 2023) |
| 52.204-24 | Representation Regarding Certain Telecommunications and Video Surveillance Services or Equipment (Nov 2021) |
| 52.204-27 | Prohibition on a ByteDance Covered Application (Jun 2023) |
| 52.212-4 | Contract Terms and Conditions – Commercial items (Nov 2023) |
| 52.217-5 | Evaluation of Options (Jul 1990) |
| 52.232-18 | Availability of Funds (Apr 1984) |
| 52.232-39 | Unenforceability of Unauthorized Obligations (Jun 2013) |
| 52.237-2 | Protection of Government Buildings, Equipment, and Vegetation (Apr 1984) |
| 52.243-1 Alt III | Changes – Fixed-Price (Apr 1984) |
| 52.245-1 | Government Property (Sep 2021) |
| 52.245-9 | Use and Charges (Apr 2012) |
| 52.246-4 | Inspection of Services – Fixed Price (Aug 1996) |
| 52.252-1 | Solicitation Provisions Incorporated by Reference (Feb 1998) |
| 252.201-7000 | Contracting Officer's Representative (Dec 1991) |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights (Dec 2022) |
| 252.203-7003 | Agency Office of the Inspector General (Aug 2019) |
| 252.203-7005 | Representation Relating to Compensation of Former DoD Officials (Sep 2022) |
| 252.204-7000 | Disclosure of Information (Oct 2016) |
| 252.204-7002 | Payment for Sub-line Items Not separately Priced (Apr 2020) |
| 252.204-7003 | Control of Government Personnel Work Product (Apr 1992) |
| 252.204-7004 | Antiterrorism Awareness Training for Contractors (Jan 2023) |
| 252.204-7008 | Compliance with Safeguarding Covered Defense Information Controls (Oct 2016) |
| 252.204-7009 | Limitations on the Use or Disclosure of Third-Party Contractor Reported Cyber Incident Information (Jan 2023) |
| 252.204-7014 | Limitations on the Use or Disclosure of Information by Litigation Support Contractors (Jan 2023) |
| 252.204-7015 | Notice of Authorized Disclosure of Information for Litigation Support (Jan 2023) |
| 252.209-7004 | Subcontracting with Firms that are owned or controlled by the Government of a Country that is a State Sponsor of Terrorism (May 2019) |
| 252.227-7015 | Technical Data – Commercial Items (Jan 2025) |
| 252.232-7003 | Electronic Submission of Payment Requests and Receiving Reports (Dec 2018) |

| 252.232-7010 | Levies on Contract Payments (Dec 2006) |
| 252.239-7001 | Information Assurance Contractor Training and Certification (Jan 2008) |
| 252.243-7001 | Pricing of Contract Modifications (Dec 1991) |

## FAR & DFARS CLAUSES AND PROVISIONS INCORPORATED IN FULL TEXT

**FAR Provision 52.212-1 Instructions to Offerors – Commercial Products and Commercial Services (Sep 2023)**

(a) North American Industry Classification System (NAICS) code and small business size standard. The NAICS code(s) and small business size standard(s) for this acquisition appear elsewhere in the solicitation. However, the small business size standard for a concern that submits an offer, other than on a construction or service acquisition, but proposes to furnish an end item that it did not itself manufacture, process, or produce is 500 employees, or 150 employees for information technology value-added resellers under NAICS code 541519, if the acquisition—

  (1) Is set aside for small business and has a value above the simplified acquisition threshold;

  (2) Uses the HUBZone price evaluation preference regardless of dollar value, unless the offeror waives the price evaluation preference; or

  (3) Is an 8(a), HUBZone, service-disabled veteran-owned, economically disadvantaged women-owned, or women-owned small business set-aside or sole-source award regardless of dollar value.

(b) Submission of offers. Submit signed and dated offers to the office specified in this solicitation at or before the exact time specified in this solicitation. Offers may be submitted on the SF 1449, letterhead stationery, or as otherwise specified in the solicitation. As a minimum, offers must show—

  (1) The solicitation number;

  (2) The time specified in the solicitation for receipt of offers;

  (3) The name, address, and telephone number of the offeror;

  (4) A technical description of the items being offered in sufficient detail to evaluate compliance with the requirements in the solicitation. This may include product literature, or other documents, if necessary;

  (5) Terms of any express warranty;

  (6) Price and any discount terms;

(7) "Remit to" address, if different than mailing address;

(8) A completed copy of the representations and certifications at Federal Acquisition Regulation (FAR) 52.212-3 (see FAR 52.212-3(b) for those representations and certifications that the offeror shall complete electronically);

(9) Acknowledgment of Solicitation Amendments;

(10) Past performance information, when included as an evaluation factor, to include recent and relevant contracts for the same or similar items and other references (including contract numbers, points of contact with telephone numbers and other relevant information); and

(11) If the offer is not submitted on the SF 1449, include a statement specifying the extent of agreement with all terms, conditions, and provisions included in the solicitation. Offers that fail to furnish required representations or information, or reject the terms and conditions of the solicitation may be excluded from consideration.

(12) Offerors shall submit its' offer as follows:

    (A) Submit electronic copy via the GSA eBuy Portal

    (B) Send a notification of offer via email to all three following addresses:

        edward.wolfe@dla.mil

        laura.c.taylor@dla.mil

    (C) Hard copy (i.e., paper or CD disks) submissions are not authorized under this RFQ.

    (D) Facsimile submissions are not authorized under this RFQ.

(c) Period for acceptance of offers. The offeror agrees to hold the prices in its offer firm for 30 calendar days from the date specified for receipt of offers, unless another time period is specified in an addendum to the solicitation.

(d) Product samples. When required by the solicitation, product samples shall be submitted at or prior to the time specified for receipt of offers. Unless otherwise specified in this solicitation, these samples shall be submitted at no expense to the Government, and returned at the sender's request and expense, unless they are destroyed during preaward testing.

(e) Multiple offers. Offerors are encouraged to submit multiple offers presenting alternative terms and conditions, including alternative line items (provided that the alternative line items are consistent with FAR subpart 4.10), or alternative commercial products or commercial services for satisfying the requirements of this solicitation. Each offer submitted will be evaluated separately.

(f) Late submissions, modifications, revisions, and withdrawals of offers.

(1) Offerors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation. If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office on the date that offers or revisions are due.

(2) (i) Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and

    (A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

    (B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

    (C) If this solicitation is a request for proposals, it was the only proposal received.

(ii) However, a late modification of an otherwise successful offer, that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

(3) Acceptable evidence to establish the time of receipt at the Government installation includes the time/date stamp of that installation on the offer wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.

(4) If an emergency or unanticipated event interrupts normal Government processes so that offers cannot be received at the Government office designated for receipt of offers by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation or other notice of an extension of the closing date, the time specified for receipt of offers will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

(5) Offers may be withdrawn by written notice received at any time before the exact time set for receipt of offers. Oral offers in response to oral solicitations may be withdrawn orally. If the solicitation authorizes facsimile offers, offers may be withdrawn via facsimile received at any time before the exact time set for receipt of offers, subject to the conditions specified in the solicitation concerning facsimile offers. An offer may be withdrawn in person by an offeror or its authorized representative if, before the exact

time set for receipt of offers, the identity of the person requesting withdrawal is established and the person signs a receipt for the offer.

(g) Contract award (not applicable to Invitation for Bids). The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

(h) Multiple awards. The Government may accept any item or group of items of an offer, unless the offeror qualifies the offer by specific limitations. Unless otherwise provided in the Schedule, offers may not be submitted for quantities less than those specified. The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit prices offered, unless the offeror specifies otherwise in the offer.

(i) Availability of requirements documents cited in the solicitation.

  (1) (i) The GSA Index of Federal Specifications, Standards and Commercial Item Descriptions, FPMR Part 101–29, and copies of Federal specifications, standards, and product descriptions can be downloaded from the ASSIST website at https://assist.dla.mil.

  (ii) If the General Services Administration, Department of Agriculture, or Department of Veterans Affairs issued this solicitation, a copy of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained from the address in paragraph (i)(1)(i) of this provision.

  (2) Most unclassified Defense specifications and standards may be downloaded from the ASSIST website at https://assist.dla.mil.

  (3) Defense documents not available from the ASSIST website may be requested from the Defense Standardization Program Office by—

    (i) Using the ASSIST feedback module ( https://assist.dla.mil/feedback); or

    (ii) Contacting the Defense Standardization Program Office by telephone at 571–767–6688 or email at assisthelp@dla.mil.

  (4) Nongovernment (voluntary) standards must be obtained from the organization responsible for their preparation, publication, or maintenance.

(j) Unique entity identifier.(Applies to all offers that exceed the micro-purchase threshold, and offers at or below the micro-purchase threshold if the solicitation requires the Contractor to be registered in the System for Award Management (SAM).) The Offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "Unique Entity

Identifier" followed by the unique entity identifier that identifies the Offeror's name and address. The Offeror also shall enter its Electronic Funds Transfer (EFT) indicator, if applicable. The EFT indicator is a four-character suffix to the unique entity identifier. The suffix is assigned at the discretion of the Offeror to establish additional SAM records for identifying alternative EFT accounts (see FAR subpart 32.11) for the same entity. If the Offeror does not have a unique entity identifier, it should contact the entity designated at www.sam.gov for unique entity identifier establishment directly to obtain one. The Offeror should indicate that it is an offeror for a Government contract when contacting the entity designated at www.sam.gov for establishing the unique entity identifier.

(k) [Reserved]

(l) Debriefing. If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:

(1) The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.

(2) The overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror.

(3) The overall ranking of all offerors, when any ranking was developed by the agency during source selection.

(4) A summary of the rationale for award;

(5) For acquisitions of commercial products, the make and model of the product to be delivered by the successful offeror.

(6) Reasonable responses to relevant questions posed by the debriefed offeror as to whether source selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency.

(End of provision)

**FAR 52.212-2 Evaluation—Commercial Products and Commercial Services (Nov 2021)**

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate offers:

Factor 1: Technical Acceptability

Factor 2: Performance Confidence Assessment
Factor 3: Price

An offeror's technical proposal must be rated acceptable to proceed with the evaluation. The Performance Confidence Assessment is equally important as Technical Acceptability. Technical Acceptability and Performance Confidence Assessment, when combined, are significantly more important than Price.

(b) *Options*. The Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced. Evaluation of options shall not obligate the Government to exercise the option(s).

(c) A written notice of award or acceptance of an offer, mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer, shall result in a binding contract without further action by either party. Before the offer's specified expiration time, the Government may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award.

(End of provision)

### FAR 52.212-3, Offeror Representations and Certifications—Commercial Products and Commercial Services (MAR 2025) (DEVIATION 2025-O0003 & 2025-O0004)

The Offeror shall complete only paragraph (b) of this provision if the Offeror has completed the annual representations and certification electronically in the System for Award Management (SAM) accessed through https://www.sam.gov. If the Offeror has not completed the annual representations and certifications electronically, the Offeror shall complete only paragraphs (c) through (v) of this provision.

(a) *Definitions*. As used in this provision—

*Covered telecommunications equipment or services* has the meaning provided in the clause 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment.

*Economically disadvantaged women-owned small business (EDWOSB) concern* means a small business concern that is at least 51 percent directly and unconditionally owned by, and the management and daily business operations of which are controlled by, one or more women who are citizens of the United States and who are economically disadvantaged in accordance with 13 CFR part 127, and the concern is certified by SBA or an approved third-

party certifier in accordance with 13 CFR 127.300. It automatically qualifies as a women-owned small business eligible under the WOSB Program.

*Forced or indentured child labor* means all work or service—

    (1) Exacted from any person under the age of 18 under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily; or

    (2) Performed by any person under the age of 18 pursuant to a contract the enforcement of which can be accomplished by process or penalties.

*Highest-level owner* means the entity that owns or controls an immediate owner of the offeror, or that owns or controls one or more entities that control an immediate owner of the offeror. No entity owns or exercises control of the highest level owner.

*Immediate owner* means an entity, other than the offeror, that has direct control of the offeror. Indicators of control include, but are not limited to, one or more of the following: ownership or interlocking management, identity of interests among family members, shared facilities and equipment, and the common use of employees.

*Inverted domestic corporation*, means a foreign incorporated entity that meets the definition of an inverted domestic corporation under 6 U.S.C. 395(b), applied in accordance with the rules and definitions of 6 U.S.C. 395(c).

*Manufactured end product* means any end product in product and service codes (PSCs) 1000-9999, except—

    (1) PSC 5510, Lumber and Related Basic Wood Materials;

    (2) Product or Service Group (PSG) 87, Agricultural Supplies;

    (3) PSG 88, Live Animals;

    (4) PSG 89, Subsistence;

    (5) PSC 9410, Crude Grades of Plant Materials;

    (6) PSC 9430, Miscellaneous Crude Animal Products, Inedible;

    (7) PSC 9440, Miscellaneous Crude Agricultural and Forestry Products;

    (8) PSC 9610, Ores;

    (9) PSC 9620, Minerals, Natural and Synthetic; and

(10) PSC 9630, Additive Metal Materials.

*Place of manufacture* means the place where an end product is assembled out of components, or otherwise made or processed from raw materials into the finished product that is to be provided to the Government. If a product is disassembled and reassembled, the place of reassembly is not the place of manufacture.

*Predecessor* means an entity that is replaced by a successor and includes any predecessors of the predecessor.

*Reasonable inquiry* has the meaning provided in the clause 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment.

*Restricted business operations* means business operations in Sudan that include power production activities, mineral extraction activities, oil-related activities, or the production of military equipment, as those terms are defined in the Sudan Accountability and Divestment Act of 2007 (Pub. L. 110-174). Restricted business operations do not include business operations that the person (as that term is defined in Section 2 of the Sudan Accountability and Divestment Act of 2007) conducting the business can demonstrate—

(1) Are conducted under contract directly and exclusively with the regional government of southern Sudan;

(2) Are conducted pursuant to specific authorization from the Office of Foreign Assets Control in the Department of the Treasury, or are expressly exempted under Federal law from the requirement to be conducted under such authorization;

(3) Consist of providing goods or services to marginalized populations of Sudan;

(4) Consist of providing goods or services to an internationally recognized peacekeeping force or humanitarian organization;

(5) Consist of providing goods or services that are used only to promote health or education; or

(6) Have been voluntarily suspended.

*Sensitive technology—*

(1) Means hardware, software, telecommunications equipment, or any other technology that is to be used specifically—

(i) To restrict the free flow of unbiased information in Iran; or

   (ii) To disrupt, monitor, or otherwise restrict speech of the people of Iran; and

 (2) Does not include information or informational materials the export of which the President does not have the authority to regulate or prohibit pursuant to section 203(b)(3)of the International Emergency Economic Powers Act ( 50 U.S.C. 1702(b)(3)).

*Service-disabled veteran-owned small business (SDVOSB) concern* means a small business concern—

 (1) (i) Not less than 51 percent of which is owned and controlled by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

   (ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran; or

 (2) A small business concern eligible under the SDVOSB Program in accordance with 13 CFR part 128 (see subpart 19.14).

 (3) Service-disabled veteran, as used in this definition, means a veteran as defined in 38 U.S.C. 101(2), with a disability that is service connected, as defined in 38 U.S.C. 101(16), and who is registered in the Beneficiary Identification and Records Locator Subsystem, or successor system that is maintained by the Department of Veterans Affairs' Veterans Benefits Administration, as a service-disabled veteran.

*Service-disabled veteran-owned small business (SDVOSB) concern eligible under the SDVOSB Program* means an SDVOSB concern that—

 (1) Effective January 1, 2024, is designated in the System for Award Management (SAM) as certified by the Small Business Administration (SBA) in accordance with 13 CFR 128.300; or

 (2) Has represented that it is an SDVOSB concern in SAM and submitted a complete application for certification to SBA on or before December 31, 2023.

*Service-disabled veteran-owned small business (SDVOSB) Program* means a program that authorizes contracting officers to limit competition, including award on a sole-source basis, to SDVOSB concerns eligible under the SDVOSB Program.

*Small business concern*—

(1) Means a concern, including its affiliates, that is independently owned and operated, not dominant in its field of operation, and qualified as a small business under the criteria in 13 CFR part 121 and size standards in this solicitation.

(2) Affiliates, as used in this definition, means business concerns, one of whom directly or indirectly controls or has the power to control the others, or a third party or parties control or have the power to control the others. In determining whether affiliation exists, consideration is given to all appropriate factors including common ownership, common management, and contractual relationships. SBA determines affiliation based on the factors set forth at 13 CFR 121.103.

*Small disadvantaged business concern*, consistent with 13 CFR 124.1001, means a small business concern under the size standard applicable to the acquisition, that—

(1) Is at least 51 percent unconditionally and directly owned (as defined at 13 CFR 124.105) by—

(i) One or more socially disadvantaged (as defined at 13 CFR 124.103) and economically disadvantaged (as defined at 13 CFR 124.104) individuals who are citizens of the United States; and

(ii) Each individual claiming economic disadvantage has a net worth not exceeding the threshold at 13 CFR 124.104(c)(2) after taking into account the applicable exclusions set forth at 13 CFR124.104(c)(2); and

(2) The management and daily business operations of which are controlled (as defined at 13.CFR 124.106) by individuals, who meet the criteria in paragraphs (1)(i) and (ii) of this definition.

*Subsidiary* means an entity in which more than 50 percent of the entity is owned—

(1) Directly by a parent corporation; or

(2) Through another subsidiary of a parent corporation

*Successor* means an entity that has replaced a predecessor by acquiring the assets and carrying out the affairs of the predecessor under a new name (often through acquisition or merger). The term "successor" does not include new offices/divisions of the same company or a company that only changes its name. The extent of the responsibility of the successor for the liabilities of the predecessor may vary, depending on State law and specific circumstances.

*Veteran-owned small business concern* means a small business concern—

    (1) Not less than 51 percent of which is owned and controlled by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

    (2) The management and daily business operations of which are controlled by one or more veterans.

*Women-owned business concern* means a concern which is at least 51 percent owned by one or more women; or in the case of any publicly owned business, at least 51 percent of its stock is owned by one or more women; and whose management and daily business operations are controlled by one or more women

*Women-owned small business concern* means a small business concern—

    (1) That is at least 51 percent owned by one or more women; or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

    (2) Whose management and daily business operations are controlled by one or more women.

*Women-owned small business (WOSB) concern eligible under the WOSB Program* (in accordance with 13 CFR part 127), means a small business concern that is at least 51 percent directly and unconditionally owned by, and the management and daily business operations of which are controlled by, one or more women who are citizens of the United States, and the concern is certified by SBA or an approved third-party certifier in accordance with 13 CFR 127.300.

(b) (1) *Annual Representations and Certifications.* Any changes provided by the Offeror in paragraph (b)(2) of this provision do not automatically change the representations and certifications in SAM.

(2) The offeror has completed the annual representations and certifications electronically in SAM accessed through http://www.sam.gov. After reviewing SAM information, the Offeror verifies by submission of this offer that the representations and certifications currently posted electronically at FAR 52.212-3, Offeror Representations and Certifications-Commercial Products and Commercial Services, have been entered or updated in the last 12 months, are current, accurate, complete, and applicable to this solicitation (including the business size standard(s) applicable to the NAICS code(s) referenced for this solicitation), at the time this offer is submitted and are incorporated in this offer by reference (see FAR 4.1201), except for paragraphs _____.

    *[Offeror to identify the applicable paragraphs at (c) through (v) of this provision that the offeror has completed for the purposes of this solicitation only, if any.*

*These amended representation(s) and/or certification(s) are also incorporated in this offer and are current, accurate, and complete as of the date of this offer.*

*Any changes provided by the offeror are applicable to this solicitation only, and do not result in an update to the representations and certifications posted electronically on SAM.*]

(c) Offerors must complete the following representations when the resulting contract is for supplies to be delivered or services to be performed in the United States or its outlying areas, or when the contracting officer has applied part 19 in accordance with 19.000(b)(1)(ii). Check all that apply.

(1) *Small business concern.* The offeror represents as part of its offer that—

(i) It □ is, □ is not a small business concern; or

(ii) It □ is, □ is not a small business joint venture that complies with the requirements of 13 CFR 121.103(h) and 13 CFR 125.8(a) and (b). [ *The offeror shall enter the name and unique entity identifier of each party to the joint venture:* _____.]

(2) *Veteran-owned small business concern.* [*Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.*] The offeror represents as part of its offer that it □ is, □ is not a veteran-owned small business concern.

(3) *SDVOSB concern.* [*Complete only if the offeror represented itself as a veteran-owned small business concern in paragraph (c)(2) of this provision.*] The offeror represents that it □ is, □ is not an SDVOSB concern.

(4) *SDVOSB concern joint venture eligible under the SDVOSB Program.* The offeror represents that it □ is, □ is not an SDVOSB joint venture eligible under the SDVOSB Program that complies with the requirements of 13 CFR 128.402. [*Complete only if the offeror represented itself as an SDVOSB concern in paragraph (c)(3) of this provision.*] [*The offeror shall enter the name and unique entity identifier of each party to the joint venture:* _____.]

(5) *Small disadvantaged business concern.* [*Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.*] The offeror represents that it □ is, □ is not a small disadvantaged business concern as defined in 13 CFR 124.1001.

(6) *Women-owned small business concern.* [*Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.*] The offeror represents that it □ is, □ is not a women-owned small business concern.

(7) *WOSB joint venture eligible under the WOSB Program.* The offeror represents that it □ is, □ is not a joint venture that complies with the requirements of 13 CFR

127.506(a) through (c). [ *The offeror shall enter the name and unique entity identifier of each party to the joint venture:* _____.]

(8) *Economically disadvantaged women-owned small business (EDWOSB) joint venture.* The offeror represents that it □ is, □ is not a joint venture that complies with the requirements of 13 CFR 127.506(a) through (c). [*The offeror shall enter the name and unique entity identifier of each party to the joint venture:* _____.]

**Note to paragraphs (c)(9) and (10):** Complete paragraphs (c)(9) and (10) only if this solicitation is expected to exceed the simplified acquisition threshold.

(9) *Women-owned business concern (other than small business concern).* [*Complete only if the offeror is a women-owned business concern and did not represent itself as a small business concern in paragraph (c)(1) of this provision.*] The offeror represents that it □ is a women-owned business concern.

(10) *Tie bid priority for labor surplus area concerns.* If this is an invitation for bid, small business offerors may identify the labor surplus areas in which costs to be incurred on account of manufacturing or production (by offeror or first-tier subcontractors) amount to more than 50 percent of the contract price:_____

(11) *HUBZone small business concern.* [*Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.*] The offeror represents, as part of its offer, that–

(i) It □ is, □ is not a HUBZone small business concern listed, on the date of this representation, as having been certified by SBA as a HUBZone small business concern in the Dynamic Small Business Search and SAM, and will attempt to maintain an employment rate of HUBZone residents of 35 percent of its employees during performance of a HUBZone contract (see 13 CFR 126.200(e)(1)); and

(ii) It □ is, □ is not a HUBZone joint venture that complies with the requirements of 13 CFR 126.616(a) through (c). [*The offeror shall enter the name and unique entity identifier of each party to the joint venture:* _____.] Each HUBZone small business concern participating in the HUBZone joint venture shall provide representation of its HUBZone status.

(d) [Reserved]

(e) *Certification Regarding Payments to Influence Federal Transactions (31 http://uscode.house.gov/ U.S.C. 1352).* (Applies only if the contract is expected to exceed $150,000.) By submission of its offer, the offeror certifies to the best of its knowledge and belief that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress or an employee of a Member of Congress on

his or her behalf in connection with the award of any resultant contract. If any registrants under the Lobbying Disclosure Act of 1995 have made a lobbying contact on behalf of the offeror with respect to this contract, the offeror shall complete and submit, with its offer, OMB Standard Form LLL, Disclosure of Lobbying Activities, to provide the name of the registrants. The offeror need not report regularly employed officers or employees of the offeror to whom payments of reasonable compensation were made.

(f) *Buy American Certificate*. (Applies only if the clause at Federal Acquisition Regulation (FAR) 52.225-1, Buy American-Supplies, is included in this solicitation.)

(1) (i) The Offeror certifies that each end product, except those listed in paragraph (f)(2) of this provision, is a domestic end product and that each domestic end product listed in paragraph (f)(3) of this provision contains a critical component.

(ii) The Offeror shall list as foreign end products those end products manufactured in the United States that do not qualify as domestic end products. For those foreign end products that do not consist wholly or predominantly of iron or steel or a combination of both, the Offeror shall also indicate whether these foreign end products exceed 55 percent domestic content, except for those that are COTS items. If the percentage of the domestic content is unknown, select "no".

(iii) The Offeror shall separately list the line item numbers of domestic end products that contain a critical component (see FAR 25.105).

(iv) The terms "commercially available off-the-shelf (COTS) item," "critical component," "domestic end product," "end product," "foreign end product," and "United States" are defined in the clause of this solicitation entitled "Buy American-Supplies."

(2) Foreign End Products:

*[List as necessary by Line Item No., Country of Origin, Exceeds 55% domestic content (yes/no]*

(3) Domestic end products containing a critical component:

Line Item No. ____

*[List as necessary]*

(4) The Government will evaluate offers in accordance with the policies and procedures of FAR part 25.

(g) (1) *Buy American-Free Trade Agreements-Israeli Trade Act Certificate.* (Applies only if the clause at FAR 52.225-3, Buy American-Free Trade Agreements-Israeli Trade Act, is included in this solicitation.)

    (i) (A) The Offeror certifies that each end product, except those listed in paragraph (g)(1)(ii) or (iii) of this provision, is a domestic end product and that each domestic end product listed in paragraph (g)(1)(iv) of this provision contains a critical component.

        (B) The terms "Bahraini, Moroccan, Omani, Panamanian, or Peruvian end product," "commercially available off-the-shelf (COTS) item," "critical component," "domestic end product," "end product," "foreign end product," "Free Trade Agreement country," "Free Trade Agreement country end product," "Israeli end product," and "United States" are defined in the clause of this solicitation entitled "Buy American-Free Trade Agreements-Israeli Trade Act."

    (ii) The Offeror certifies that the following supplies are Free Trade Agreement country end products (other than Bahraini, Moroccan, Omani, Panamanian, or Peruvian end products) or Israeli end products as defined in the clause of this solicitation entitled "Buy American-Free Trade Agreements-Israeli Trade Act."

    Free Trade Agreement Country End Products (Other than Bahraini, Moroccan, Omani, Panamanian, or Peruvian End Products) or *Israeli End Products*:

        *[List as necessary by Line Item No. and Country of Origin]*

    (iii) The Offeror shall list those supplies that are foreign end products (other than those listed in paragraph (g)(1)(ii) of this provision) as defined in the clause of this solicitation entitled "Buy American-Free Trade Agreements-Israeli Trade Act." The Offeror shall list as other foreign end products those end products manufactured in the United States that do not qualify as domestic end products. For those foreign end products that do not consist wholly or predominantly of iron or steel or a combination of both, the Offeror shall also indicate whether these foreign end products exceed 55 percent domestic content, except for those that are COTS items. If the percentage of the domestic content is unknown, select "no".

    *Other Foreign End Products*:

    *[List as necessary by Line Item No., Country of Origin, Exceeds 55% domestic content (yes/no)*

(iv) The Offeror shall list the line item numbers of domestic end products that contain a critical component (see FAR 25.105).

Line Item No. ____

[List as necessary]

(v) The Government will evaluate *offers* in accordance with the policies and procedures of FAR part 25.

(2) *Buy American-Free Trade Agreements-Israeli Trade Act Certificate, Alternate II.* If Alternate II to the clause at FAR 52.225-3 is included in this solicitation, substitute the following paragraph (g)(1)(ii) for paragraph (g)(1)(ii) of the basic provision:

(g)(1)(ii) The offeror certifies that the following supplies are Israeli end products as defined in the clause of this solicitation entitled "Buy American—Free Trade Agreements—Israeli Trade Act":

*Israeli End Products*:

[*List as necessary*]

(3) *Buy American-Free Trade Agreements-Israeli Trade Act Certificate, Alternate III.* If Alternate III to the clause at 52.225-3 is included in this solicitation, substitute the following paragraphs (g)(1)(i)(B) and (g)(1)(ii) for paragraphs (g)(1)(i)(B) and (g)(1)(ii) of the basic provision:

(g)(1)(i)(B) The terms "Korean end product", "commercially available off-the-shelf (COTS) item," "critical component," "domestic end product," "end product," "foreign end product," "Free Trade Agreement country," "Free Trade Agreement country end product," "Israeli end product," and "United States" are defined in the clause of this solicitation entitled "Buy American—Free Trade Agreements—Israeli Trade Act."

(g)(1)(ii) The Offeror certifies that the following supplies are Korean end products or Israeli end products as defined in the clause of this solicitation entitled "Buy American—Free Trade Agreements—Israeli Trade Act":

*Korean End Products or Israeli End Products:*

[*List as necessary*]

(4) *Trade Agreements Certificate.* (Applies only if the clause at FAR 52.225-5, Trade Agreements, is included in this solicitation.)

(i) The offeror certifies that each end product, except those listed in paragraph (g)(4)(ii) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled "Trade Agreements."

(ii) The offeror shall list as other end products those end products that are not U.S.-made or designated country end products.

*Other End Products*:

*[List as necessary]*

(iii) The Government will evaluate offers in accordance with the policies and procedures of FAR part 25. For line items covered by the WTO GPA, the Government will evaluate offers of U.S.-made or designated country end products without regard to the restrictions of the Buy American statute. The Government will consider for award only offers of U.S.-made or designated country end products unless the Contracting Officer determines that there are no offers for such products or that the offers for such products are insufficient to fulfill the requirements of the solicitation.

(h) *Certification Regarding Responsibility Matters (Executive Order 12689).* (Applies only if the contract value is expected to exceed the simplified acquisition threshold.) The offeror certifies, to the best of its knowledge and belief, that the offeror and/or any of its principals–

(1) □ Are, □ are not presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency;

(2) □ Have, □ have not, within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a Federal, state or local government contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property;

(3) □ Are, □ are not presently indicted for, or otherwise criminally or civilly charged by a Government entity with, commission of any of these offenses enumerated in paragraph (h)(2) of this clause; and

(4) □ Have, □ have not, within a three-year period preceding this offer, been notified of any delinquent Federal taxes in an amount that exceeds the threshold at 9.104-5(a)(2) for which the liability remains unsatisfied.

(i) Taxes are considered delinquent if both of the following criteria apply:

(A) *The tax liability is finally determined.* The liability is finally determined if it has been assessed. A liability is not finally determined if there is a pending administrative or judicial challenge. In the case of a judicial challenge to the liability, the liability is not finally determined until all judicial appeal rights have been exhausted.

(B) *The taxpayer is delinquent in making payment.* A taxpayer is delinquent if the taxpayer has failed to pay the tax liability when full payment was due and required. A taxpayer is not delinquent in cases where enforced collection action is precluded.

(ii) *Examples.*

(A) The taxpayer has received a statutory notice of deficiency, under I.R.C. §6212, which entitles the taxpayer to seek Tax Court review of a proposed tax deficiency. This is not a delinquent tax because it is not a final tax liability. Should the taxpayer seek Tax Court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights.

(B) The IRS has filed a notice of Federal tax lien with respect to an assessed tax liability, and the taxpayer has been issued a notice under I.R.C. §6320 entitling the taxpayer to request a hearing with the IRS Office of Appeals contesting the lien filing, and to further appeal to the Tax Court if the IRS determines to sustain the lien filing. In the course of the hearing, the taxpayer is entitled to contest the underlying tax liability because the taxpayer has had no prior opportunity to contest the liability. This is not a delinquent tax because it is not a final tax liability. Should the taxpayer seek tax court review, this will not be a final tax liability until the taxpayer has exercised all judicial appeal rights.

(C) The taxpayer has entered into an installment agreement pursuant to I.R.C. §6159. The taxpayer is making timely payments and is in full compliance with the agreement terms. The taxpayer is not delinquent because the taxpayer is not currently required to make full payment.

(D) The taxpayer has filed for bankruptcy protection. The taxpayer is not delinquent because enforced collection action is stayed under 11 U.S.C. §362 (the Bankruptcy Code).

(i) *Certification Regarding Knowledge of Child Labor for Listed End Products (Executive Order 13126). [The Contracting Officer must list in paragraph (i)(1) any end products being acquired under this solicitation that are included in the List of Products Requiring Contractor Certification as to Forced or Indentured Child Labor, unless excluded at 22.1503(b).]*

(1) *Listed end products.*

(2) *Certification.* [*If the Contracting Officer has identified end products and countries of origin in paragraph (i)(1) of this provision, then the offeror must certify to either (i)(2)(i) or (i)(2)(ii) by checking the appropriate block.*]

☐ (i) The offeror will not supply any end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product.

☐ (ii) The offeror may supply an end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product. The offeror certifies that it has made a good faith effort to determine whether forced or indentured child labor was used to mine, produce, or manufacture any such end product furnished under this contract. On the basis of those efforts, the offeror certifies that it is not aware of any such use of child labor.

(j) *Place of manufacture.* (Does not apply unless the solicitation is predominantly for the acquisition of manufactured end products.) For statistical purposes only, the offeror shall indicate whether the place of manufacture of the end products it expects to provide in response to this solicitation is predominantly-

(1) ☐ In the United States (Check this box if the total anticipated price of offered end products manufactured in the United States exceeds the total anticipated price of offered end products manufactured outside the United States); or

(2) ☐ Outside the United States.

(k) *Certificates regarding exemptions from the application of the Service Contract Labor Standards* (Certification by the offeror as to its compliance with respect to the contract also constitutes its certification as to compliance by its subcontractor if it subcontracts out the exempt services.) [*The contracting officer is to check a box to indicate if paragraph (k)(1) or (k)(2) applies.*]

☐ (1)  *Maintenance, calibration, or repair of certain equipment as described in FAR* 22.1003-4(c)(1). The offeror ☐ does ☐ does not certify that–

(i) The items of equipment to be serviced under this contract are used regularly for other than Governmental purposes and are sold or traded by the offeror (or subcontractor in the case of an exempt subcontract) in substantial quantities to the general public in the course of normal business operations;

(ii) The services will be furnished at prices which are, or are based on, established catalog or market prices (see FAR 22.1003-4(c)(2)(ii)) for the maintenance, calibration, or repair of such equipment; and

(iii) The compensation (wage and fringe benefits) plan for all service employees performing work under the contract will be the same as that used for these employees and equivalent employees servicing the same equipment of commercial customers.

☐ (2)  *Certain services as described in FAR* 22.1003-4(d)(1). The offeror ☐ does ☐ does not certify that-

(i) The services under the contract are offered and sold regularly to non-Governmental customers, and are provided by the offeror (or subcontractor in the case of an exempt subcontract) to the general public in substantial quantities in the course of normal business operations;

(ii) The contract services will be furnished at prices that are, or are based on, established catalog or market prices (see FAR 22.1003-4(d)(2)(iii));

(iii) Each service employee who will perform the services under the contract will spend only a small portion of his or her time (a monthly average of less than 20 percent of the available hours on an annualized basis, or less than 20 percent of available hours during the contract period if the contract period is less than a month) servicing the Government contract; and

(iv) The compensation (wage and fringe benefits) plan for all service employees performing work under the contract is the same as that used for these employees and equivalent employees servicing commercial customers.

(3) If paragraph (k)(1) or (k)(2) of this clause applies–

(i) If the offeror does not certify to the conditions in paragraph (k)(1) or (k)(2) and the Contracting Officer did not attach a Service Contract Labor Standards wage determination to the solicitation, the offeror shall notify the Contracting Officer as soon as possible; and

(ii) The Contracting Officer may not make an award to the offeror if the offeror fails to execute the certification in paragraph (k)(1) or (k)(2) of this clause or to contact the Contracting Officer as required in paragraph (k)(3)(i) of this clause.

(l) *Taxpayer Identification Number (TIN)* ( 26 U.S.C. 6109, 31 U.S.C. 7701). (Not applicable if the offeror is required to provide this information to the SAM to be eligible for award.)

(1) All offerors must submit the information required in paragraphs (l)(3) through (l)(5) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d),

reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the Internal Revenue Service (IRS).

(2) The TIN may be used by the Government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government ( 31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the offeror's TIN.

(3) *Taxpayer Identification Number (TIN)*.

☐TIN: _____.

☐TIN has been applied for.

☐TIN is not required because:

☐Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the United States and does not have an office or place of business or a fiscal paying agent in the United States;

☐Offeror is an agency or instrumentality of a foreign government;

☐Offeror is an agency or instrumentality of the Federal Government.

(4) *Type of organization*.

☐Sole proprietorship;

☐Partnership;

☐Corporate entity (not tax-exempt);

☐Corporate entity (tax-exempt);

☐Government entity (Federal, State, or local);

☐Foreign government;

☐International organization per 26 CFR1.6049-4;

☐Other _____.

(5) *Common parent.*

☐Offeror is not owned or controlled by a common parent;

☐Name and TIN of common parent:

Name _____.

TIN _____.

(m) *Restricted business operations in Sudan.* By submission of its offer, the offeror certifies that the offeror does not conduct any restricted business operations in Sudan.

(n) Prohibition on Contracting with Inverted Domestic Corporations.

(1) Government agencies are not permitted to use appropriated (or otherwise made available) funds for contracts with either an inverted domestic corporation, or a subsidiary of an inverted domestic corporation, unless the exception at 9.108-2(b) applies or the requirement is waived in accordance with the procedures at 9.108-4.

(2) *Representation.* The Offeror represents that–

(i) It ☐ is, ☐ is not an inverted domestic corporation; and

(ii) It ☐ is, ☐ is not a subsidiary of an inverted domestic corporation.

(o) Prohibition on contracting with entities engaging in certain activities or transactions relating to Iran.

(1) The offeror shall e-mail questions concerning sensitive technology to the Department of State at CISADA106@state.gov.

(2) *Representation and Certifications.* Unless a waiver is granted or an exception applies as provided in paragraph (o)(3) of this provision, by submission of its offer, the offeror-

(i) Represents, to the best of its knowledge and belief, that the offeror does not export any sensitive technology to the government of Iran or any entities or individuals owned or controlled by, or acting on behalf or at the direction of, the government of Iran;

(ii) Certifies that the offeror, or any person owned or controlled by the offeror, does not engage in any activities for which sanctions may be imposed under section 5 of the Iran Sanctions Act; and

(iii) Certifies that the offeror, and any person owned or controlled by the offeror, does not knowingly engage in any transaction that exceeds the threshold at FAR 25.703-2(a)(2)

with Iran's Revolutionary Guard Corps or any of its officials, agents, or affiliates, the property and interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (et seq.) (see OFAC's Specially Designated Nationals and Blocked Persons List at https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx).

(3) The representation and certification requirements of paragraph (o)(2) of this provision do not apply if-

(i) This solicitation includes a trade agreements certification (*e.g.*, 52.212-3(g) or a comparable agency provision); and

(ii) The offeror has certified that all the offered products to be supplied are designated country end products.

(p) *Ownership or Control of Offeror.* (Applies in all solicitations when there is a requirement to be registered in SAM or a requirement to have a unique entity identifier in the solicitation).

(1) The Offeror represents that it □ has or □ does not have an immediate owner. If the Offeror has more than one immediate owner (such as a joint venture), then the Offeror shall respond to paragraph (2) and if applicable, paragraph (3) of this provision for each participant in the joint venture.

(2) If the Offeror indicates "has" in paragraph (p)(1) of this provision, enter the following information:

Immediate owner CAGE code: _____.

Immediate owner legal name: _____.

(Do not use a "doing business as" name)

Is the immediate owner owned or controlled by another entity: □ Yes or □ No.

(3) If the Offeror indicates "yes" in paragraph (p)(2) of this provision, indicating that the immediate owner is owned or controlled by another entity, then enter the following information:

Highest-level owner CAGE code: _____.

Highest-level owner legal name: _____.

(*Do not use a "doing business as" name*)

(q) *Representation by Corporations Regarding Delinquent Tax Liability or a Felony Conviction under any Federal Law.*

(1) As required by sections 744 and 745 of Division E of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235), and similar provisions, if contained in subsequent appropriations acts, The Government will not enter into a contract with any corporation that–

(i) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless an agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(ii) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless an agency has considered suspension or debarment of the corporation and made a determination that this action is not necessary to protect the interests of the Government.

(2) The Offeror represents that–

(i) It is □ is not □ a corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

(ii) It is □ is not □ a corporation that was convicted of a felony criminal violation under a Federal law within the preceding 24 months.

(r) *Predecessor of Offeror.* (Applies in all solicitations that include the provision at 52.204-16, Commercial and Government Entity Code Reporting.)

(1) The Offeror represents that it □ is or □ is not a successor to a predecessor that held a Federal contract or grant within the last three years.

(2) If the Offeror has indicated "is" in paragraph (r)(1) of this provision, enter the following information for all predecessors that held a Federal contract or grant within the last three years (if more than one predecessor, list in reverse chronological order):

Predecessor CAGE code: (or mark "Unknown").

Predecessor legal name:_____ .

(*Do not use a "doing business as" name*).

(s) [Reserved]

(t) [Reserved]

(u) (1) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions), Government agencies are not permitted to use appropriated (or otherwise made available) funds for contracts with an entity that requires employees or subcontractors of such entity seeking to report waste, fraud, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(2) The prohibition in paragraph (u)(1) of this provision does not contravene requirements applicable to Standard Form 312 (Classified Information Nondisclosure Agreement), Form 4414 (Sensitive Compartmented Information Nondisclosure Agreement), or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

(3) *Representation*. By submission of its offer, the Offeror represents that it will not require its employees or subcontractors to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting waste, fraud, or abuse related to the performance of a Government contract to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information (*e.g.*, agency Office of the Inspector General).

(v) *Covered Telecommunications Equipment or Services-Representation*. Section 889(a)(1)(A) and section 889 (a)(1)(B) of Public Law 115-232.

(1) The Offeror shall review the list of excluded parties in the System for Award Management (SAM) ( https://www.sam.gov) for entities excluded from receiving federal awards for "covered telecommunications equipment or services".

(2) The Offeror represents that–

(i) It ☐ does, ☐ does not provide covered telecommunications equipment or services as a part of its offered products or services to the Government in the performance of any contract, subcontract, or other contractual instrument.

(ii) After conducting a reasonable inquiry for purposes of this representation, that it ☐ does, ☐ does not use covered telecommunications equipment or services, or any

equipment, system, or service that uses covered telecommunications equipment or services.

(End of Provision)

**FAR 52.212-5 -- Contract Terms and Conditions Required To Implement Statutes or Executive Orders—Commercial Products and Commercial Services (MAR 2025) (Deviation 2025-O0003 & O0004)**

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial products and commercial services:

(1) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

(2) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab Covered Entities (Dec 2023) (Section 1634 of Pub. L. 115-91).

(3) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (Nov 2021) (Section 889(a)(1)(A) of Pub. L. 115-232).

(4) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (Nov 2015).

(5) 52.232-40, Providing Accelerated Payments to Small Business Subcontractors (Mar 2023) ( 31 U.S.C. 3903 and 10 U.S.C. 3801).

(6) 52.233-3, Protest After Award (Aug 1996) (31 U.S.C. 3553).

(7) 52.233-4, Applicable Law for Breach of Contract Claim (Oct 2004) (Public Laws 108-77 and 108-78 ( 19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial products and commercial services:

 X  (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (Jun 2020), with Alternate I (Nov 2021) (41 U.S.C. 4704 and 10 U.S.C. 4655).

_X_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (Nov 2021) (41 U.S.C. 3509)).

__ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (Jun 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)

__ (4) 52.203-17, Contractor Employee Whistleblower Rights (Nov 2023) ( 41 U.S.C. 4712); this clause does not apply to contracts of DoD, NASA, the Coast Guard, or applicable elements of the intelligence community—see FAR 3.900(a).

_X_ (5) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (Jun 2020) (Pub. L. 109-282) ( 31 U.S.C. 6101 note).

__ (6) [Reserved].

__ (7) 52.204-14, Service Contract Reporting Requirements (Oct 2016) (Pub. L. 111-117, section 743 of Div. C).

__ (8) 52.204-15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (Oct 2016) (Pub. L. 111-117, section 743 of Div. C).

_X_ (9) 52.204-27, Prohibition on a ByteDance Covered Application (Jun 2023) (Section 102 of Division R of Pub. L. 117-328).

__ (10) 52.204-28, Federal Acquisition Supply Chain Security Act Orders—Federal Supply Schedules, Governmentwide Acquisition Contracts, and Multi-Agency Contracts. (Dec 2023) ( Pub. L. 115–390, title II).

_X_ (11) (i) 52.204-30, Federal Acquisition Supply Chain Security Act Orders—Prohibition. (Dec 2023) ( Pub. L. 115–390, title II).

__ (ii) Alternate I (Dec 2023) of 52.204-30.

_X_ (12) 52.209-6, Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, Proposed for Debarment, or Voluntarily Excluded. (Jan 2025) ( 31 U.S.C. 6101 note).

_X_ (13) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (Oct 2018) ( 41 U.S.C. 2313).

__ (14) [Reserved].

__ (15) 52.219-3, Notice of HUBZone Set-Aside or Sole-Source Award (Oct 2022) ( 15 U.S.C. 657a).

__ (16) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Oct 2022) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

__ (17) [Reserved]

__ (18) (i) 52.219-6, Notice of Total Small Business Set-Aside (Nov 2020) (15 U.S.C. 644).

__ (ii) Alternate I (Mar 2020) of 52.219-6.

__ (19) (i) 52.219-7, Notice of Partial Small Business Set-Aside (Nov 2020) (15 U.S.C. 644).

__ (ii) Alternate I (Mar 2020) of 52.219-7.

__ (20) 52.219-8, Utilization of Small Business Concerns (Jan 2025)( 15 U.S.C. 637(d)(2) and (3)).

__ (21) (i) 52.219-9, Small Business Subcontracting Plan (Jan 2025) ( 15 U.S.C. 637(d)(4)).

__ (ii) Alternate I (Nov 2016) of 52.219-9.

__ (iii) Alternate II (Nov 2016) of 52.219-9.

__ (iv) Alternate III (Jun 2020) of 52.219-9.

___ (v) Alternate IV (Jan 2025) of 52.219-9.

___ (22) (i) 52.219-13, Notice of Set-Aside of Orders (Mar 2020) (15 U.S.C. 644(r)).

___ (ii) Alternate I (Mar 2020) of 52.219-13.

___ (23) 52.219-14, Limitations on Subcontracting (Oct 2022) (15 U.S.C. 657s).

___ (24) 52.219-16, Liquidated Damages—Subcontracting Plan (Sep 2021) (15 U.S.C. 637(d)(4)(F)(i)).

___ (25) 52.219-27, Notice of Set-Aside for, or Sole-Source Award to, Service-Disabled Veteran-Owned Small Business (SDVOSB) Concerns Eligible Under the SDVOSB Program (Feb 2024) (15 U.S.C. 657f).

___ (26) (i) 52.219-28, Postaward Small Business Program Rerepresentation (Jan 2025) (15 U.S.C. 632(a)(2)).

___ (ii) Alternate I (Mar 2020) of 52.219-28.

___ (27) 52.219-29, Notice of Set-Aside for, or Sole-Source Award to, Economically Disadvantaged Women-Owned Small Business Concerns (Oct 2022) (15 U.S.C. 637(m)).

___ (28) 52.219-30, Notice of Set-Aside for, or Sole-Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (Oct 2022) (15 U.S.C. 637(m)).

___ (29) 52.219-32, Orders Issued Directly Under Small Business Reserves (Mar 2020) ( 15 U.S.C. 644(r)).

___ (30) 52.219-33, Nonmanufacturer Rule (Sep 2021) ( 15 U.S.C. 637(a)(17)).

_X_ (31) 52.222-3, Convict Labor (Jun 2003) (E.O. 11755).

___ (32) 52.222-19, Child Labor—Cooperation with Authorities and Remedies (Jan 2025)( E.O. 13126).

___ (33) 52.222-21, Prohibition of Segregated Facilities (Apr 2015).

___ (34) (i) 52.222-26, Equal Opportunity (Sep 2016) (E.O. 11246).

___ (ii) Alternate I (Feb 1999) of 52.222-26.

_X_ (35) (i) 52.222-35, Equal Opportunity for Veterans (Jun 2020) ( 38 U.S.C. 4212).

___ (ii) Alternate I (Jul 2014) of 52.222-35.

_X_ (36) (i) 52.222-36, Equal Opportunity for Workers with Disabilities (Jun 2020) ( 29 U.S.C. 793).

___ (ii) Alternate I (Jul 2014) of 52.222-36.

_X_ (37) 52.222-37, Employment Reports on Veterans (Jun 2020) ( 38 U.S.C. 4212).

_X_ (38) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496).

_X_ (39) (i) 52.222-50, Combating Trafficking in Persons (Nov 2021) (22 U.S.C. chapter 78 and E.O. 13627).

___ (ii) Alternate I (Mar 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

_X_ (40) 52.222-54, Employment Eligibility Verification (Jan 2025) ( Executive Order 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial products or commercial services as prescribed in FAR 22.1803.)

___ (41) (i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA– Designated Items (May 2008) ( 42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (May 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (42) 52.223-11, Ozone-Depleting Substances and High Global Warming Potential Hydrofluorocarbons (May 2024) ( 42 U.S.C. 7671, et seq.).

__ (43) 52.223-12, Maintenance, Service, Repair, or Disposal of Refrigeration Equipment and Air Conditioners (May 2024) ( 42 U.S.C. 7671, et seq.).

__ (44) 52.223-20, Aerosols (May 2024) ( 42 U.S.C. 7671, et seq.).

__ (45) 52.223-21, Foams (May 2024) ( 42 U.S.C. 7671, et seq.).

__ (46) 52.223-23, Sustainable Products and Services (May 2024) ( E.O. 14057, 7 U.S.C. 8102, 42 U.S.C. 6962, 42 U.S.C. 8259b, and 42 U.S.C. 7671l).

__ (47) (i) 52.224-3 Privacy Training (Jan 2017) ( 5 U.S.C. 552 a).

__ (ii) Alternate I (Jan 2017) of 52.224-3.

__ (48) (i) 52.225-1, Buy American-Supplies (Oct 2022) (41 U.S.C. chapter 83).

__ (ii) Alternate I (Oct 2022) of 52.225-1.

__ (49) (i) 52.225-3, Buy American-Free Trade Agreements-Israeli Trade Act (NOV 2023) ( 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, 19 U.S.C. chapter 29 (sections 4501-4732), Public Law 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.

__ (ii) Alternate I [Reserved].

__ (iii) Alternate II (Jan 2025) of 52.225-3.

__ (iv) Alternate III (Feb 2024) of 52.225-3.

__ (v) Alternate IV (Oct 2022) of 52.225-3.

__ (50) 52.225-5, Trade Agreements (NOV 2023) ( 19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

_X_ (51) 52.225-13, Restrictions on Certain Foreign Purchases (Feb 2021) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

__ (52) 52.225-26, Contractors Performing Private Security Functions Outside the United States (Oct 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. Subtitle A, Part V, Subpart G Note).

__ (53) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (Nov 2007) (42 U.S.C. 5150).

__ (54) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (Nov 2007) (42 U.S.C. 5150).

__ (55) 52.226-8, Encouraging Contractor Policies to Ban Text Messaging While Driving (May 2024) ( E.O. 13513).

__ (56) 52.229-12, Tax on Certain Foreign Procurements (Feb 2021).

__ (57) 52.232-29, Terms for Financing of Purchases of Commercial Products and Commercial Services (Nov 2021) (41 U.S.C. 4505, 10 U.S.C. 3805).

__ (58) 52.232-30, Installment Payments for Commercial Products and Commercial Services (Nov 2021) (41 U.S.C. 4505, 10 U.S.C. 3805).

_X_ (59) 52.232-33, Payment by Electronic Funds Transfer-System for Award Management (Oct2018) ( 31 U.S.C. 3332).

__ (60) 52.232-34, Payment by Electronic Funds Transfer-Other than System for Award Management (Jul 2013) (31 U.S.C. 3332).

__ (61) 52.232-36, Payment by Third Party (May 2014) (31 U.S.C. 3332).

__ (62) 52.239-1, Privacy or Security Safeguards (Aug 1996) ( 5 U.S.C. 552a).

__ (63) 52.240-1, Prohibition on Unmanned Aircraft Systems Manufactured or Assembled by American Security Drone Act-Covered Foreign Entities (Nov 2024) (Sections 1821-1826, Pub. L. 118-31, 41 U.S.C. 3901 note prec.).

__ (64) 52.242-5, Payments to Small Business Subcontractors (Jan 2017) (15 U.S.C. 637(d)(13)).

__ (65) (i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Nov 2021) ( 46 U.S.C. 55305 and 10 U.S.C. 2631).

__ (ii) Alternate I (Apr 2003) of 52.247-64.

__ (iii) Alternate II (Nov 2021) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial products and commercial services:

_X_ (1) 52.222-41, Service Contract Labor Standards (Aug 2018) (41 U.S.C. chapter67).

_X_ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (May 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

_X_ (3) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts) (Aug 2018) (29 U.S.C. 206 and 41 U.S.C. chapter 67).

__ (4) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (May 2014) ( 29U.S.C.206 and 41 U.S.C. chapter 67).

__ (5) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (May 2014) (41 U.S.C. chapter 67).

__ (6) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services-Requirements (May 2014) (41 U.S.C. chapter 67).

_X_ (7) 52.222-55, Minimum Wages for Contractor Workers Under Executive Order 14026 (Jan 2022).

_X_ (8) 52.222-62, Paid Sick Leave Under Executive Order 13706 (Jan 2022) (E.O. 13706).

__ (9) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Jun 2020) (42 U.S.C. 1792).

__ (10) 52.247-69, Reporting Requirement for U.S.-Flag Air Carriers Regarding Training to Prevent Human Trafficking (Jan 2025) ( 49 U.S.C. 40118(g)).

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, as defined in FAR 2.101, on the date of award of this contract, and does not contain the clause at 52.215-2, Audit and Records-Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) (1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1), in a subcontract for commercial products or commercial services. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause-

   (i) 52.203-13, Contractor Code of Business Ethics and Conduct (Nov 2021) (41 U.S.C. 3509).

   (ii) 52.203-17, Contractor Employee Whistleblower Rights (Nov 2023) ( 41 U.S.C. 4712).

   (iii) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

   (iv) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab Covered Entities (Dec 2023) (Section 1634 of Pub. L. 115-91).

   (v) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (Nov 2021) (Section 889(a)(1)(A) of Pub. L. 115-232).

   (vi) 52.204-27, Prohibition on a ByteDance Covered Application (Jun 2023) (Section 102 of Division R of Pub. L. 117-328).

(vii) (A) 52.204–30, Federal Acquisition Supply Chain Security Act Orders—Prohibition. (Dec 2023) ( Pub. L. 115–390, title II).
(B) Alternate I (Dec 2023) of 52.204–30.

(viii) 52.219-8, Utilization of Small Business Concerns (Jan 2025) ( 15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds the applicable threshold specified in FAR 19.702(a) on the date of subcontract award, the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(ix) 52.222-21, Prohibition of Segregated Facilities (Apr 2015).

(x) 52.222-26, Equal Opportunity (Sep 2016) (E.O. 11246).

(xi) 52.222-35, Equal Opportunity for Veterans (Jun 2020) (38 U.S.C. 4212).

(xii) 52.222-36, Equal Opportunity for Workers with Disabilities (Jun 2020) (29 U.S.C. 793).

(xiii) 52.222-37, Employment Reports on Veterans (Jun 2020) (38 U.S.C. 4212).

(xiv) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (Dec 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

(xv) 52.222-41, Service Contract Labor Standards (Aug 2018) ( 41 U.S.C. chapter 67).

(xvi) (A) 52.222-50, Combating Trafficking in Persons (Nov 2021) (22 U.S.C. chapter 78 and E.O. 13627).
(B) Alternate I (Mar 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

(xvii) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment-Requirements (May 2014) (41 U.S.C. chapter 67).

(xviii) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services-Requirements (May 2014) (41 U.S.C. chapter 67).

(xix) 52.222-54, Employment Eligibility Verification (Jan 2025) ( E.O. 12989).

(xx) 52.222-55, Minimum Wages for Contractor Workers Under Executive Order 14026 (Jan 2022).

(xxi) 52.222-62, Paid Sick Leave Under Executive Order 13706 (Jan 2022) (E.O. 13706).

(xxii) (A) 52.224-3, Privacy Training (Jan 2017) ( 5 U.S.C. 552a).
(B) Alternate I (Jan 2017) of 52.224-3.

(xxiii) 52.225-26, Contractors Performing Private Security Functions Outside the United
        States (Oct 2016) (Section 862, as amended, of the National Defense Authorization
        Act for Fiscal Year 2008; 10 U.S.C. Subtitle A, Part V, Subpart G Note).

(xxiv) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (Jun 2020)
        (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR
        clause 52.226-6.

(xxv) 52.232-40, Providing Accelerated Payments to Small Business Subcontractors (Mar
        2023) ( 31 U.S.C. 3903 and 10 U.S.C. 3801). Flow down required in accordance with
        paragraph (c) of 52.232-40.

(xxvi) 52.240-1, Prohibition on Unmanned Aircraft Systems Manufactured or Assembled by
        American Security Drone Act-Covered Foreign Entities (Nov 2024) (Sections 1821-
        1826, Pub. L. 118-31, 41 U.S.C. 3901 note prec.).

(xxvii)  52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Nov
        2021) ( 46 U.S.C. 55305 and 10 U.S.C. 2631). Flow down required in accordance
        with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor may include in its subcontracts for commercial
products and commercial services a minimal number of additional clauses necessary to
satisfy its contractual obligations.

(End of clause)


### FAR 52.216-1 – Type of Contract (Apr 1984)

   The Government contemplates award of a firm-fixed price contract resulting from
this solicitation.

(End of provision)


### FAR 52.217-5 -- Evaluation of Options (Jul 1990)

Except when it is determined in accordance with FAR 17.206(b) not to be in the Government's
best interests, the Government will evaluate offers for award purposes by adding the total price

for all options to the total price for the basic requirement. Evaluation of options will not obligate the Government to exercise the option(s).

(End of Provision)

### FAR 52.217-8 -- Option to Extend Services (Nov 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days of the end of the current performance period.

(End of Clause)

### FAR 52.217-9 -- Option to Extend the Term of the Contract (Mar 2000)

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 months.

(End of Clause)

### FAR 52.233-2 – Service of Protest (Sep 2006)

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

See Block 9 of SF 1449.

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

(End of provision)

### FAR 52.252-2 Clauses Incorporated by Reference (Feb 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://www.acquisition.gov

(End of clause)

The following Defense Federal Acquisition Regulation (DFAR) Clauses are incorporated by full text:

### DFARS 252.204-7012 Safeguarding Covered Defense Information and Cyber Incident Reporting (May 2024)

(a) Definitions. As used in this clause—

"Adequate security" means protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information.

"Compromise" means disclosure of information to unauthorized persons, or a violation of the security policy of a system, in which unauthorized intentional or unintentional disclosure, modification, destruction, or loss of an object, or the copying of information to unauthorized media may have occurred.

"Contractor attributional/proprietary information" means information that identifies the contractor(s), whether directly or indirectly, by the grouping of information that can be traced back to the contractor(s) (e.g., program description, facility locations), personally identifiable information, as well as trade secrets, commercial or financial information, or other commercially sensitive information that is not customarily shared outside of the company.

"Controlled technical information" means technical information with military or space application that is subject to controls on the access, use, reproduction, modification, performance, display, release, disclosure, or dissemination. Controlled technical information would meet the criteria, if disseminated, for distribution statements B

through F using the criteria set forth in DoD Instruction 5230.24, Distribution Statements on Technical Documents. The term does not include information that is lawfully publicly available without restrictions.

"Covered contractor information system" means an unclassified information system that is owned, or operated by or for, a contractor and that processes, stores, or transmits covered defense information.

"Covered defense information" means unclassified controlled technical information or other information, as described in the Controlled Unclassified Information (CUI) Registry at http://www.archives.gov/cui/registry/category-list.html, that requires safeguarding or dissemination controls pursuant to and consistent with law, regulations, and Governmentwide policies, and is—

(1) Marked or otherwise identified in the contract, task order, or delivery order and provided to the contractor by or on behalf of DoD in support of the performance of the contract; or

(2) Collected, developed, received, transmitted, used, or stored by or on behalf of the contractor in support of the performance of the contract.

"Cyber incident" means actions taken through the use of computer networks that result in a compromise or an actual or potentially adverse effect on an information system and/or the information residing therein.

"Forensic analysis" means the practice of gathering, retaining, and analyzing computer-related data for investigative purposes in a manner that maintains the integrity of the data.

"Information system" means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information.

"Malicious software" means computer software or firmware intended to perform an unauthorized process that will have adverse impact on the confidentiality, integrity, or availability of an information system. This definition includes a virus, worm, Trojan horse, or other code-based entity that infects a host, as well as spyware and some forms of adware.

"Media" means physical devices or writing surfaces including, but is not limited to, magnetic tapes, optical disks, magnetic disks, large-scale integration memory chips, and printouts onto which covered defense information is recorded, stored, or printed within a covered contractor information system.

''Operationally critical support'' means supplies or services designated by the Government as critical for airlift, sealift, intermodal transportation services, or logistical support that is essential to the mobilization, deployment, or sustainment of the Armed Forces in a contingency operation.

"Rapidly report" means within 72 hours of discovery of any cyber incident.

"Technical information" means technical data or computer software, as those terms are defined in the clause at DFARS 252.227-7013 , Rights in Technical Data—Other Than

Commercial Products and Commercial Services, regardless of whether or not the clause is incorporated in this solicitation or contract. Examples of technical information include research and engineering data, engineering drawings, and associated lists, specifications, standards, process sheets, manuals, technical reports, technical orders, catalog-item identifications, data sets, studies and analyses and related information, and computer software executable code and source code.

(b) Adequate security. The Contractor shall provide adequate security on all covered contractor information systems. To provide adequate security, the Contractor shall implement, at a minimum, the following information security protections:

(1) For covered contractor information systems that are part of an Information Technology (IT) service or system operated on behalf of the Government, the following security requirements apply:

    (i) Cloud computing services shall be subject to the security requirements specified in the clause 252.239-7010 , Cloud Computing Services, of this contract.

    (ii) Any other such IT service or system (i.e., other than cloud computing) shall be subject to the security requirements specified elsewhere in this contract.

(2) For covered contractor information systems that are not part of an IT service or system operated on behalf of the Government and therefore are not subject to the security requirement specified at paragraph (b)(1) of this clause, the following security requirements apply:

    (i) Except as provided in paragraph (b)(2)(ii) of this clause, the covered contractor information system shall be subject to the security requirements in National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, "Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations" (available via the internet at https://csrc.nist.gov/publications/sp800) in effect at the time the solicitation is issued or as authorized by the Contracting Officer.

    (ii) (A) The Contractor shall implement NIST SP 800-171, as soon as practical, but not later than December 31, 2017. For all contracts awarded prior to October 1, 2017, the Contractor shall notify the DoD Chief Information Officer (CIO), via email at osd.dibcsia@mail.mil, within 30 days of contract award, of any security requirements specified by NIST SP 800-171 not implemented at the time of contract award.

    (B) The Contractor shall submit requests to vary from NIST SP 800-171 in writing to the Contracting Officer, for consideration by the DoD CIO. The Contractor need not implement any security requirement adjudicated by an authorized representative of the DoD CIO to be nonapplicable or to have an alternative, but equally effective, security measure that may be implemented in its place.

(C) If the DoD CIO has previously adjudicated the contractor's requests indicating that a requirement is not applicable or that an alternative security measure is equally effective, a copy of that approval shall be provided to the Contracting Officer when requesting its recognition under this contract.

(D) If the Contractor intends to use an external cloud service provider to store, process, or transmit any covered defense information in performance of this contract, the Contractor shall require and ensure that the cloud service provider meets security requirements equivalent to those established by the Government for the Federal Risk and Authorization Management Program (FedRAMP) Moderate baseline (https://www.fedramp.gov/documents-templates/) and that the cloud service provider complies with requirements in paragraphs (c) through (g) of this clause for cyber incident reporting, malicious software, media preservation and protection, access to additional information and equipment necessary for forensic analysis, and cyber incident damage assessment.

(3) Apply other information systems security measures when the Contractor reasonably determines that information systems security measures, in addition to those identified in paragraphs (b)(1) and (2) of this clause, may be required to provide adequate security in a dynamic environment or to accommodate special circumstances (e.g., medical devices) and any individual, isolated, or temporary deficiencies based on an assessed risk or vulnerability. These measures may be addressed in a system security plan.

(c) Cyber incident reporting requirement.

(1) When the Contractor discovers a cyber incident that affects a covered contractor information system or the covered defense information residing therein, or that affects the contractor's ability to perform the requirements of the contract that are designated as operationally critical support and identified in the contract, the Contractor shall—

(i) Conduct a review for evidence of compromise of covered defense information, including, but not limited to, identifying compromised computers, servers, specific data, and user accounts. This review shall also include analyzing covered contractor information system(s) that were part of the cyber incident, as well as other information systems on the Contractor's network(s), that may have been accessed as a result of the incident in order to identify compromised covered defense information, or that affect the Contractor's ability to provide operationally critical support; and

(ii) Rapidly report cyber incidents to DoD at https://dibnet.dod.mil.

(2) Cyber incident report. The cyber incident report shall be treated as information created by or for DoD and shall include, at a minimum, the required elements at https://dibnet.dod.mil.

(3) Medium assurance certificate requirement. In order to report cyber incidents in accordance with this clause, the Contractor or subcontractor shall have or acquire a

DoD-approved medium assurance certificate to report cyber incidents. For information on obtaining a DoD-approved medium assurance certificate, see https://public.cyber.mil/eca/.

(d) Malicious software. When the Contractor or subcontractors discover and isolate malicious software in connection with a reported cyber incident, submit the malicious software to DoD Cyber Crime Center (DC3) in accordance with instructions provided by DC3 or the Contracting Officer. Do not send the malicious software to the Contracting Officer.

(e) Media preservation and protection. When a Contractor discovers a cyber incident has occurred, the Contractor shall preserve and protect images of all known affected information systems identified in paragraph (c)(1)(i) of this clause and all relevant monitoring/packet capture data for at least 90 days from the submission of the cyber incident report to allow DoD to request the media or decline interest.

(f) Access to additional information or equipment necessary for forensic analysis. Upon request by DoD, the Contractor shall provide DoD with access to additional information or equipment that is necessary to conduct a forensic analysis.

(g) Cyber incident damage assessment activities. If DoD elects to conduct a damage assessment, the Contracting Officer will request that the Contractor provide all of the damage assessment information gathered in accordance with paragraph (e) of this clause.

(h) DoD safeguarding and use of contractor attributional/proprietary information. The Government shall protect against the unauthorized use or release of information obtained from the contractor (or derived from information obtained from the contractor) under this clause that includes contractor attributional/proprietary information, including such information submitted in accordance with paragraph (c). To the maximum extent practicable, the Contractor shall identify and mark attributional/proprietary information. In making an authorized release of such information, the Government will implement appropriate procedures to minimize the contractor attributional/proprietary information that is included in such authorized release, seeking to include only that information that is necessary for the authorized purpose(s) for which the information is being released.

(i) Use and release of contractor attributional/proprietary information not created by or for DoD. Information that is obtained from the contractor (or derived from information obtained from the contractor) under this clause that is not created by or for DoD is authorized to be released outside of DoD—

    (1) To entities with missions that may be affected by such information;

    (2) To entities that may be called upon to assist in the diagnosis, detection, or mitigation of cyber incidents;

    (3) To Government entities that conduct counterintelligence or law enforcement investigations;

(4) For national security purposes, including cyber situational awareness and defense purposes (including with Defense Industrial Base (DIB) participants in the program at 32 CFR part 236); or

(5) To a support services contractor ("recipient") that is directly supporting Government activities under a contract that includes the clause at 252.204-7009 , Limitations on the Use or Disclosure of Third-Party Contractor Reported Cyber Incident Information.

(j) Use and release of contractor attributional/proprietary information created by or for DoD. Information that is obtained from the contractor (or derived from information obtained from the contractor) under this clause that is created by or for DoD (including the information submitted pursuant to paragraph (c) of this clause) is authorized to be used and released outside of DoD for purposes and activities authorized by paragraph (i) of this clause, and for any other lawful Government purpose or activity, subject to all applicable statutory, regulatory, and policy based restrictions on the Government's use and release of such information.

(k) The Contractor shall conduct activities under this clause in accordance with applicable laws and regulations on the interception, monitoring, access, use, and disclosure of electronic communications and data.

(l) Other safeguarding or reporting requirements. The safeguarding and cyber incident reporting required by this clause in no way abrogates the Contractor's responsibility for other safeguarding or cyber incident reporting pertaining to its unclassified information systems as required by other applicable clauses of this contract, or as a result of other applicable U.S. Government statutory or regulatory requirements.

(m) Subcontracts. The Contractor shall—

(1) Include this clause, including this paragraph (m), in subcontracts, or similar contractual instruments, for operationally critical support, or for which subcontract performance will involve covered defense information, including subcontracts for commercial products or commercial services, without alteration, except to identify the parties. The Contractor shall determine if the information required for subcontractor performance retains its identity as covered defense information and will require protection under this clause, and, if necessary, consult with the Contracting Officer; and

(2) Require subcontractors to—

(i) Notify the prime Contractor (or next higher-tier subcontractor) when submitting a request to vary from a NIST SP 800-171 security requirement to the Contracting Officer, in accordance with paragraph (b)(2)(ii)(B) of this clause; and

(ii) Provide the incident report number, automatically assigned by DoD, to the prime Contractor (or next higher-tier subcontractor) as soon as practicable,

when reporting a cyber incident to DoD as required in paragraph (c) of this clause.

(End of clause)

**DFARS 252.204-7019 Notice of NISTSP 800-171 DoD Assessment Requirements (Nov 2023)**

(a) *Definitions*.

"Basic Assessment", "Medium Assessment", and "High Assessment" have the meaning given in the clause 252.204-7020, NIST SP 800-171 DoD Assessments.

"Covered contractor information system" has the meaning given in the clause 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting, of this solicitation.

(b) *Requirement*. In order to be considered for award, if the Offeror is required to implement NIST SP 800–171, the Offeror shall have a current assessment ( *i.e.,* not more than 3 years old unless a lesser time is specified in the solicitation) (see 252.204–7020) for each covered contractor information system that is relevant to the offer, contract, task order, or delivery order. The Basic, Medium, and High NIST SP 800–171 DoD Assessments are described in the NIST SP 800–171 DoD Assessment Methodology located at https://www.acq.osd.mil/asda/dpc/cp/cyber/docs/safeguarding/NIST-SP-800-171-Assessment-Methodology-Version-1.2.1-6.24.2020.pdf .

(c) *Procedures*.

(1) The Offeror shall verify that summary level scores of a current NIST SP 800-171 DoD Assessment (i.e., not more than 3 years old unless a lesser time is specified in the solicitation) are posted in the Supplier Performance Risk System (SPRS) () for all covered contractor information systems relevant to the offer.

(2) If the Offeror does not have summary level scores of a current NIST SP 800-171 DoD Assessment (i.e., not more than 3 years old unless a lesser time is specified in the solicitation) posted in SPRS, the Offeror may conduct and submit a Basic Assessment to for posting to SPRS in the format identified in paragraph (d) of this provision.

(d) *Summary level scores*. Summary level scores for all assessments will be posted 30 days post-assessment in SPRS to provide DoD Components visibility into the summary level scores of strategic assessments.

(1) *Basic Assessments*. An Offeror may follow the procedures in paragraph (c)(2) of this provision for posting Basic Assessments to SPRS.

(i)  The email shall include the following information:

(A) Cybersecurity standard assessed (e.g., NIST SP 800-171 Rev 1).

(B) Organization conducting the assessment (e.g., Contractor self-assessment).

(C) For each system security plan (security requirement 3.12.4) supporting the performance of a DoD contract—

(1) All industry Commercial and Government Entity (CAGE) code(s) associated with the information system(s) addressed by the system security plan; and

(2) A brief description of the system security plan architecture, if more than one plan exists.

(D) Date the assessment was completed.

(E) Summary level score (e.g., 95 out of 110, NOT the individual value for each requirement).

(F) Date that all requirements are expected to be implemented (i.e., a score of 110 is expected to be achieved) based on information gathered from associated plan(s) of action developed in accordance with NIST SP 800-171.

(ii) If multiple system security plans are addressed in the email described at paragraph (d)(1)(i) of this section, the Offeror shall use the following format for the report:

| Security System Plan | CAGE Codes supported by this plan | Brief description of the plan architecture | Date of assessment | Total Score | Date score of 110 will be achieved |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

(2) *Medium and High Assessments*. DoD will post the following Medium and/or High Assessment summary level scores to SPRS for each system assessed:

(i) The standard assessed (e.g., NIST SP 800-171 Rev 1).

(ii) Organization conducting the assessment, e.g., DCMA, or a specific organization (identified by Department of Defense Activity Address Code (DoDAAC)).

(iii) All industry CAGE code(s) associated with the information system(s) addressed by the system security plan.

(iv) A brief description of the system security plan architecture, if more than one system security plan exists.

(v) Date and level of the assessment, i.e., medium or high.

(vi) Summary level score (e.g., 105 out of 110, not the individual value assigned for each requirement).

(vii) Date that all requirements are expected to be implemented (i.e., a score of 110 is expected to be achieved) based on information gathered from associated plan(s) of action developed in accordance with NIST SP 800-171.

(3) *Accessibility.*

(i) Assessment summary level scores posted in SPRS are available to DoD personnel, and are protected, in accordance with the standards set forth in DoD Instruction 5000.79, Defense-wide Sharing and Use of Supplier and Product Performance Information (PI).

(ii) Authorized representatives of the Offeror for which the assessment was conducted may access SPRS to view their own summary level scores, in accordance with the SPRS Software User's Guide for Awardees/Contractors available at https://www.sprs.csd.disa.mil/pdf/SPRS_Awardee.pdf.

(iii) A High NIST SP 800-171 DoD Assessment may result in documentation in addition to that listed in this section. DoD will retain and protect any such documentation as "Controlled Unclassified Information (CUI)" and intended for internal DoD use only. The information will be protected against unauthorized use and release, including through the exercise of applicable exemptions under the Freedom of Information Act (e.g., Exemption 4 covers trade secrets and commercial or financial information obtained from a contractor that is privileged or confidential).

(End of provision)

**DFARS 252.204-7020 NIST SP 800-171 DoD Assessment Requirements (Nov 2023)**

(a) *Definitions.*

"Basic Assessment" means a contractor's self-assessment of the contractor's implementation of NIST SP 800-171 that—

(1) Is based on the Contractor's review of their system security plan(s) associated with covered contractor information system(s);

(2) Is conducted in accordance with the NIST SP 800-171 DoD Assessment Methodology; and

(3) Results in a confidence level of "Low" in the resulting score, because it is a self-generated score.

"Covered contractor information system" has the meaning given in the clause 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting, of this contract.

"High Assessment" means an assessment that is conducted by Government personnel using NIST SP 800-171A, Assessing Security Requirements for Controlled Unclassified Information that—

(1) Consists of—

(i) A review of a contractor's Basic Assessment;

(ii) A thorough document review;

(iii) Verification, examination, and demonstration of a Contractor's system security plan to validate that NIST SP 800-171 security requirements have been implemented as described in the contractor's system security plan; and

(iv) Discussions with the contractor to obtain additional information or clarification, as needed; and

(2) Results in a confidence level of "High" in the resulting score.

"Medium Assessment" means an assessment conducted by the Government that—

(1) Consists of—

(i) A review of a contractor's Basic Assessment;

(ii) A thorough document review; and

(iii) Discussions with the contractor to obtain additional information or clarification, as needed; and

(2) Results in a confidence level of "Medium" in the resulting score.

(b) *Applicability.* This clause applies to covered contractor information systems that are required to comply with the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, in accordance with Defense Federal Acquisition Regulation System (DFARS) clause at 252.204-7012, Safeguarding Covered Defense Information and Cyber Incident Reporting, of this contract.

(c) *Requirements.* The Contractor shall provide access to its facilities, systems, and personnel necessary for the Government to conduct a Medium or High NIST SP 800–171 DoD Assessment, as described in NIST SP 800–171 DoD Assessment Methodology at https://www.acq.osd.mil/asda/dpc/cp/cyber/docs/safeguarding/NIST-SP-800-171-Assessment-Methodology-Version-1.2.1-6.24.2020.pdf , if necessary.

(d) *Procedures.* Summary level scores for all assessments will be posted in the Supplier Performance Risk System (SPRS) () to provide DoD Components visibility into the summary level scores of strategic assessments.

(1) *Basic Assessments.* A contractor may submit, via encrypted email, summary level scores of Basic Assessments conducted in accordance with the NIST SP 800-171 DoD Assessment Methodology to for posting to SPRS.

(i) The email shall include the following information:

(A) Version of NIST SP 800-171 against which the assessment was conducted.

(B) Organization conducting the assessment (e.g., Contractor self-assessment).

(C) For each system security plan (security requirement 3.12.4) supporting the performance of a DoD contract—

(1) All industry Commercial and Government Entity (CAGE) code(s) associated with the information system(s) addressed by the system security plan; and

(2) A brief description of the system security plan architecture, if more than one plan exists.

(D) Date the assessment was completed.

(E) Summary level score (e.g., 95 out of 110, NOT the individual value for each requirement).

(F) Date that all requirements are expected to be implemented (i.e., a score of 110 is expected to be achieved) based on information gathered from associated plan(s) of action developed in accordance with NIST SP 800-171.

(ii) If multiple system security plans are addressed in the email described at paragraph (b)(1)(i) of this section, the Contractor shall use the following format for the report:

| Security System Plan | CAGE Codes supported by this plan | Brief description of the plan architecture | Date of assessment | Total Score | Date score of 110 will be achieved |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

(2) Medium and High Assessments. DoD will post the following Medium and/or High Assessment summary level scores to SPRS for each system security plan assessed:

(i) The standard assessed (e.g., NIST SP 800-171 Rev 1).

(ii) Organization conducting the assessment, e.g., DCMA, or a specific organization (identified by Department of Defense Activity Address Code (DoDAAC)).

(iii) All industry CAGE code(s) associated with the information system(s) addressed by the system security plan.

(iv) A brief description of the system security plan architecture, if more than one system security plan exists.

(v) Date and level of the assessment, i.e., medium or high.

(vi) Summary level score (e.g., 105 out of 110, not the individual value assigned for each requirement).

(vii) Date that all requirements are expected to be implemented (i.e., a score of 110 is expected to be achieved) based on information gathered from associated plan(s) of action developed in accordance with NIST SP 800-171.

(e) *Rebuttals*.

(1) DoD will provide Medium and High Assessment summary level scores to the Contractor and offer the opportunity for rebuttal and adjudication of assessment summary level scores prior to posting the summary level scores to SPRS (see SPRS User's Guide https://www.sprs.csd.disa.mil/pdf/SPRS_Awardee.pdf).

(2) Upon completion of each assessment, the contractor has 14 business days to provide additional information to demonstrate that they meet any security requirements not observed by the assessment team or to rebut the findings that may be of question.

(f) *Accessibility*.

(1) Assessment summary level scores posted in SPRS are available to DoD personnel, and are protected, in accordance with the standards set forth in DoD Instruction 5000.79, Defense-wide Sharing and Use of Supplier and Product Performance Information (PI).

(2) Authorized representatives of the Contractor for which the assessment was conducted may access SPRS to view their own summary level scores, in accordance with the SPRS Software User's Guide for Awardees/Contractors available at.

(3) A High NIST SP 800-171 DoD Assessment may result in documentation in addition to that listed in this clause. DoD will retain and protect any such documentation as "Controlled Unclassified Information (CUI)" and intended for internal DoD use only. The information will be protected against unauthorized use and release, including through the exercise of applicable exemptions under the Freedom of Information Act (e.g., Exemption 4 covers trade secrets and commercial or financial information obtained from a contractor that is privileged or confidential).

(g) Subcontracts.

(1) The Contractor shall insert the substance of this clause, including this paragraph (g), in all subcontracts and other contractual instruments, including subcontracts for the acquisition of commercial products or commercial services (excluding commercially available off-the-shelf).

(2) The Contractor shall not award a subcontract or other contractual instrument, that is subject to the implementation of NIST SP 800–171 security requirements, in accordance with DFARS clause 252.204–7012 of this contract, unless the subcontractor has completed, within the last 3 years, at least a Basic NIST SP 800–171 DoD Assessment, as described in https://www.acq.osd.mil/asda/dpc/cp/cyber/docs/safeguarding/NIST-SP-800-171-

Assessment-Methodology-Version-1.2.1-6.24.2020.pdf, for all covered contractor information systems relevant to its offer that are not part of an information technology service or system operated on behalf of the Government.

(3) If a subcontractor does not have summary level scores of a current NIST SP 800-171 DoD Assessment (i.e., not more than 3 years old unless a lesser time is specified in the solicitation) posted in SPRS, the subcontractor may conduct and submit a Basic Assessment, in accordance with the NIST SP 800-171 DoD Assessment Methodology, to mailto:webptsmh@navy.mil for posting to SPRS along with the information required by paragraph (d) of this clause.

(End of clause)

**DFARS 252.232-7003 Electronic Submission of Payment Requests and Receiving Reports (Dec 2018)**

(a) *Definitions.* As used in this clause—

*Contract financing payment* means an authorized Government disbursement of monies to a contractor prior to acceptance of supplies or services by the Government.

(1) Contract financing payments include—

(i) Advance payments;

(ii) Performance-based payments;

(iii) Commercial advance and interim payments;

(iv) Progress payments based on cost under the clause at Federal Acquisition Regulation (FAR) 52.232-16, Progress Payments;

(v) Progress payments based on a percentage or stage of completion (see FAR 32.102(e)), except those made under the clause at FAR 52.232-5, Payments Under Fixed-Price Construction Contracts, or the clause at FAR 52.232-10, Payments Under Fixed-Price Architect-Engineer Contracts; and

(vi) Interim payments under a cost reimbursement contract, except for a cost reimbursement contract for services when Alternate I of the clause at FAR 52.232-25, Prompt Payment, is used.

(2) Contract financing payments do not include—

(i) Invoice payments;

(ii) Payments for partial deliveries; or

(iii) Lease and rental payments.

*Electronic form* means any automated system that transmits information electronically from the initiating system to affected systems.

*Invoice payment* means a Government disbursement of monies to a contractor under a contract or other authorization for supplies or services accepted by the Government.

(1) Invoice payments include—

(i) Payments for partial deliveries that have been accepted by the Government;

(ii) Final cost or fee payments where amounts owed have been settled between the Government and the contractor;

(iii) For purposes of subpart 32.9 only, all payments made under the clause at 52.232-5, Payments Under Fixed-Price Construction Contracts, and the clause at 52.232-10, Payments Under Fixed-Price Architect-Engineer Contracts; and

(iv) Interim payments under a cost-reimbursement contract for services when Alternate I of the clause at 52.232-25, Prompt Payment, is used.

(2) Invoice payments do not include contract financing payments.

*Payment request* means any request for contract financing payment or invoice payment submitted by the Contractor under this contract or task or delivery order.

*Receiving report* means the data prepared in the manner and to the extent required by Appendix F, Material Inspection and Receiving Report, of the Defense Federal Acquisition Regulation Supplement.

(b) Except as provided in paragraph (d) of this clause, the Contractor shall submit payment requests and receiving reports in electronic form using Wide Area WorkFlow (WAWF). The Contractor shall prepare and furnish to the Government a receiving report at the time of each delivery of supplies or services under this contract or task or delivery order.

(c) Submit payment requests and receiving reports to WAWF in one of the following electronic formats:

(1) Electronic Data Interchange.

(2) Secure File Transfer Protocol.

(3) Direct input through the WAWF website.

(d) The Contractor may submit a payment request and receiving report using methods other than WAWF only when—

(1) The Contractor has requested permission in writing to do so, and the Contracting Officer has provided instructions for a temporary alternative method of submission of payment requests and receiving reports in the contract administration data section of this contract or task or delivery order;

(2) DoD makes payment for commercial transportation services provided under a Government rate tender or a contract for transportation services using a DoD-approved electronic third-party payment system or other exempted vendor payment/invoicing system (*e.g.,* PowerTrack, Transportation Financial Management System, and Cargo and Billing System);

(3) DoD makes payment on a contract or task or delivery order for rendered health care services using the TRICARE Encounter Data System; or

(4) The Governmentwide commercial purchase card is used as the method of payment, in which case submission of only the receiving report in WAWF is required.

(e) Information regarding WAWF is available at *https://wawf.eb.mil/.*

(f) In addition to the requirements of this clause, the Contractor shall meet the requirements of the appropriate payment clauses in this contract when submitting payment requests.

(End of clause)


**DFARS 252.232-7006 Wide Area WorkFlow Payment Instructions (Jan 2023)**

(a) Definitions. As used in this clause—

"Department of Defense Activity Address Code (DoDAAC)" is a six position code that uniquely identifies a unit, activity, or organization.

"Document type" means the type of payment request or receiving report available for creation in Wide Area WorkFlow (WAWF).

"Local processing office (LPO)" is the office responsible for payment certification when payment certification is done external to the entitlement system.

"Payment request" and "receiving report" are defined in the clause at 252.232-7003 , Electronic Submission of Payment Requests and Receiving Reports.

(b) Electronic invoicing. The WAWF system provides the method to electronically process vendor payment requests and receiving reports, as authorized by Defense Federal Acquisition Regulation Supplement (DFARS) 252.232-7003 , Electronic Submission of Payment Requests and Receiving Reports.

(c) WAWF access. To access WAWF, the Contractor shall—

   (1) Have a designated electronic business point of contact in the System for Award Management at https://www.sam.gov; and

   (2) Be registered to use WAWF at https://wawf.eb.mil/ following the step-by-step procedures for self-registration available at this web site.

(d) WAWF training. The Contractor should follow the training instructions of the WAWF Web-Based Training Course and use the Practice Training Site before submitting payment requests through WAWF. Both can be accessed by selecting the "Web Based Training" link on the WAWF home page at https://wawf.eb.mil/

(e) WAWF methods of document submission. Document submissions may be via web entry, Electronic Data Interchange, or File Transfer Protocol.

(f) WAWF payment instructions. The Contractor shall use the following information when submitting payment requests and receiving reports in WAWF for this contract or task or delivery order:

   (1) Document type. The Contractor shall submit payment requests using the following document type(s):

      (i) For cost-type line items, including labor-hour or time-and-materials, submit a cost voucher.

      (ii) For fixed price line items—

      (A) That require shipment of a deliverable, submit the invoice and receiving report specified by the Contracting Officer.

      _____

      (Contracting Officer: Insert applicable invoice and receiving report document type(s) for fixed price line items that require shipment of a deliverable.)

      (B) For services that do not require shipment of a deliverable, submit either the Invoice 2in1, which meets the requirements for the invoice and receiving report, or the applicable invoice and receiving report, as specified by the Contracting Officer.

(Contracting Officer: Insert either "Invoice 2in1" or the applicable invoice and receiving report document type(s) for fixed price line items for services.)

(iii) For customary progress payments based on costs incurred, submit a progress payment request.

(iv) For performance based payments, submit a performance based payment request.

(v) For commercial financing, submit a commercial financing request.

(2) Fast Pay requests are only permitted when Federal Acquisition Regulation (FAR) 52.213-1 is included in the contract.

[Note: The Contractor may use a WAWF "combo" document type to create some combinations of invoice and receiving report in one step.]

(3) Document routing. The Contractor shall use the information in the Routing Data Table below only to fill in applicable fields in WAWF when creating payment requests and receiving reports in the system.

Routing Data Table*

| Field Name in WAWF | Data to be entered in WAWF |
| --- | --- |
| Pay Official DoDAAC | **HQ0490** |
| Issue By DoDAAC | **SP0600** |
| Admin DoDAAC | **SP0600** |
| Inspect By DoDAAC | N/A |
| Ship To Code | N/A |
| Ship From Code | N/A |
| Mark For Code | N/A |
| Service Approver (DoDAAC) | N/A |
| Service Acceptor (DoDAAC) | **SP0600** |
| Accept at Other DoDAAC | N/A |
| LPO DoDAAC | N/A |
| DCAA Auditor DoDAAC | N/A |

| Other DoDAAC(s) | N/A |
|---|---|

(4) Payment request. The Contractor shall ensure a payment request includes documentation appropriate to the type of payment request in accordance with the payment clause, contract financing clause, or Federal Acquisition Regulation 52.216-7, Allowable Cost and Payment, as applicable.

(5) Receiving report. The Contractor shall ensure a receiving report meets the requirements of DFARS Appendix F.

(g) WAWF point of contact.

(1) The Contractor may obtain clarification regarding invoicing in WAWF from the following contracting activity's WAWF point of contact.

The Contracting Officer and Contract Specialist(s).

(2) Contact the WAWF helpdesk at 866-618-5988, if assistance is needed.

(End of clause)

**DFARS 252.232-7007 Limitation of Governments Obligation (Apr 2014)**

(a) Contract line item(s) _____ are incrementally funded. For these items, the sum of _____ of the total price is presently available for payment and allotted to this contract. An allotment schedule is set forth in paragraph (j) of this clause.

(b) For item(s) identified in paragraph (a) of this clause, the Contractor agrees to perform up to the point at which the total amount payable by the Government, including reimbursement in the event of termination of those item(s) for the Government's convenience, approximates the total amount currently allotted to the contract. The Contractor is not authorized to continue work on those item(s) beyond that point. The Government will not be obligated in any event to reimburse the Contractor in excess of the amount allotted to the contract for those item(s) regardless of anything to the contrary in the clause entitled "Termination for Convenience of the Government." As used in this clause, the total amount payable by the Government in the event of termination of applicable contract line item(s) for convenience includes costs, profit, and estimated termination settlement costs for those item(s).

(c) Notwithstanding the dates specified in the allotment schedule in paragraph (j) of this clause, the Contractor will notify the Contracting Officer in writing at least ninety days prior to the date when, in the Contractor's best judgment, the work will reach the point at which the total amount payable by the Government, including any cost for termination for convenience, will approximate 85 percent of the total amount then allotted to the contract for performance of

the applicable item(s). The notification will state (1) the estimated date when that point will be reached and (2) an estimate of additional funding, if any, needed to continue performance of applicable line items up to the next scheduled date for allotment of funds identified in paragraph (j) of this clause, or to a mutually agreed upon substitute date. The notification will also advise the Contracting Officer of the estimated amount of additional funds that will be required for the timely performance of the item(s) funded pursuant to this clause, for a subsequent period as may be specified in the allotment schedule in paragraph (j) of this clause or otherwise agreed to by the parties. If after such notification additional funds are not allotted by the date identified in the Contractor's notification, or by an agreed substitute date, the Contracting Officer will terminate any item(s) for which additional funds have not been allotted, pursuant to the clause of this contract entitled "Termination for Convenience of the Government."

(d) When additional funds are allotted for continued performance of the contract line item(s) identified in paragraph (a) of this clause, the parties will agree as to the period of contract performance which will be covered by the funds. The provisions of paragraphs (b) through (d) of this clause will apply in like manner to the additional allotted funds and agreed substitute date, and the contract will be modified accordingly.

(e) If, solely by reason of failure of the Government to allot additional funds, by the dates indicated below, in amounts sufficient for timely performance of the contract line item(s) identified in paragraph (a) of this clause, the Contractor incurs additional costs or is delayed in the performance of the work under this contract and if additional funds are allotted, an equitable adjustment will be made in the price or prices (including appropriate target, billing, and ceiling prices where applicable) of the item(s), or in the time of delivery, or both. Failure to agree to any such equitable adjustment hereunder will be a dispute concerning a question of fact within the meaning of the clause entitled "Disputes."

(f) The Government may at any time prior to termination allot additional funds for the performance of the contract line item(s) identified in paragraph (a) of this clause.

(g) The termination provisions of this clause do not limit the rights of the Government under the clause entitled "Default." The provisions of this clause are limited to the work and allotment of funds for the contract line item(s) set forth in paragraph (a) of this clause. This clause no longer applies once the contract is fully funded except with regard to the rights or obligations of the parties concerning equitable adjustments negotiated under paragraphs (d) and (e) of this clause.

(h) Nothing in this clause affects the right of the Government to terminate this contract pursuant to the clause of this contract entitled "Termination for Convenience of the Government."

(i) Nothing in this clause shall be construed as authorization of voluntary services whose acceptance is otherwise prohibited under 31 U.S.C. 1342.

(j) The parties contemplate that the Government will allot funds to this contract in accordance
with the contract's Schedule of Services.

(End of clause)


The following Defense Logistics Agency (DLAD) provisions are incorporated by full text:

**DLAD 52.233-9001 Disputes Agreement to Use Alternative Dispute Resolution (ADR)
(Jun 2020)**

(a) The parties agree to negotiate with each other to try to resolve any disputes that may arise.  If
unassisted negotiations are unsuccessful, the parties will use alternative dispute resolution
(ADR) techniques to try to resolve the dispute.  Litigation will only be considered as a last
resort when ADR is unsuccessful or has been documented by the party rejecting ADR to be
inappropriate for resolving the dispute.

(b) Before either party determines ADR inappropriate, that party must discuss the use of ADR
with the other party.  The documentation rejecting ADR must be signed by an official
authorized to bind the contractor (see FAR 52.233-1), or, for the Agency, by the contracting
officer, and approved at a level above the contracting officer after consultation with the ADR
Specialist and legal counsel.  Contractor personnel are also encouraged to include the ADR
Specialist in their discussions with the contracting officer before determining ADR to be
inappropriate.

(c) If you wish to opt out of this clause, check here [ ].  Alternate wording may be negotiated
with the contracting officer.

(End of Provision)

## QUOTE PREPARATION INSTRUCTIONS

To ensure timely and equitable evaluation of proposals, offerors must follow the instructions contained herein. Offerors are required to meet all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements, in addition to those identified as evaluation factors. Failure to meet a requirement may result in an offer being ineligible for award. Offerors must clearly identify any exception to the solicitation terms and conditions and provide complete accompanying rationale. The offers shall consist of three separate parts:

    a. Part I – Technical Proposal
    b. Part II – Past Performance
    c. Part III – Price Proposal

**Submit in accordance with FAR clause 52.212-1 listed above in this RFQ.**

**SPECIFIC INSTRUCTIONS:**

**PART I – TECHNICAL PROPOSAL** - Limited to no more than <u>30 pages</u>. Submit one electronic copy.

The Technical Proposal must clearly reflect how the Offeror will comply with the performance requirements identified in the PWS regardless of the Government's estimated effort in the PWS. It must be clear and concise. The level of effort must be considered with the solution outlined in your quote. Quotes shall be based on appropriate labor categories specified in the Offeror's GSA Multiple Award Schedule (MAS). If an Offeror intends to use any labor categories that it deems consistent in duties with the Government estimated level of effort labor categories but are titled differently in accordance with the GSA schedule, the Offeror must cross-map those labor categories to the Government's PWS to ensure the quote receives a proper evaluation. Any use of subject matter experts or other labor categories not established in the MAS shall be explained in full as to why an existing labor category is impractical to use, or the quote shall be deemed noncompliant.

For any segment(s) of a quote with a defined page limit, pages exceeding the specified limit will be removed and not forwarded for evaluation. Table of Contents, title pages, Cover Page, Quality Control Plan, Organizational Conflicts of Interests (OCIs), Non-Disclosure Agreements (NDAs), resumes, and letters of intent regarding Key Personnel are NOT subject to page limits.

**PART II – PAST PERFORMANCE INFORMATION** - Limited to no more than 5 pages per contract listed. Please only include references for the same or similar type of contract. Submit one electronic copy.

***Quality and Satisfaction Rating for Contracts Completed in the Past Three Years***: Provide any information currently available (letters, metrics, customer surveys, independent surveys, etc.) which demonstrates customer satisfaction with overall job performance and quality of completed product for same or similar type of contract. In addition, explain corrective actions taken in the past, if any, for substandard performance and any current performance problems such as cost overruns, extended performance periods, numerous warranty calls, etc.

***Performance Surveys***: The Government will evaluate the quality and extent of Offeror's performance deemed relevant to the requirements of this RFQ. The Government will use information submitted by the offeror and other sources such as other federal government offices, Past Performance Questionnaires and commercial sources, to assess performance. The Contracting Officer will request Past Performance Questionnaires only from those references that are determined to be recent and relevant. Offerors are advised not to collect their own questionnaires from references, as they will not be accepted by the Government. Provide a list of at least two (2) but no more than six (6) of the most relevant contracts performed for federal agencies and commercial customers within the last three (3) years. Relevant contracts include those similar in size, scope and magnitude when compared to the requirements defined in the attached Statement of Work. The evaluation of past performance information will take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition. Furnish the following information for each contract listed:

- Owner/Customer/Agency/Installation Name
- Current name, address, fax & phone numbers, and email address of the Point(s) of Contact for the reference contract
- Offeror/Company/Division name
- Contract/Account Number
- Contract Dollar Value
- Contract Type
- Award Date
- Period of Performance
- Product/Service Description
- Comments regarding any known performance deemed unacceptable to the customer, or not in accordance with the contract terms and conditions.

If a teaming arrangement is contemplated, provide complete information as to the arrangement, including any relevant and recent past performance information on previous teaming arrangements with same partner. If this is a first-time joint effort, each party to the arrangement must provide past performance information.

***Subcontractor Consent:*** Past performance information pertaining to a subcontractor cannot be disclosed to the prime offeror without the subcontractor's consent. Provide with the proposal a letter from all subcontractors that will perform major or critical aspects of the requirement, consenting to the release of their past performance information to the prime contractor.

**PART III – PRICE PROPOSAL – Submit one electronic copy.**

- Offerors shall submit a firm-fixed price proposal
- Complete blocks 17a, 17b, 30a through 30c of the SF1449, in doing so, the offeror accedes to the contract terms and conditions as written in the RFQ, clauses 52.212-2 and 52.212-4, (including the addendum) and 52.212-5, (including the addendum). These sections constitute the model contract.
- Insert proposed unit and extended prices, as well as any required costs for travel, in the Pricing Matrix (Attachment 1) and return in its entirety. (Submit one electronic copy)
- Complete the necessary fill-ins and certifications in FAR 52.212-3 and return in its entirety in addition to the completed on-line certifications and representations via SAM

*Documents submitted in response to this RFQ must be fully responsive to and consistent with the following:*

- Inform the Contracting Officer of any document(s) that constitute confidential or proprietary business records and mark those records accordingly
- Include documentation to support all prices, with no hard-coding of data and not password protected
- Requirements of the RFQ (CLINs & PWS) and Government standards and regulations pertaining to the PWS
- Evaluation Factors for Award in Provision FAR 52.212-2 of this RFQ
- Any limitation on the number of proposal pages; pages exceeding the page limitations set forth in this Provision FAR 52.212-1 will not be read or evaluated
- The quote will be on 8 1/2" x 11" paper except for fold-outs used for charts, tables, or diagrams, which may not exceed 11" x 17"
- A page is defined as one face of a sheet of paper containing information
- Typing shall not be less than 12 sized font, except for as provided in the Attachment 1 template
- Elaborate formats, bindings or color presentations are not desired or required

For any segment(s) of a quote with a defined page limit, pages exceeding the specified limit will be removed and not forwarded for evaluation. Table of Contents, title pages, Cover Page, Quality Control Plan, Organizational Conflicts of Interests (OCIs), Non-Disclosure Agreements (NDAs), resumes, and letters of intent regarding Key Personnel are NOT subject to page limits

## BASIS FOR CONTRACT AWARD

Quotes received in response to the RFQ will be evaluated using Performance-Price Tradeoff procedures pursuant to FAR 15.101-1. The Government will award a firm-fixed price contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate offers in descending order of importance:

Factor 1: Technical Acceptability
       Subfactors: Technical/Management Approach, Quality Management Approach, Risk
Factor 2: Performance Confidence Assessment
Factor 3: Price

The Government reserves the right to award to other than the lowest priced evaluated offer. An offeror's technical proposal must be rated acceptable to proceed with the evaluation. The Performance Confidence Assessment is equally important as Technical Acceptability. Technical Acceptability and Performance Confidence Assessment, when combined, are significantly more important than Price.

Vendors are encouraged to provide their best proposal with their initial submission without the need to submit additional information. The Government intends to issue an award without engaging in discussions with vendors but reserves the right to allow clarifications to identify minor technical or administrative errors; however, these clarifications will not result in an opportunity to resubmit a quote. The Government also reserves the right to conduct discussions if discussions are determined to be advantageous to the Government to maximize the Government's ability to obtain the best value. If any discussions are conducted it may be either orally or in writing. The scope and extent of discussions are a matter of contracting officer judgement. These statements must not be construed to mean the Government is obligated to conduct any discussions with any vendor.

## 1. Technical Acceptability

The Government will evaluate the technical proposal on an acceptable/ unacceptable basis. Assigning ratings of either acceptable or unacceptable will be based on an evaluation of the proposal for technical acceptability as outlined in Table 1 below. Consideration will be given to three subfactors: Technical/Management Approach, Quality Management Approach, and Risk. The three subfactors are equal in terms of importance. An unacceptable rating in any subfactor, will result in an overall unacceptable rating for the Technical Acceptability Factor. Any Offeror who receives an overall technical rating of unacceptable will not be eligible for award.

    Technical/Management Approach: Offerors will be evaluated on their proposed technical/management approach to comply with the PWS. This includes evaluating the reasonableness and practicality of meeting the requirements outlined in the PWS. The Offeror will also be evaluated on its understanding of the technical and project environment

and how it will apply the technical approach to completing and meeting the PWS's requirements. The Offeror's approach to applying the appropriate resources (i.e., staff, budget, etc.) towards successful accomplishment of the various performance requirements in the PWS will also be assessed.

Quality Management Approach: The Offeror will be evaluated on its overall approach to, and application of Quality Management in completing all tasks to meet the objectives and outcomes defined in the PWS. The Offeror will also be evaluated on its proposed practices and methodologies to ensure quality work product and deliverables. In addition, the Offeror will be evaluated on the rationale supporting its proposed approach to staffing. The quality of the proposed team members (key personnel, non-key personnel, subcontractor personnel, and any other supporting personnel) is assessed on whether they have the level of experience and skills deemed by the Government to be necessary to meet the objectives and outcomes for all tasks found in the RFQ. The Offeror is also assessed on the proposed labor mix.

Risk: The Offeror will be evaluated on the Risk of successfully accomplishing all performance requirements in the PWS, from a technical standpoint, deemed by the Government to be contained in its technical proposal. Based upon the Offeror's proposed approaches to Technical/Management and Quality Management. The Government assesses the level of Risk in accepting the Offeror's proposal (i.e., risk that the Offeror will not successfully accomplish all performance requirement in the PWS from a technical standpoint).

**Table 1 – Technical Acceptability Definitions**

| Adjectival Rating | Description |
|---|---|
| Acceptable | Offeror's technical approach meets specified minimum performance or capability requirements as required in the PWS |
| Unacceptable | Technical approach fails to meet specified minimum performance capability requirements. The quote has one or more significant weaknesses that is/are very likely to cause unmitigated disruption of schedule, drastically increased cost, or severely degraded performance and is therefore not awardable. Quotes in which the technical approach is determined unacceptable will not be further considered for award. |

## 2. Performance Confidence Assessment

The Performance Confidence Assessment evaluation factor assesses the degree of confidence the Government has in an Offeror's ability to supply services that meet users' needs, based on the Offeror's demonstrated record of past performance. This evaluation considers each Offeror's recent and relevant record of past performance in supplying acquisition management support

services that are similar or greater in scope, magnitude and complexity than the effort described in this solicitation.

There are two aspects to this evaluation. The first is to evaluate the Offeror's past performance for ability to meet the solicitation requirements. Common aspects of relevancy include similarity of service/support, complexity, dollar value, contract type, and degree of subcontract/teaming. For the purpose of this RFQ, a relevance rating will be assigned based on the following definitions:

**Table 2 – Past Performance Relevancy Ratings**

| Rating | Definition |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities of this requirement. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities of this requirement. |

The second aspect of the Past Performance evaluation is to evaluate how well the Offeror has previously performed. After evaluating the Offeror's recent (within 3 years) past performance that is relevant to the contract requirements, the Offerors is assigned a performance confidence assessment rating. Past performance information submitted may include performance still in progress, however, it should have a minimum of one year performance history. A record of poor performance may be considered an indication that the offeror has failed to conform to contract requirements and/or to standards of good workmanship, adhere to contract schedules, including the administrative aspects of performance; provide reasonable and cooperative behavior and commitment to customer satisfaction; and/or display a business-like concern for the interests of the customer. Offerors shall be afforded an opportunity to address unfavorable reports of past performance, and the offeror's response, or lack thereof, will be taken into consideration. Recent contracts may be examined to ensure that corrective action measures have been put in place to prevent the recurrence of past performance problems. Prompt actions taken to correct performance problems may be considered a reflection of management concern for customer satisfaction; however, such action may not mitigate all negative performance trends. Additionally, a record of acceptable past performance will not result in a favorable assessment of an otherwise unacceptable proposal.

Using the questionnaire at Attachment 4, the Contracting Officer shall seek relevant performance information on past and present efforts similar in scope to this acquisition provided by the

Offeror and data independently obtained from other government and commercial sources. Past performance regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement will be rated as past performance information for the principal offeror.

Upon assessing recency and relevancy, each Offeror shall then be assigned one of the following ratings in Table 3 below:

**Table 3 – Past Performance Confidence Assessment Ratings**

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

An assessment of past performance information is separate from the responsibility determination required under FAR Subpart 9.1.

The Government reserves the right to consider any information available to it in evaluating an offeror's past performance. This includes information obtained from the offeror's references, past and present customers, subcontractors, and any other sources that may have useful information. The Government will utilize the submissions provided by the Offeror (maximum of five) on the offeror's past performance reference submission (Attachment 4- Past Performance). In addition, the Government may use any data the Contracting Officer determines recent and relevant. This includes: Past Performance Information Retrieval System (PPIRS), past performance questionnaires, Customer feedback, and the offeror's past performance under DLA Energy Contracts, Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontract Reporting System (eSRS), or other databases; interviews with Program Managers, Contracting Officers, and Fee Determining Officials; and the Defense Contract

Management Agency. However, the Government reserves the right not to contact all of the references listed by the offeror. The Government also reserves the right to assess the offeror's past performance based solely on the offeror's performance under an existing DLA Energy contract or a previous DLA Energy contract for work similar to that required by the solicitation.

In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned the offeror shall be determined to have unknown past performance. (see FAR 15.305(a)(2)(iv)).

### 3. Price:

The Government intends to award a firm-fixed price contract from this solicitation. The Government will evaluate the price of all technically acceptable offers. An Offeror's proposed unit prices will be compared to the offerors' publicized schedule contract. An Offeror's price will also be verified by ensuring unit prices multiplied by quantities are correct. The total CLIN amounts, plus any proposed amounts for annual travel, will then be added to determine annual prices for the base year and each option years. The total evaluated price will be calculated by adding all option year prices to the base year price. The total evaluated price will be a consideration in the final source selection decision. Price reasonableness will be assessed in accordance with FAR 15.404-1. Evaluation of options will not obligate the Government to exercise the option(s).

## ADDITIONAL INFORMATION TO OFFERORS

1. Offerors are cautioned to submit sufficient information in the format specified in FAR Provision 52.212-1. Offerors may be asked to clarify certain aspects of their proposal (*for example*, the relevance of past performance information) or respond to adverse past performance information to which the Offeror has not previously had an opportunity to respond. Communication conducted to resolve minor or clerical errors would not constitute discussions and the Contracting Officer reserves the right to award a contract without the opportunity for proposal revision.

2. After quotes have been evaluated against the evaluation factors, the Contracting Officer will conduct an integrated assessment of all quotes submitted under this RFQ to make the award decision. The award will be made to the Offeror whose quote is determined to provide the overall best value to the Government.

3. The Government intends to award a contract without discussions with respective Offerors. However, the Government reserves the right to conduct discussions if deemed in its best interest.

4. An Ombudsman has been established for this procurement. The role of the Ombudsman is to provide contractors and other interested parties a conduit to address issues of impropriety on the part of Government officials and other concerns not suitable for a more open forum. Offerors may contact the Ombudsman directly at the number below:

>    Mr. James Clough
>    Phone: (445) 737-4011
>    E-mail: James.Clough@dla.mil

4. After award, the successful Schedule Holder personnel will be required to complete a Financial/Non-Disclosure Agreement as required for performance under the resultant task order. A sample copy is attached to this RFQ as Attachment 3 for informational purposes only.

**Task Order Point(s) of Contact (POC)**

The Schedule Holder shall include a cover page identifying points of contact. The Schedule Holder shall provide a POC who is authorized to hold discussions/negotiations with the Government and has the full authority to bind the company to a contract/order. The Schedule Holder shall also identify a POC who will be responsible for reviewing any applicable performance evaluation reports rendered by the Government. This may include electronic performance reports produced via the Contractor Performance Assessment Reporting System (CPARS). This cover page is excluded from any page limits. Information required includes: first name, last name, title, e-mail address, phone number, and level of authority.

**RFQ ATTACHMENTS LIST**

1        **Pricing Matrix (Attachment 1)**

2        **WAWF DODAAC Matrix (Attachment 2)**

3        **Combined Financial Non-Disclosure Agreement (NDA) (Attachment 3)**

4        **Past Performance Questionnaire (sample) (Attachment 4)**

5        **DLA Contact List (Attachment 5)**

6        **Personnel Qualification Matrix (Attachment 6)**

END OF DOCUMENT

# Exhibit E



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

U.S. Government Accountability Office
Office of the General Counsel
Procurement Law Division

**Protest of C.H. Guernsey & Company**

under

Defense Logistics Agency
Request for Quotation
No. SP0600-26-Q-0810

for

Acquisition Management Support Services

GSA Professional Services Category 541611

Submitted to

▇▇▇▇▇▇▇

Contracting Officer
Defense Logistics Agency – Energy
8725 John J. Kingman Road
Fort Belvoir, VA 22060-6222
▇▇▇▇▇▇▇▇

Kendra P. Norwood
Michael T. Patterson
Ruth El
FLUET
1751 Pinnacle Drive, Ste 1000
Tysons, VA 22102
knorwood@fluet.law
mpatterson@fluet.law
rel@fluet.law

May 7, 2026

*Counsel for C.H. Guernsey & Company*

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND ..................................................................................................3

    A.    The Solicitation and Overview of the Procurement...................................3

    B.    The Evaluation Scheme .............................................................................3

    C.    Guernsey's Quotation ................................................................................7

    D.    The Award and Brief Explanation..............................................................7

III. PROTEST GROUNDS.........................................................................................8

    A.    The Agency Unreasonably Evaluated Technical Acceptability by
           Failing to Assess Whether ScottMadden's Proposed Level of
           Effort and Labor Mix Could Support Performance ...................................9

          1.    The Agency Failed to Evaluate Level of Effort and Labor
               Mix Under Technical Subfactor 1.................................................9

          2.    The Agency Failed to Evaluate Staffing Feasibility Under
               Technical Subfactor 2.................................................................12

           3.    The Agency Failed to Evaluate Performance Risk Under
               Technical Subfactor 3.................................................................13

    B.    The Agency's Past Performance Evaluation Was Unreasonable .........15

          1.    ScottMadden Has No Recent, Relevant Past Performance...................16

          2.    The Agency Assigned ScottMadden an Improper
               Confidence Rating.......................................................................18

          3.    The Agency Conducted a Disparate Past Performance
               Evaluation ...................................................................................18

               a.    The Agency's Acceptance of ScottMadden's Risk Profile
                    Lacks a Rational Basis...................................................20

               b.    The Agency's Failure to Evaluate Risk Renders the
                    Technical Evaluation Unreasonable ...............................20

    C.    The Agency's Best-Value Tradeoff Was Irrational.................................21

          1.    The Tradeoff Was Irrational Because ScottMadden Never
               Should Have Been Rated Technically Acceptable and Was
               Ineligible for Award.....................................................................21

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

2.    The Tradeoff Was Irrational Because Guernsey Was Entitled to a Much Higher Performance Confidence Rating Than ScottMadden ................................................................22

3.    The Agency Failed to Conduct the Required Best-Value Tradeoff and Instead ██████████████ ██████████████ ................................................................23

D.    The Agency's Unreasonable Evaluation Prejudiced Guernsey ...........................25

IV. REQUEST FOR DOCUMENTS ................................................................27

V. REQUEST FOR RELIEF AND CONCLUSION ................................................................28

VI. PROCEDURAL MATTERS ................................................................28

A.    Timeliness................................................................28

B.    Interested Party Status................................................................28

C.    Jurisdiction................................................................29

D.    Request for Protective Order ................................................................29

ii

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

C.H. Guernsey & Company ("Guernsey") protests the Defense Logistics Agency's ("DLA" or the "Agency") award of a task order under the General Services Administration's ("GSA") Multiple Award Schedule ("MAS") program to ScottMadden, Inc. ("Scott Madden") for Acquisition Management Support Services under Request for Quotation No. SP0600-26-Q-0810 (the "RFQ" or "Solicitation").[1] As detailed below, the award was contrary to the RFQ and law.

## I.
## INTRODUCTION

This protest concerns a fundamental failure by the Agency to evaluate whether the awardee's quotation satisfied the Solicitation's technical requirements—particularly with respect to the level of effort, labor mix, and performance risk associated with performing highly specialized utilities privatization support services.

The RFQ required the Agency to assess whether each offeror proposed an adequate level of effort and appropriate labor categories to successfully perform the Performance Work Statement ("PWS"), and to evaluate the risk associated with the proposed technical approach. Yet, the record presently available demonstrates that the Agency accepted ScottMadden's quotation as "technically acceptable" despite clear indicators that its proposed staffing approach could not reasonably support the scope and complexity of the required work.[2]

---

[1] The RFQ was issued to vendors holding contracts under GSA's Professional Services Category 541611. Thus, this procurement was to be conducted pursuant to the provisions of FAR Subpart 8.4.

[2] The record presently available is necessarily limited because, although the Agency initially offered Guernsey a post-award debriefing in response to Guernsey's request—and represented that it would begin preparing that debriefing—the Agency later withdrew that offer and instead provided only a brief explanation. *See* Ex. K. Guernsey specifically requested the information identified in FAR 52.212-1(l), *which the RFQ expressly incorporated*, to make an informed decision regarding whether a protest was warranted. *Id.* But the Agency nevertheless declined to provide Guernsey any of the information that FAR 52.212-1(l) requires once the decision has been made to provide a debriefing. This includes the opportunity to ask questions or receive additional information concerning the evaluation or award decision. Although GAO generally does not review the adequacy of debriefings, GAO has expressly observed that an agency's refusal to permit reasonable questions during a debriefing process is inconsistent with applicable procurement regulations and may unnecessarily force unsuccessful offerors to file protests to obtain information concerning the procurement. *See Optimal Solutions & Techs.*, B-407467, B-407467.2, Jan. 4, 2013, 2013 CPD ¶ 20 at 3 n.1 ("we find the decision not to provide an offeror the opportunity to ask reasonable questions during the debriefing is not consistent with applicable procurement regulations, and may unnecessarily cause an unsuccessful offeror to file a bid protest in order to obtain such information"); *Del-Jen Educ. & Tng. Grp./Fluor Fed. Sols. LLC*, B-406897.3, May 28, 2014, 2014 CPD ¶ 166 at 4 n.5 (same). FAR 8.405-2(d) requires that "The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors. The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable." While not a formal debrief, the "brief explanation," is set forth in the same

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

Specifically, based on the Government's stated level of effort, as well as the GSA Schedule labor rates available to ScottMadden, and the senior-level expertise required by the PWS, ScottMadden's total evaluated price reflects a quotation that either materially reduced the level of effort required to perform the work, substituted lower-skilled labor categories for senior-level subject matter experts, or both. Any of these approaches would present significant performance risk and fail to satisfy the Solicitation's technical requirements. The Agency was required to identify and evaluate these risks under the Technical Acceptability factor. It did not. Because the Technical Acceptability factor was evaluated on an Acceptable/Unacceptable basis, the Agency's failure to reasonably assess technical feasibility and performance risk was outcome-determinative.

Compounding this error, the Agency unreasonably credited ScottMadden with favorable past performance despite the apparent absence of recent and relevant experience performing comparable utilities privatization support work, while failing to give appropriate weight to Guernsey's extensive and highly relevant incumbent performance record. Based on ScottMadden's lack of relevant experience, the Agency was required by law to have assigned it a neutral confidence rating, which also was outcome-determinative.

At a minimum, the Agency's best-value tradeoff was irrational because it failed to justify selecting a lower-priced, higher-risk, and less experienced offeror over Guernsey's demonstrably superior past performance—despite the RFQ's express statement that non-price factors were significantly more important than price.

The Agency's best-value decision therefore lacks a rational basis. It reflects the selection of a lower-priced quotation that presents materially greater performance risk and inferior qualifications, contrary to the RFQ's express weighting of non-price factors.

For the reasons set forth below, Guernsey respectfully requests that the Government Accountability Office ("GAO") sustain the protest and grant the relief requested herein.

---

subpart of the regulation and therefore is an explanation of these same points – the evaluation criteria, level of effort, mix of labor, and price reasonableness.

2

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

## II.
## BACKGROUND

**A.    The Solicitation and Overview of the Procurement**

On October 27, 2025, DLA issued the Solicitation through GSA eBuy—a tool used by federal agencies to procure complex products and services from authorized GSA Schedule contractors. The RFQ contemplated a single task order award comprised of one base year with four additional option years.[3] The RFQ at issue here is for Utilities Privatization Support Services ("UPSS") at three military installations in Alaska: Fort Greely ("FGA"); Fort Wainwright ("FWA"; and Joint Base Elmendorf Richardson ("JBER"). The support services sought under the RFQ are to assist DLA with the administration of existing Utility Services contracts at each installation.

The specific work that will be performed under the task order involves providing support to the contracting officer and contracting officer's representatives at each installation in all aspects of contract administration, including, but not limited to the reconciliation of Regulatory Commission of Alaska rating filings, rate-based accounting, technical support, pricing support, cost estimating support, energy master planning, and litigation support for the Utility Services contracts awarded to the Installation Utility Systems Owner, Doyon Utilities, LLC ("DU"), based in Fairbanks, Alaska.[4] The UPSS contractor is not only expected to be intimately familiar with the Utility Services contracts, but also the energy infrastructure and multiple stakeholders at each installation to provide comprehensive technical support through demonstrated subject matter expertise.

In sum, through this procurement, DLA seeks a contractor to serve as DLA's right hand and subject matter expert on all aspects of Utility Services contract management by monitoring and assessing DU's work, interfacing with stakeholders, and assisting the federal government in achieving its long and short-term utility management and energy use goals.[5]

**B.    The Evaluation Scheme**

The RFQ provided that offerors' quotes would be evaluated using "Performance-Price Tradeoff procedures pursuant to FAR 15.101-1" with the award of a firm-fixed price contract to the responsible offeror whose quote, "conforming to the Solicitation will be the most advantageous to the Government."[6] Under the RFQ's evaluation scheme, the following factors were to be used to evaluate offers:

Factor 1: Technical Acceptability

Subfactors:

---

[3] *Id.* at 3.
[4] *Id.* at 3.
[5] Ex. A-1 at 3.
[6] *Id.* at 69.



*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

1. Technical/Management Approach,

2. Quality Management Approach

3. Risk

Factor 2: Performance Confidence Assessment

Factor 3: Price[7]

The RFQ provided that Technical Acceptability is equally important as Performance Confidence Assessment, and Technical Acceptability and Performance Confidence Assessment, when combined, are significantly more important than Price.[8]

Under Factor 1, the Technical Acceptability factor, its three subfactors were of equal importance. An offeror's technical proposal had to be rated Acceptable to proceed with the evaluation.[9] An Unacceptable rating on any one of the three subfactors would result in an overall Unacceptable rating.[10] Offers were to be evaluated on an Acceptable/Unacceptable basis as outlined by the following definitions:

**Technical Acceptability Definitions**

| Adjectival Rating | Description |
| --- | --- |
| Acceptable | Offeror's technical approach meets specified minimum performance or capability requirements as required in the PWS |
| Unacceptable | Technical approach fails to meet specified minimum performance capability requirements. The quote has one or more significant weaknesses that is/are very likely to cause unmitigated disruption of schedule, drastically increased cost, or severely degraded performance and is therefore not awardable. Quotes in which the technical approach is determined unacceptable will not be further considered for award.[11] |

Importantly, the Solicitation stated that "level of effort must be considered with the solution outlined" in an offeror's quote, and quotes "shall be based on appropriate labor categories specified in the Offeror's GSA Multiple Award Schedule (MAS)."[12] If an offeror intended to use any labor categories that it deemed consistent with the duties of the Government-estimated level-

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 70.
[12] *Id.* at 66.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

of-effort labor categories but were titled differently, the offeror had to "cross-map those labor categories" to the Government's PWS to ensure the quote was properly evaluated.[13]

Under Factor 2, the Performance Confidence Assessment factor, the Agency was to assess the degree of confidence it had in an offeror's ability to supply services that meet users' needs, based on a demonstrated record of past performance, which included each offeror's recent and relevant past performance in supplying acquisition management support services that were similar or greater in scope, magnitude, and complexity than the effort described in the Solicitation.[14]

There were two aspects of the Past Performance evaluation under Factor 2. The first was to evaluate an offeror's past performance to determine its ability to meet the Solicitation requirements.[15] The Solicitation noted that common aspects of relevancy included similarity of service/support, complexity, dollar value, contract type, and degree of subcontract/teaming.[16] Relevancy ratings were to be assigned as follows:

**Past Performance Relevancy Ratings**

| Rating | Definition |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities of this requirement. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities of this requirement.[17] |

The second aspect of the Past Performance evaluation related to how well an offeror had previously performed.[18] Offerors were instructed to submit up to five recent past performance references for contracts performed within the past three years.[19] After evaluating the relevance and recency of an offeror's past performance, the Agency was to assigned a performance confidence assessment rating according to the following rubric:

---

[13] *Id.*
[14] *Id.* at 70-71.
[15] *Id.* at 71.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 71, 72.

5

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

**Past Performance Confidence Assessment Ratings**

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort.[20] |

Finally, under Factor 3, the Price factor, the Solicitation noted that an offeror's proposed unit prices would be compared to the offeror's publicized schedule contract.[21] Offerors were instructed to insert their unit prices into the RFQ's Attachment 1 Pricing Matrix by contract line-item number ("CLIN") and the corresponding proposed labor category.[22] The Pricing Matrix was pre-populated with a proposed number of hours for each labor category, reflecting the Agency's estimated level of effort. The instructions provided in the Pricing Matrix stated that it was "up to the offeror to determine its appropriate labor category mix, proposed hours, GSA contract rate, and annual travel requirements."[23] The Solicitation advised offerors that a proposal's total evaluated price would be calculated by adding all four option year prices to the base year price and that price reasonableness would be assessed in accordance with FAR 15.404-1.[24]

The Solicitation provided that once quotes were evaluated against each of the three factors, an "integrated assessment of all quotes submitted" would be conducted to make the award decision.[25]

---

[20] *Id.* at 72.
[21] *Id.* at 71.
[22] *See* Ex. A-3 (RFQ Attachment 1 Pricing Matrix).
[23] *Id.*
[24] Ex. A-1 at 73.
[25] *Id.* at 74.

6

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

**C.    Guernsey's Quotation**

Guernsey submitted a timely quotation in response to the RFQ on November 26, 2025, for a total price of ▮▮▮▮▮▮▮

**D.    The Award and Brief Explanation**

On April 28, 2026, the Agency notified Guernsey that it had awarded the contract to ScottMadden on the preceding day.[26] The Agency's post-award notice indicated that the contract was awarded for a total contract price of $10,309,884.00, including all option years.[27]

Later on April 28, Guernsey requested a debriefing from the Agency.[28] Guernsey made this request consistent with the provisions of the RFQ, which expressly included FAR 52.212-1 (I):

(I) Debriefing. If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:

(1) The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.

(2) The overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror.

(3) The overall ranking of all offerors, when any ranking was developed by the agency during source selection.

(4) A summary of the rationale for award;

(5) For acquisitions of commercial products, the make and model of the product to be delivered by the successful offeror.

(6) Reasonable responses to relevant questions posed by the debriefed offeror as to whether source selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency.[29]

The Agency responded two days later, on April 30, with an offer to provide Guernsey with a debriefing approximately two weeks later, on May 13.[30] ▮▮▮▮▮▮▮▮▮▮▮▮

---

[26] Ex. D (Post-Award Notice to Guernsey).
[27] *Id.*
[28] Ex. K at 3-4 (Guernsey Debriefing Request Emails).
[29] Ex. A-1 at 16.
[30] Ex. K at 2-3.

7

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810



This protest follows.

### III.
### PROTEST GROUNDS

GAO has recognized that a protester is not required to know the precise contents of an awardee's proposal to state a valid challenge to an agency's evaluation. Rather, although protesters often lack access to an awardee's proposal, they must nevertheless provide allegations or evidence which, if uncontradicted, establish the likelihood of improper agency action and are not based on mere speculation. *BNL, Inc.*, B-409450; B-409450.3, May 1, 2014, at 9–10 (explaining that access to an awardee's proposal is not required, but dismissing allegations that lacked a sufficient factual basis and amounted to speculation).

Here, unlike in *BNL*, the protest is grounded in the solicitation's express requirements and objective facts. Given the RFQ's emphasis on staffing adequacy, level of effort, and performance risk under the Technical Factor, and the awardee's significantly lower proposed price, the awardee's proposal could only satisfy the requirements by adopting one or more approaches—

---

[31] *Id.*
[32] *Id.* at 1-2.
[33] *Id.* at 1.

8

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

such as reduced labor hours, less-qualified personnel, or an unrealistic labor mix—that directly implicate the evaluation of technical risk under the stated criteria. Accordingly, Guernsey's challenge is not based on conjecture, but on reasonable inferences drawn from the solicitation and the awardee's pricing, and therefore provides a sufficient basis to warrant full review of the agency's technical evaluation and the awardee's proposal.

### A.    The Agency Unreasonably Evaluated Technical Acceptability by Failing to Assess Whether ScottMadden's Proposed Level of Effort and Labor Mix Could Support Performance

The Agency's technical evaluation was unreasonable because it failed to assess whether ScottMadden's proposed level of effort, labor mix, and staffing approach were sufficient to perform the requirements of the PWS, as required by the Solicitation. Although this procurement did not provide for a price realism evaluation, the Agency was nevertheless required to evaluate whether each quote reflected an adequate technical approach supported by sufficient resources and appropriate labor categories, and to assess the performance risk associated with that approach. Where, as here, a quotation reflects a disconnect between the scope of work, the required expertise, and the resources proposed to perform that work, the Agency must evaluate that risk under the RFQ's technical factors. While such a disconnect was (or should have been) readily apparent here, the Agency nevertheless proceeded to find ScottMadden technically acceptable.

GAO has consistently held that an agency's technical evaluation must reasonably assess whether an offeror's proposed staffing approach is adequate to perform the solicitation requirements. *See AT&T Corp.*, B–299542.3, B–299542.4, Nov. 16, 2007, 2008 CPD ¶ 65 at 14–16 (sustaining protest where agency's evaluation of awardee's staffing plan was inconsistent with underlying evaluation findings and failed to reasonably assess whether proposed staffing provided value to the government). An agency's evaluation is unreasonable where it fails to reconcile clear deficiencies or inconsistencies in an offeror's proposed staffing approach and nevertheless relies on that approach in making its award decision.

In short, ScottMadden's quote was constructed by proposing either insufficient labor hours or an improper substitution of lower-skilled labor categories for senior-level personnel, or both. Under the RFQ, each of these scenarios required the Agency to find the quotation technically unacceptable or, at a minimum, assign significant performance risk. The Agency did neither.

### 1.    The Agency Failed to Evaluate Level of Effort and Labor Mix Under Technical Subfactor 1

Under Technical Subfactor 1, Technical/Management Approach, the RFQ required offerors to propose a technical approach supported by an adequate level of effort and appropriate labor categories capable of performing highly specialized utilities privatization support services. These services include regulatory rate case support, cost-of-service analysis, tariff evaluation, financial modeling, and expert witness support—functions that require senior-level subject matter expertise.

9

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

The Government provided an estimated level of effort in the Pricing Matrix and expressly instructed offerors that they were responsible for proposing "an adequate amount of labor to meet all requirements."[34] Despite this requirement, the Agency failed to evaluate whether ScottMadden's proposed staffing approach reflected the level of effort and expertise necessary to perform the PWS.

Based on (1) the Government's estimated level of effort, (2) the senior-level labor categories required by the PWS, and (3) ScottMadden's publicly available GSA Schedule labor rates, ScottMadden's quotation reflects a staffing approach that could not reasonably support performance of the required level of effort using appropriate labor categories. This disconnect should have resulted in either a finding that the quotation was technically unacceptable, or the assignment of significant performance risk. Neither happened here.

The Agency performed no meaningful analysis of whether ScottMadden's quote could support the expert-level, multi-installation utilities privatization support required under the PWS, including technical, economic, financial, and regulatory analyses as well as litigation support. Because the RFQ required the Agency to evaluate whether each offeror proposed an adequate amount of labor and used appropriate MAS labor categories, the Agency's failure to conduct this analysis rendered its performance risk evaluation unreasonable.

In addition, the RFQ required the Agency to evaluate whether an offeror's approach was supported by an appropriate level of effort, adequate resources, and personnel with the requisite expertise.[35] This type of evaluation necessarily requires the Agency to assess whether the offeror's approach reflects a realistic and supportable plan for performing the task order requirements. Moreover, an agency's technical evaluation is unreasonable where it fails to consider whether the proposed technical approach provides for a sufficient level of effort. *Exelis Sys. Corp.*, B-407111 et al., Nov. 13, 2012, 2012 CPD ¶ 340 at 12-13 (sustaining protest where agency failed to reasonably evaluate differences in proposed labor hours under staffing plan). Similarly, GAO has found evaluations unreasonable where the agency fails to reconcile deficiencies in an offeror's staffing approach or relies on conclusions inconsistent with underlying evaluation findings. *AT&T Corp.*, B–299542.3, B–299542.4, Nov. 16, 2007, 2008 CPD ¶ 65 at 16.

Guernsey proposed



---

[34] Ex. A-1 at 4.
[35] *See* Ex. A-1 at 66.
[36] *See* Ex. H.
[37] *See* Ex. D.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

██████████████████████████████████████████████████████.

Under the Solicitation's evaluation scheme, the Agency was required to identify and evaluate this ███████ It did not.

This failure is particularly significant because the level of effort required for this requirement is not ████████████████████████████████████████████████ ████████████ ████████████████████████████████████ The instant RFQ, however, provided for a level of effort of only 9,076 hours annually[39]██ ██████████████████████ [0] This ███████████ underscores the risk inherent in any proposal that ██████████ ████████████████████████████████████

As the incumbent contractor, Guernsey ████████████ ████████████████████████████████ Indeed, ██████████████████████████ This ████████████ underscores the magnitude of the effort required and highlights the risk inherent in any proposal that ████████████ ████████████████████████████

The following table illustrates ████████████ ████████████████████████████████

██████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[38] *See* Ex. B-2.
[39] *See* Ex. A-3.
[40] ████████████████ █ ████████████████
████████████████████████████████████

████████████████████████████████
███████

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

These defects are not subtle and would have been apparent from a basic comparison of the required level of effort, labor categories, and the resources reflected in ScottMadden's quotation.

### 2.    The Agency Failed to Evaluate Staffing Feasibility Under Technical Subfactor 2

Under Subfactor 2, Technical Acceptability (related to staffing), the RFQ required the Agency to evaluate whether each offeror proposed an adequate and feasible staffing approach— i.e., whether the offeror could provide the appropriate labor categories and qualified personnel necessary to perform the PWS, at the proposed level of effort, for the duration of the performance period. This evaluation was central to the RFQ's requirement under Subfactor 2 that "level of effort must be considered with the solution outlined," and that quotations be based on "appropriate labor categories" available under the offeror's MAS contract.[41]

Here, publicly available labor-market indicators, including ScottMadden's recruiting activity and job postings[42], reinforce that ScottMadden does not have an established bench of the personnel necessary to perform this requirement and instead would be required to recruit and retain highly specialized regulatory, financial, and utility-sector talent post-award. In a current labor market for senior-level, niche expertise, the risks of delayed hiring, the inability to attract qualified candidates, or turnover are not speculative; it is a foreseeable performance risk that the RFQ required the Agency to consider as part of its staffing evaluation.

The staffing risk is amplified here because ScottMadden's $10.3 million total evaluated price indicates that it proposed either a materially reduced level of effort, a labor mix skewed toward less senior personnel, or both. Each scenario increases the risk of staffing failures. A reduced level of effort is inherently risky on a requirement that ██████████████████ ███████████████████████████████████████████████[43] In those instances, there is less slack to absorb any staffing shortfalls, ramp-up delays, or rework. Likewise, if ScottMadden's approach depends on post-award hiring of specialized personnel to perform senior-level functions, any inability to staff those roles will necessarily translate into degraded performance, schedule disruption, and an increased risk of unsuccessful performance—all of which render a quote unacceptable under the express terms of the RFQ.

Because Technical Acceptability was evaluated on an acceptable/unacceptable basis— and an unacceptable rating for any subfactor required an overall unacceptable rating—for the reasons detailed above, the Agency could not have rationally found ScottMadden's quote acceptable under Subfactor 2.. GAO should sustain the protest on this basis because the Agency

---

[41] Ex. A-1 at 66.
[42] Ex. C
[43] *See* Table 1. *supra.*

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

failed to reasonably evaluate Scott Madden's staffing and the attendant technical risk as required under Subfactor 2.

> 3.    **The Agency Failed to Evaluate Performance Risk Under Technical Subfactor 3**

The RFQ required the Agency to evaluate the risk associated with each offeror's technical approach, including whether the proposed level of effort and labor mix created a risk of unsuccessful performance.

Here, ScottMadden's quotation presented clear indicators of elevated performance risk. Its proposed approach necessarily reflects either ████████████████████████████████████████████████████████████████████████████████ There is no indication that the Agency identified or assessed this risk.

An Agency's failure to evaluate obvious performance risk renders the technical evaluation unreasonable. This principle applies with particular force where, as here, the solicitation required the Agency to evaluate whether the proposed staffing approach and level of effort would support successful performance. *See Exelis Sys. Corp.*, B-407111 et al., Nov. 13, 2012, 2012 CPD ¶ 340 at 12–13 (agency could not reasonably ignore differences in productive labor hours where staffing level was a stated evaluation consideration).

The PWS requires senior-level expertise across a broad range of disciplines, including utility plant accounting, depreciation studies, tariff modification analysis, corporate tax strategy, Contribution In Aid of Construction (CIAC) analysis, business case analysis, specialized project financing, and expert witness testimony in rate case litigation.[44] Individuals performing the Principal role would manage and be in charge of these disciplines,[45] as this position carries the highest level of responsibility and the largest level of effort—6,558 hours per year[46] (out of 9,076 total hours annually), or 32,790 hours over the five-year period of performance. The PWS also requires individuals performing the Senior Project Manager role to lead multi-installation coordination and direct and coordinate a variety of professional disciplines to achieve project goals with the primary responsibilities being project planning, scheduling, and reporting while monitoring and guiding staff in the production of project deliverables.[47]

Under ScottMadden's GSA MAS Price List,[48] the only labor categories capable of performing these duties are its Partner ($469.42/hr.) and Director ($357.85/hr.) categories for the

---

[44] *See* Ex. A-1 at 3-10.
[45] *See* Ex. G at 5 (Guernsey's GSA Schedule Contract).
[46] *See* Ex. A-3.
[47] *Id.; see also* Ex. G at 5.
[48] Ex. E-2 at tab Price List (ScottMadden's GSA Price List).

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

Principal role, and its Manager ($331.01/hr.) and Senior Associate ($288.54/hr.) categories for the Senior Project Manager role. These categories are the only ones with the seniority, expertise, and strategic leadership capability required to perform the PWS's high-complexity, high-responsibility tasks.



ScottMadden's total evaluated price was ▮▮▮ $10,309,884.00—

ScottMadden's entire proposed price was $10,309,884.00.

The Agency's failure to evaluate whether ScottMadden's proposed labor mix and level of effort could support performance of the PWS demonstrates that it did not conduct the performance risk analysis required under Technical Acceptability subfactor 3.



Had the Agency

This requirement is not generic consulting. It requires a UPSS contractor with intimate knowledge of the US contracts, stakeholders, and installation-specific energy systems at FGA, FWA, and JBER.[55] The contractor must deliver high-level technical reviews, support system inventory changes, oversee DU's performance, provide advanced economic and financial analyses, and serve as a subject-matter expert and potential expert witness in complex utility regulatory disputes.[56] In short, the UPSS contractor must serve as DLA's right hand and subject matter expert on all aspects of contract management, monitoring and assessing DU's work,



[53] Ex. A-1 at 4.
[54] *Id.* at 66.
[55] *Id.* at 3-10.
[56] *Id.*

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

interfacing with stakeholders, and assisting the federal government in achieving its long- and short-term utility management and energy goals.

. The Agency's failure to identify or address this disconnect rendered the price evaluation unreasonable.

The Agency's acceptance of such an approach, without any documented analysis, renders the Agency's technical acceptability and risk evaluation unreasonable and contrary to the RFQ's requirements.

**B.    The Agency's Past Performance Evaluation Was Unreasonable**

The Agency's past performance evaluation was unreasonable because it failed to meaningfully distinguish between Guernsey's highly relevant, successful incumbent performance and ScottMadden's apparent lack of recent and relevant experience.

nder the RFQ,

The RFQ required the Agency to evaluate past performance based on recency and relevance to the highly specialized requirements of this procurement. Where an offeror like ScottMadden lacks such experience, the Agency is required to assign a neutral confidence

---

[57] *See* Ex. E-2 at tab Price List (ScottMadden's GSA Price List); *see also* Ex. E-1.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

rating—not a favorable one.

Further, the Agency did not

while at the same time credit ScottMadden with anything other than a Neutral Confidence rating given its apparent lack of qualifying recent and relevant experience.

The Agency cannot laud the benefits of a cut-rate $10 million quote while disregarding the corresponding performance risk that comes along with it.
while also refusing to grapple with the obvious implications on overall performance risk, and then papering over those issues by assigning ScottMadden a confidence assessment that is, at best, neutral. This disparate treatment between the offerors as well as the unsupported confidence assessment assigned to ScottMadden were not only unreasonable but also prejudicial.

### 1. ScottMadden Has No Recent, Relevant Past Performance

The RFQ limited the past performance evaluation to contracts that are both (1) recent (within the past three years) and (2) relevant, i.e., similar in scope, magnitude, and complexity to the highly specialized services required here.[61] Where a solicitation requires past performance to be similar in size, scope, and complexity, GAO has sustained protests when the record does not demonstrate that the awardee's experience reflects those characteristics. *Harmonia Holdings Grp., LLC*, B-417475.3 *et al.*, Sept. 23, 2019, 2019 CPD ¶ 333 at 13-14.

There is no indication that ScottMadden possesses past performance that meets these recency and relevance requirements. In particular, there is no record of ScottMadden having performed contracts involving any of the following core PWS functions, including:

---

[58] Ex. K at 1.
[59] Ex. K at 1.
[60]



[61] *Id.* at 67.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

- utilities privatization advisory services,
- Alaska specific regulatory rate case and tariff support,
- Alaska specific cost-of-service modeling and expert testimony, and
- multi-installation utility advisory efforts of comparable scale.[62]

This is based on publicly available information, including ScottMadden's published project descriptions, personnel profiles, and recruiting activity, none of which reflect performance of utilities privatization support services comparable in scope, magnitude, and complexity to the PWS requirements.

Additionally, a review of ScottMadden's recent job postings reveal that it has been actively seeking personnel with capabilities aligned to the RFQ's core requirements, such as regulatory support, cost-of-service analysis, and utility sector expertise, which means these capabilities are lacking within ScottMadden at sufficient depth to successfully perform.[63] Finally, the staff profiles and capabilities featured on ScottMadden's website do not reflect a dedicated bench of regulatory or utility privatization specialists (much less any with Alaska experience), further reinforcing the conclusion that ScottMadden lacks demonstrated experience in key RFQ technical areas.[64]

Because these functions are central—not tangential—to the task order, the lack of comparable work experience means ScottMadden cannot be considered to have "relevant" past performance under the RFQ.

Under these circumstances, the Agency could not have reasonably assigned a favorable confidence assessment rating. Where an offeror lacks a record of relevant past performance, or where the record is too limited to support a meaningful assessment, the proper rating is unknown confidence (neutral), meaning the offeror may not be evaluated either favorably or unfavorably. *ASRC Federal Data Network Technologies, LLC*, B-419519.4, Sept. 19, 2022, at 12 (citing FAR 15.305(a)(2)(iv)). A neutral rating is appropriate where , as here, an offeror's performance record is "so sparse that no meaningful confidence assessment rating can be reasonably assigned." *Id.* at 12.

Accordingly, a neutral confidence rating would have been the only evaluation outcome consistent with the RFQ and governing law. Any assignment of a favorable confidence rating to ScottMadden necessarily would have relied on contracts that do not meet the solicitation's recency and relevance requirements, and therefore would be unreasonable. By contrast, Guernsey, the incumbent contractor, possesses multiple contracts that are "Very Relevant" under

---

[62] *See, e.g.,* Ex. M ScottMadden Marketing Presentation.
[63] *See* Ex. C.
[64] ScottMadden does not have a public, named bench of current specialists who explicitly market or document direct federal utility privatization work *See* https://www.scottmadden.com/our-experts/ (last visited May 6, 2026).

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

the RFQ's evaluation scheme, reflecting performance of the same or substantially similar work.

On this record, the Agency could not reasonably conclude that ScottMadden possessed "recent and relevant" past performance comparable to the requirement. Accordingly, a neutral rating would have been the only confidence assessment consistent with the RFQ and governing law.

### 2.    The Agency Assigned ScottMadden an Improper Confidence Rating

Because ScottMadden lacks recent and relevant past performance, the Agency was required to assign a neutral confidence rating, not a positive or favorable one. This requirement is grounded in both statute and regulation. *See* 41 U.S.C. § 1126(b) and FAR 15.305(a)(2)(iv) (providing that where an offeror has no relevant past performance, it may not be evaluated favorably or unfavorably). The RFQ mirrors this framework by requiring a confidence assessment tied to relevant past performance.

GAO has sustained protests where agencies assign favorable past performance ratings without a reasonable basis in the information required by the solicitation. In *Kauffman*, for example, GAO found the evaluation unreasonable where the agency relied on information outside the required past performance submissions and failed to apply the solicitation's past performance criteria. *Kauffman & Assocs., Inc.*, B-421917.2 *et al.*, Jan. 29, 2024, 2024 CPD ¶ 40 at 12-13. The deficiency here is more fundamental: ScottMadden appears to lack qualifying past performance altogether, yet the Agency nevertheless assigned a non-neutral confidence assessment.

Thus, where *Kauffman* involved a misapplication of evaluation criteria, this procurement involves a lack of qualifying past performance altogether, coupled with a favorable confidence assessment. Under these circumstances, any assignment of a positive confidence rating to ScottMadden is inconsistent with the RFQ, contrary to statute and regulation, and unsupported by the record.

### 3.    The Agency Conducted a Disparate Past Performance Evaluation

The Agency also failed to evaluate offerors on an equal basis. It is a fundamental principle of procurement law that agencies must evaluate proposals evenhandedly and in accordance with the solicitation's evaluation criteria. *Kauffman* at 7. Here, the record reflects disparate treatment in two critical respects:

- **Disparate treatment of relevance**: Guernsey's past performance, which is directly aligned with the PWS, was ████████████████████

---

[65] *See* Ex. F at 38-59.

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

███████████████ ScottMadden's lack of relevant experience was credited with a favorable confidence rating where only a neutral one was allowed.

- **Inconsistent application of evaluation standards**: The Agency ███████ ████████████████████ while favorably evaluating ScottMadden's quote without comparable evidence of relevant experience.

GAO has sustained protests in precisely these circumstances, where an agency penalizes one offeror for deficiencies or closely scrutinizes its proposal, while failing to apply the same level of scrutiny to another offeror with similar or more significant shortcomings. *Kauffman, supra* (sustaining disparate treatment claim where agency assessed weaknesses to one offeror but failed to apply the same criteria to another).

The disparity here is even more stark. Guernsey, the incumbent, demonstrated ████ ████████████████████ while ScottMadden lacked comparable experience. Yet the Agency's evaluation outcomes ███████████████████. By ████████████ ███████████████████ crediting ScottMadden despite its lack of recent and relevant experience, the Agency abandoned the RFQ's recency and relevancy requirements and conducted a disparate evaluation.

The Agency failed to reasonably evaluate the performance risk associated with ScottMadden's quotation, as required by the RFQ, and instead accepted substantial, unaddressed risk without a rational basis for doing so. The RFQ required the Agency to assess the risk of not successfully accomplishing the PWS requirements based on the offeror's technical approach, staffing, and overall management approach.[66] This requirement is not discretionary; rather, it is a core component of the technical evaluation, intended to ensure that the selected contractor can perform the work with an acceptable likelihood of success.

GAO has held that an agency must meaningfully evaluate performance risk where the record reflects indicators such as insufficient staffing or level of effort, lack of relevant experience, or a mismatch between the proposed approach and the resources devoted to it. *See Guidehouse LLP*, B-419336, et al., Jan. 21, 2021, 2021 CPD ¶ 60 at 4-5 (agency reasonably assessed risk where proposed labor hours "appear[ed] low relative to the level of effort associated with the approach," noting that such a mismatch creates risk of "disruption of schedule, an increase in price, or a degradation of performance").

Here, ScottMadden's quotation presents multiple, compounding indicators of elevated performance risk that the Agency failed to properly consider:

- **Lack of Relevant Experience**: ScottMadden lacks demonstrated experience performing work of similar scope, magnitude, and complexity to the RFQ

---

[66] *See* Ex. A-1 at 70.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

requirements, including utilities privatization regulatory support, rate case analysis, and tariff development. As discussed above, public sources reinforce the absence of demonstrated capability (ScottMadden's own public information does not identify projects or clients reflecting the PWS's core utilities-privatization technical and regulatory functions, and ScottMadden's LinkedIn job postings reflect efforts to recruit for roles aligned with these capabilities after award rather than demonstrating an established, committed team with this specialized experience).[67]

- **Insufficient Level of Effort:** ScottMadden's approximately $10.3 million price means that it necessarily offered a significantly reduced level of effort that is inconsistent with the scope and complexity of the PWS, particularly in light of Guernsey's incumbent experience.

Each of these factors independently raises performance risk. Collectively, they presented an unacceptably high risk that ScottMadden's approach could not be successfully executed.

### a. The Agency's Acceptance of ScottMadden's Risk Profile Lacks a Rational Basis

Despite these clear indicators, the Agency concluded that ScottMadden's risk of unsuccessful performance was acceptable. That conclusion cannot be reconciled with the facts, however. Here, there is no indication that the Agency reconciled ScottMadden's lack of experience, the absence of committed, qualified personnel, or a reduced level of effort with the risk of unsuccessful performance. At minimum, these deficiencies required the Agency to assign a heightened performance risk rating, which did not happen here as evidenced of ScottMadden's selection for award. But given their cumulative effect, these clear risk factors should have called into question whether ScottMadden's quotation could satisfy the RFQ's minimum capability requirements.

### b. The Agency's Failure to Evaluate Risk Renders the Technical Evaluation Unreasonable

The Agency failed to reasonably evaluate performance risk associated with ScottMadden's quote. GAO has consistently held that agencies must evaluate proposals in accordance with the solicitation's evaluation criteria and in an even-handed manner; where an agency fails to meaningfully assess required elements, such as performance risk, the resulting evaluation is unreasonable. *Kauffman & Assocs., Inc.*, B-421917.2 et al., 2024 CPD ¶ 40 at 7-8; *Guidehouse LLP*, B-419336 et al., 2021 CPD ¶ 60 at 6.

---

[67] Notably, even if an offeror attempts a "buy-in" under a fixed-price, staffing feasibility remains a technical requirement; the inability to hire or retain qualified personnel introduces significant performance risk and directly undermines the viability of the proposed technical approach.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

In this procurement, DLA did not reasonably evaluate required risk considerations tied to feasibility, staffing, and experience. Because risk was a stated subfactor, that failure undermines the overall technical acceptability determination. *Kauffman & Assocs, Inc.*, B-421917.2 et al., 2024 CPD ¶ 40 at 7-8; *Guidehouse LLP*, B-419336 et al., 2021 CPD ¶ 60 at 6. Accordingly, the technical evaluation record does not support DLA's conclusion that ScottMadden's quotation met the RFQ's minimum performance and capability requirements.

Each of these elements was required by the RFQ. Taken together, they demonstrate that DLA's risk evaluation—and therefore its overall technical acceptability determination—was unsupported by the record and inconsistent with the solicitation. Accordingly, GAO should sustain the protest on this basis.

## C.    The Agency's Best-Value Tradeoff Was Irrational

The Agency's best-value determination cannot stand because it rested on evaluations that were fundamentally flawed and inconsistent with the Solicitation. ScottMadden should not have been rated technically acceptable and therefore was ineligible for award; the ▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ should have weighed heavily in Guernsey's favor; and the Agency failed to conduct the qualitative tradeoff required by the RFQ, ▉▉▉▉



o such explanation exists, and the resulting award decision lacks a rational basis.

### 1.    The Tradeoff Was Irrational Because ScottMadden Never Should Have Been Rated Technically Acceptable and Was Ineligible for Award

As demonstrated in Section III.A, ScottMadden's quotation could not satisfy the Solicitation's minimum technical requirements. Its price and labor mix necessarily reflect either a materially reduced level of effort, the use of lower-skilled MAS labor categories for senior-level roles, or both. Under the RFQ, either scenario required an Unacceptable rating under the Technical Acceptability factor.

The Solicitation could not have been clearer about the consequences of such a rating. It stated that "an unacceptable rating in any subfactor will result in an overall unacceptable rating for the Technical Acceptability factor," and that "any Offeror who receives an overall technical rating of unacceptable will not be eligible for award."[68] This language is mandatory, not discretionary. A quotation that fails any Technical Acceptability subfactor must be rejected and cannot be considered in a best-value tradeoff.

---

[68] Ex. A-1 at 69.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

Because ScottMadden's quotation necessarily failed to proposed an adequate level of effort, labor mix, and/or senior-level expertise, it should have received an Unacceptable rating under at least one subfactor. At that point, the Solicitation required the Agency to assign an overall Unacceptable rating and remove ScottMadden from further consideration. The Agency's decision to treat ScottMadden as technically acceptable, and include its quote in the tradeoff, directly contravened the Solicitation's explicit instructions.

This error was outcome-determinative. Had the Agency properly applied the Solicitation's terms as written, ScottMadden would have been eliminated from the competition, and no tradeoff involving its quotation could have occurred. The Agency's best-value determination therefore rests on a fundamentally flawed premise and cannot be sustained.

2.    **The Tradeoff Was Irrational Because Guernsey Was Entitled to a Much Higher Performance Confidence Rating Than ScottMadden**

The RFQ required the Agency to assess the degree of confidence it had in each offeror's ability to successfully perform the requirement based on recent and relevant past performance. Under the Solicitation and governing standards, Guernsey's extensive, directly relevant incumbent performance ███████████████████████. Guernsey has performed this exact requirement for years, at all three installations, and has consistently delivered high-quality results. Nothing in the record suggests otherwise █████████████████████

ScottMadden, by contrast, lacks recent and relevant experience performing utilities privatization support services. Indeed, there is no indication that it has performed work that is in any way comparable in scope, magnitude, or complexity. Under the RFQ, an offeror with no relevant past performance must receive a Neutral Confidence rating. Where the limited information available indicates performance risk, a Limited Confidence or even No Confidence rating may be appropriate. But in no circumstance may an offeror with no relevant past performance be evaluated favorably.

A meaningful distinction exists between the offerors' past performance records, and that distinction should have carried significant weight in the best-value tradeoff. In a tradeoff where non-price factors were significantly more important than price, this disparity in demonstrated performance capability should have strongly favored Guernsey. The Agency's failure to account for this clear difference in past performance undermined the integrity of the tradeoff and materially skewed the outcome.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

3.    **The Agency Failed to Conduct the Required Best-Value Tradeoff and Instead** ███████████████████████

███████████████████████

The RFQ required a true best-value tradeoff in which the non-price factors, when combined, were significantly more important than price.[69] That framework obligated the Agency to meaningfully compare the relative merits of the quotations, identify discriminators, and assess whether ██████████████████████████████████████████
The available facts, however, indicate that the Agency did not perform this analysis. Instead, it treated all technically acceptable quotations as equal ████████████████████ without identifying any qualitative distinctions.

This failure is particularly stark given the substantial differences between the offerors. ScottMadden's technical approach was unsupported by relevant experience, incompatible with the required level of effort, and lacked any demonstrated capability to perform the PWS's specialized regulatory, financial, and litigation-support tasks. Its staffing plan was not supported by identified or committed personnel and was contingent on post-award hiring, contrary to the RFQ's requirement to propose an established, cross-mapped labor mix. Its quotation presented multiple, compounding indicators of elevated performance risk, including lack of relevant experience, insufficient level of effort, uncommitted personnel, and ███████████████

ScottMadden lacks any recent, relevant past performance meeting the RFQ's stated criteria and should have received a Neutral rating under FAR 15.305(a)(2)(iv), yet the Agency assigned a favorable confidence rating without a rational basis for doing so. In comparison, the

████████████████████████████████████████████

████████████████████████ reflects that Guernsey was

████████████████████████ The Agency failed to recognize this impossibility or assess whether the proposed labor mix was feasible. Each of these defects is a material discriminator that the Agency was required to consider in a best-value tradeoff. The Agency's failure to identify or weigh any of them demonstrates that it did not conduct the required qualitative comparison.

This is precisely the error GAO condemned in *AT&T Mobility LLC*, B-420494, May 10, 2022, 2022 CPD ¶ 115. In that decision, GAO sustained the protest because the agency, despite announcing a weighted best-value scheme, evaluated proposals in a manner inconsistent with the solicitation and failed to perform a proper tradeoff analysis. *AT&T Mobility LLC*, B-420494 at 11. GAO found that the agency had effectively conducted a pass/fail review under the non-price factors, relying on a matrix of "yes/no" determinations rather than assessing the relative merits of

---

[69] Ex. A-1 at 69.
[70] *See* Ex. K at 1.

███████████████████████

█████████████

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

the proposals and the record was "devoid of any meaningful qualitative analysis." *Id.* at 6. GAO held that this approach unlawfully converted the procurement into an LPTA selection.

GAO further emphasized that an agency may not base its source selection on adjectival ratings alone, because such ratings "serve only as guides to intelligent decision-making." *Id.* at 9. Instead, the source selection official must look behind the adjectival ratings and consider the underlying strengths, weaknesses, and discriminators. *Id.* at 10. In *AT&T*, the agency failed to do so, simply noting that both offerors received the same adjectival ratings and then selecting the lowest-priced proposal. GAO held that this was improper because the agency had never determined, based on a qualitative assessment, that the proposals were technically equivalent. As GAO explained, "the record is simply devoid of any qualitative discussion of the underlying merits of the proposals and why they should have been considered technically equivalent." *Id.* at 9. Thus, here, even if ScottMadden could have received ███████ ████████████████ there is still no way that ████████ █████████████ ScottMadden's absence of experience could have resulted in the award here—especially in the absence of any documentation reflecting a rational basis for such a conclusion. As in *AT&T*, the Agency here failed to reconcile significant deficiencies in the awardee's technical approach and instead relied on an unsupported conclusion of acceptability in making its award decision.

GAO's decision in *GlassLock, Inc.*, B-299931, B-299931.2, Oct. 10, 2007, 2007 CPD ¶ 216, reinforces the same principle and further demonstrates why the Agency's source selection here was unlawful. In *GlassLock*, the solicitation expressly provided that technical factors were more important than price and required a tradeoff analysis. Despite this, the agency concluded that both quotations were "technically acceptable" and then ████████████████████ r without identifying any qualitative distinctions or explaining why the █████████ ██████████████████████████████████ GAO sustained the protest, holding that ███████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████ GAO emphasized that the source selection decision was defective because it contained no "analysis, determination or even statement" explaining how ████████████ ██████████████████

The same defect is present here. The Agency failed to perform a qualitative comparison of the proposals, did not properly analyze the relative merits of the offerors' technical approaches, neglected to properly ██████████████████████████████ nor did it consider how ScottMadden's ███████████ ██████████ As in *AT&T* and *GlassLock*, the Agency appears to have abandoned the RFQ's best-value framework and improperly ██████████████████

Taken together, *AT&T* and *GlassLock* establish a clear and controlling rule: an agency may not announce a best-value tradeoff, assign significant weight to technical factors, and then ignore that framework by ██████████████████████████████ That is precisely what occurred here. The Agency's failure to identify or weigh any of the ██████

24

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

█████████████████████████████, and its failure to acknowledge the significant performance risks inherent in ScottMadden's quotation, demonstrates that it abandoned the required best-value methodology and improperly ██████████████ contrary to the Solicitation and GAO precedent.

Guernsey has performed this exact requirement for nearly twenty years; ScottMadden has no relevant past performance, no demonstrated staffing capability, an infeasible level of effort, and mathematically impossible pricing. Under the RFQ, these are mandatory discriminators that must be weighed in a best-value tradeoff. Yet, the Agency's █████████████████████ without any documented qualitative comparison—reflects the same failure to perform the kind of qualitative analysis contemplated by the solicitation that GAO found dispositive in *AT&T*. GAO's conclusion in *GlassLock* applies with full force here: ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████. That is precisely what DLA did.

The Agency's best-value determination was irrational because ScottMadden never should have been rated Acceptable under the Technical Acceptability factor and was therefore ineligible for award. No doubt, Guernsey was entitled to a Substantial Confidence rating, while ScottMadden was entitled to a rating of Neutral Confidence or lower. The Agency has thus improperly considered and selected a technically unacceptable, higher-risk, less-qualified offeror for award in direct contravention of the RFQ's terms. Because DLA's best-value tradeoff (1) relied on flawed evaluations, (2) ███████████████████████████████, and (3)█████████████ ████████████████████████████ GAO should sustain this protest and recommend that the Agency reevaluate quotations in accordance with the Solicitation and applicable law.

### D.    The Agency's Unreasonable Evaluation Prejudiced Guernsey

The Agency's errors were not harmless. To the contrary, they materially affected the outcome of the procurement and deprived Guernsey of a fair opportunity for award. GAO requires only a reasonable possibility of prejudice, and it resolves doubts in favor of the protester. *Insight Tech. Solutions, Inc.*, B-420133.2 et al., Dec. 20, 2021, 2022 CPD ¶ 13 at 11. A protester is prejudiced where, but for the agency's errors, it would have had a substantial chance of award. *VariQ Corp.*, B-414650.11, B-414650.15, May 30, 2018, 2018 CPD ¶ 199 at 9. That standard is easily met here.

Had the Agency conducted a lawful evaluation, Guernsey would have been the clear best-value offeror. Guernsey is the only offeror with nearly twenty years of directly relevant experience performing the exact requirement at the same installations. Its quotation demonstrated ████████████████████████████████████████████████████ aligned with the PWS and the Government's needs. ████████████████████████████████████████ Under the RFQ's evaluation scheme— where Technical Acceptability (Subfactor 1), Performance Confidence (Subfactor 2), and Risk (Subfactor 3)██████████████████ these advantages should have been central to the Agency's best-value determination.

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

Instead, the Agency's flawed evaluation obscured these strengths and artificially elevated ScottMadden's quotation. As demonstrated in Sections III.A and III.B, the Agency failed to recognize that ScottMadden did not propose committed personnel, and offered a level of effort that was insufficient to perform the PWS while also lacking recent and relevant past performance. The Agency also failed to identify the significant performance risks inherent in ScottMadden's approach by ignoring the fact that it proposed a staffing approach that could not reasonably support the required level of effort and expertise. By treating ScottMadden's quotation as technically acceptable and assigning it an unwarranted favorable confidence rating, the Agency eliminated the very discriminators that the RFQ required it to consider.

The Agency then compounded these errors by failing to conduct the required best-value tradeoff. As explained in Section III.C, the Agency treated all technically acceptable quotations as equal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ without identifying or weighing any qualitative distinctions. This is precisely the type of ▮▮▮▮▮▮▮▮▮▮▮▮▮ that GAO condemned in *AT&T* and *GlassLock*. In both cases, GAO sustained the protest because the agencies failed to perform the qualitative analysis required by the solicitation, thereby creating a reasonable possibility that the protester would have been selected for award. The same is true here. The Agency's failure to consider Guernsey's substantial technical advantages, its failure to assess ScottMadden's elevated performance risk and lack of relevant experience, and its failure to ▮▮▮▮▮▮▮▮▮▮▮▮ all contributed to a distorted evaluation that deprived Guernsey of the benefit of the RFQ's weighting scheme.

Had the Agency properly evaluated the non-price factors, and had it performed the required best-value tradeoff, Guernsey would have had a substantial chance of receiving the award. Indeed, given Guernsey's unmatched experience as the longtime incumbent, its superior performance record, and its fully informed and supported technical and staffing approach, a lawful evaluation would have made Guernsey the most advantageous offeror under the RFQ's stated evaluation scheme. Under GAO's prejudice standard, these facts are more than sufficient to sustain this protest.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

## IV.
## REQUEST FOR DOCUMENTS

Under 4 C.F.R. § 21.1(d)(2), Guernsey requests that the Agency produce the following additional documents as part of its Agency Report:[71]

1.      A complete copy of all proposals or other communications submitted in response to the Solicitation. These documents are relevant because Guernsey has specifically challenged the Government's evaluation of proposals under the Solicitation and the resulting award decision.

2.      All evaluation documents. These documents are relevant because Guernsey has specifically challenged the Agency's evaluation of proposals under the Solicitation, and the resulting award decision.

3.      All communications between the Agency, ScottMadden, Guernsey, or any other offeror relating to this procurement. These documents are relevant to understanding the Agency's conduct of discussions, including whether discussions were conducted in a fair and consistent manner.

4.      All communications between the Agency and the installation Contracting Officer Representatives (CORs) as it pertains to this Solicitation. *These documents are relevant because the PWS requires the UPSS to work closely with the installation CORs on the day-to-day requirements of the PWS.*

5.      The source selection plan or any other documents related to the evaluation method. These documents are relevant because Guernsey has specifically challenged the Government's evaluation of proposals under the Solicitation and the resulting award decision.

6.      All documents reflecting the Agency's tradeoff process and source selection decision. These documents are relevant because Guernsey has specifically challenged the Government's evaluation of proposals under the Solicitation and the resulting award decision.

7.      All documents reflecting any disagreements between evaluators and/or the source selection authority regarding the source selection decision. *These documents are relevant because Guernsey has specifically challenged the Government's best-value tradeoff.*

---

[71] For any documents that the Agency received or maintained in a format other than PDF, we request that the Agency provide those documents in their native format.

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

8.      All documents reflecting any recommendations to the source selection authority regarding the source selection decision. *These documents are relevant because Guernsey has specifically challenged the Government's best-value tradeoff.*

9.      [redacted]

## V.
## REQUEST FOR RELIEF AND CONCLUSION

For the reasons discussed above, Guernsey requests that GAO:

1.      Sustain this protest;

2.      Determine that the Agency's award decision was unreasonable and not consistent with the Solicitation and law;

3.      Recommend that the Agency rescind the award to ScottMadden, engage in meaningful discussions, re-evaluate proposals, and conduct a proper source selection;

4.      Recommend that the Agency reimburse Guernsey's protest costs; and

5.      Grant such other relief as may be just and appropriate.

## VI.
## PROCEDURAL MATTERS

### A.      Timeliness

On April 27, 2026, the Agency awarded the order at issue to ScottMadden. This protest, filed within ten days of award, is thus timely. 4 C.F.R. § 21.2(a)(2). In addition, because this protest is filed within ten days of award, Guernsey is entitled to a stay of performance pending the resolution of this protest. *See* 31 U.S.C. § 3553(d).

### B.      Interested Party Status

Guernsey timely submitted a proposal in response to the Solicitation. As demonstrated above, had the Agency properly evaluated Guernsey's and ScottMadden's proposals in accordance with the Solicitation, Guernsey's proposal would have had a substantial chance of receiving the award. Therefore, in accordance with GAO's Bid Protest Regulations, Guernsey is an interested party and is entitled to pursue this protest. *See* 4 C.F.R. § 21.0(a)(1).

Guernsey's street address is 5555 North Grand Blvd., Oklahoma City, OK 73112-5507. Contact information for Guernsey's representative is Ashish Agrawal, Senior Vice President, 405-416-8189 (telephone), 907-347-9990 (mobile), ashish.agrawal@guernsey.us (email). All communications should be directed to the undersigned.

28

*Protest of C.H. Guernsey & Company*
Under Request for Quotation No. SP0600-26-Q-0810

## C.    Jurisdiction

The estimated value of the order at issue is $10,309,884.00. Although the Federal Acquisition Streamlining Act ("FASA") generally limits GAO's jurisdiction over protests challenging the issuance of task and delivery orders under certain multiple-award IDIQ contracts, GAO has held that the FASA task-order jurisdictional limits do not apply to orders placed against the General Services Administration's Federal Supply Schedule ("FSS"). *See Severn Companies, Inc.*, B-275717.2, Apr. 28, 1997, 97-1 CPD ¶ 181 at 2 n.1. Accordingly, GAO has jurisdiction to consider this protest.

## D.    Request for Protective Order

This protest contains information that Guernsey considers confidential and proprietary. Guernsey also expects that resolving this protest may require the parties to exchange more confidential, proprietary, and source-selection-sensitive information. Pursuant to 4 C.F.R. § 21.1(d)(1) and 21.4, Guernsey thus requests that GAO issue a protective order. In the meantime, Guernsey requests that GAO and the parties treat this submission, including all attachments, as protected.

Respectfully submitted,

Kendra P. Norwood
Michael T. Patterson
Ruth El
FLUET
1751 Pinnacle Drive, Ste 1000
Tysons, VA 22101
(703) 590-1234

May 7, 2026

*Counsel for C.H. Guernsey & Company*

cc:
Contracting Officer
Defense Logistics Agency – Energy
8725 John J. Kingman Road
Fort Belvoir, VA 22060-6222

*Protest of C.H. Guernsey & Company*
*Under Request for Quotation No. SP0600-26-Q-0810*

Enclosures:
Exhibit A-1 – RFQ-SP0600-26-Q-0810
Exhibit A-2 – RFQ-SP060026Q0810_SF1449 Rev1
Exhibit A-3 – RFQ-SP0600-26-Q-0810 - Attachment 1-Pricing Matrix
Exhibit A-4 – RFQ-SP0600-26-Q-0810 - Attachment 4-Past Performance Questionnaire
Exhibit B-1 – RFQ-SP0600-22-Q-0800 - RFQ (Prior Award)
Exhibit B-2 – RFQ-SP0600-22-Q-0800 Attachment 1 - Pricing Matrix (Prior Award)
Exhibit C – ScottMadden Company website and LinkedIn job postings
Exhibit D – 20260428 Post Award Notice
Exhibit E-1 – ScottMadden – GSA Schedule Contract Number 47QRAA19D002N
Exhibit E-2 – ScottMadden GSA Rates - 47QRAA19D002N (Price List Generation Date Oct. 16 2025)

Exhibit G – Guernsey-GSA Schedule Contract Number 47QRAA19D00DM and Price List

Exhibit J – 2022 to 2026 SOW changes Alaska
Exhibit K – Guernsey Debriefing Request Emails

Exhibit M – ScottMadden Marketing Presentation

30

# Exhibit F

| Case Type | PROTEST |
|---|---|
| Company Status | LARGE |
| Protester | C H Guernsey & Company |
| B-Number | B-424484.1 |
| Agency | DEPARTMENT OF DEFENSE/DEFENSE LOGISTICS AGENCY |
| Intervenors | |
| Solicitation Number | SP0600-26-Q-0810 |
| Consolidated Protest | |

| GAO ATTORNEY NAME | Richards, Raymond |
|---|---|
| GAO ATTORNEY EMAIL | richardsr@gao.gov |
| Days Remaining | 74 |
| Case Status | OPEN |
| Protective Order Issued? | Y |

| Index | Type Of Filing | Filer | Protected? | Date | Comments | GAO Notes |
|---|---|---|---|---|---|---|
| 1 | Protest | PROTESTER ( C H Guernsey & Company ) | Y | May 07 2026 16:52:48 EDT | | |
| 2 | Final Redacted Protest | PROTESTER ( C H Guernsey & Company ) | N | May 08 2026 17:13:28 EDT | | |
| 3 | Notice Of Appearance | AGENCY ( Department of Defense/Defense Logistics Agency ) | N | May 11 2026 10:53:29 EDT | | |
| 4 | Notice of Appearance Acknowledged | GAO ( Department of Defense/Defense Logistics Agency ) | N | May 11 2026 11:58:04 EDT | | Notice of Appearance for Agency rep Richard Aviles from Department of Defense/Defense Logistics Agency |
| 5 | Acknowledgment Package with Protective Order | GAO | N | May 11 2026 11:58:27 EDT | | |
| 6 | Notice of Appearance Acknowledged | GAO | N | May 11 2026 12:22:35 EDT | | Notice of Appearance for Agency rep Josh Tolbert-Smith from Department of Defense / Defense Logistics Agency |
| 7 | Notice of Appearance Acknowledged | GAO | N | May 11 2026 12:23:52 EDT | | Notice of Appearance for Agency rep Daniel Douglass from Defense Logistics Agency |
| 8 | Outside Counsel Protective Order Application | PROTESTER ( C H Guernsey & Company ) | N | May 13 2026 18:11:53 EDT | Applications for Access to Material Under a Protective Order for Outside Counsel Kendra Perkins Norwood, Robert Wu, Michael T. Patterson, Ruth S. El, Marlene K. Egierski, and Amanda Z. Sin for C. H. Guernsey & Company. | Based on our review of the applications and in the absence of objections, GAO admits the following individuals to the protective order: K. P. Norwood, R. Wu, M. Patterson, R. El, M. Egierski, & A. Sin. |
| 9 | Notice Of CICA Stay Override | AGENCY ( Department of Defense/Defense Logistics Agency ) | N | May 19 2026 10:07:39 EDT | | |
| 10 | Request for Agency Compliance with 4 C.F.R. 21.6 | PROTESTER ( C H Guernsey & Company ) | N | May 20 2026 12:19:57 EDT | | |
| 11 | Minute Entry | GAO | N | May 20 2026 12:22:20 EDT | | The agency should file a response to the protester's request at EPDS No. 10. Please file by COB Friday, May 22. Thank you. |
| 12 | Response to Request for Agency Compliance with 4 C.F.R. 21.6 | AGENCY ( Department of Defense/Defense Logistics Agency ) | Y | May 22 2026 17:15:12 EDT | | |
| 13 | Response to Request for Agency Compliance with 4 CFR 21.6 (Protestor) | AGENCY ( Department of Defense/Defense Logistics Agency ) | N | May 26 2026 12:52:18 EDT | DLA does not believe further redactions to the previous response are required. The prior response is being filed a second time and marked as available to the Protestor. | As long as all parties agree to waive the 2-day hold, GAO has no objection to immediate release. |
| 14 | No Objection to Waiver of 2-day Hold for Agency's Response to Request for Agency Compliance with 4 CFR 21.6 | PROTESTER ( C H Guernsey & Company ) | N | May 26 2026 19:08:16 EDT | Protestor C.H. Guernsey & Company has no objection to the immediate release of the Agency's Response to Request for Agency Compliance with 4 CFR 21.6. | |

| Index | Type Of Filing | Filer | Protected? | Date | Comments | GAO Notes |
|---|---|---|---|---|---|---|
| 15 | No Objection to Waiver of 2-day Hold for Agency's Response to Request for Agency Compliance with 4 CFR 21.6 | AGENCY ( Department of Defense/Defense Logistics Agency ) | N | May 27 2026 07:12:13 EDT | Agency/DLA has no objection to the immediate release of the Agency's Response to Request for Agency Compliance with 4 CFR 21.6. | |
| 16 | Request for Dismissal | AGENCY ( Department of Defense/Defense Logistics Agency ) | Y | May 27 2026 15:20:54 EDT | | |
| 17 | Minute Entry | GAO | N | May 27 2026 15:31:55 EDT | | The protester should respond to the agency's request for dismissal by 12:00 p.m., ET, June 1. At this time, GAO declines to suspend the agency report requirement. |
| 18 | Minute Entry | GAO | N | May 29 2026 10:08:52 EDT | | For clarity, the associated document filed in EPDS No. 13 (the D&F) on 5/26 does not contain protected markings, is filed as not protected, as is noted by DLA as releasable to the protester. Thus, the document may be released. |
| 19 | Response to Agency's Request for Dismissal | PROTESTER ( C H Guernsey & Company ) | Y | Jun 01 2026 11:42:47 EDT | | |
| 20 | Notice Of GAO Response to Request for Dismissal | GAO | N | Jun 01 2026 13:06:48 EDT | If the parties agree to waive the 2-day hold on this document, GAO does not object to immediate release. | |
| 21 | No Objection to Waiver of 2-day Hold for the Notice of GAO Response to Request for Dismissal. | PROTESTER ( C H Guernsey & Company ) | N | Jun 01 2026 13:53:22 EDT | Protestor C.H. Guernsey & Company has no objection to the immediate release of the Notice of GAO Response to Request for Dismissal (Index No. 20). | |
| 22 | No Objection to the immediate release of the Notice of GAO Response to Request for Dismissal (Index No. 20). | AGENCY ( Department of Defense/Defense Logistics Agency ) | N | Jun 01 2026 16:09:07 EDT | | |
| 23 | Outside Counsel Protective Order Application | PROTESTER ( C H Guernsey & Company ) | N | Jun 03 2026 09:45:23 EDT | Applications for Access to Material Under a Protective Order for Outside Counsel Mark S. Teskey, Isaac B. Rosenberg, and Kia Rahnama for Protester C. H. Guernsey & Company. | |
| 24 | 5-Day Letter | AGENCY ( Department of Defense/Defense Logistics Agency ) | Y | Jun 03 2026 15:30:08 EDT | | |
| 25 | No Objection to Document's Identified in the Agency's 5-Day Letter | PROTESTER ( C H Guernsey & Company ) | N | Jun 04 2026 10:40:25 EDT | Protester has reviewed the Agency's 5-Day Letter and has no objection to the documents identified for production. Protester reserves the right to object to the scope of redactions indicated on TOC entries 15 & 16 based on relevance. | |

# Exhibit G



**DEFENSE LOGISTICS AGENCY**
**ENERGY**
**8725 JOHN J. KINGMAN ROAD**
**FORT BELVOIR, VIRGINIA 22060-6222**

May 18, 2026

**FILED IN EPDS**
Raymond Richards
U.S. Government Accountability Office
Office of General Counsel
441 G Street, N.W.
Washington, D.C. 20548

SUBJECT:    Notice of CICA Stay Override: Protest of C.H. Guernsey & Company;
            B-424484.1; Under Solicitation No. SPE600-26-Q-0810

Dear Mr. Richards:

This letter is to inform the Government Accountability Office, pursuant to 4 C.F.R. § 21.6, that I have authorized performance of Contract SP0600-26-F-8381, which was awarded under the above-referenced solicitation, notwithstanding the protest filed by C.H. Guernsey & Company, GAO file number B-424484.1. I have determined, pursuant to 31 U.S.C. § 3553(d) and Federal Acquisition Regulation 33.104(c)(2)(i), that contract performance is in the best interests of the United States.

Sincerely,

EARHARDT.GABRIELL
A.M.
Digitally signed by
EARHARDT.GABRIELLA.M
Date: 2026.05.18 17:41:36 -04 00

GABRIELLA M. EARHARDT
Acquisition Executive

# Exhibit H

**GAO** U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

**Comptroller General
of the United States**

June 1, 2026

| | |
|---|---|
| **File:** | B-424484.1 |
| **Protester:** | C H Guernsey & Company |
| **Agency:** | Department of Defense/Defense Logistics Agency |
| **Solicitation No.:** | SP0600-26-Q-0810 |

At this time, GAO declines to dismiss any of the protest grounds raised. In short, we find that the protester raises challenges requiring an answer on the merits with the benefit of a developed record.

The agency should file its report as scheduled in the acknowledgment package. If the agency would like to incorporate any or all of the arguments from its request for dismissal into its agency report, it should feel free to do so.

If any party would like clarification on this notice, please request a conference call.

Thank you.

**FOR FURTHER INFORMATION:**

GAO Attorney: Raymond Richards
Phone No: (202) 512-6517

# In The United States Court of Federal Claims
## Form 2
## Cover Sheet

Plaintiff(s) or Petitioner(s)

Names: C.H. GUERNSEY & COMPANY

Location of Plaintiff(s)/Petitioner(s) (city/state): Oklahoma City, OK

(If this is a multi-plaintiff case, pursuant to RCFC 20(a), please use a separate sheet to list additional plaintiffs.)

Name of the attorney of record (See RCFC 83.1(c)): Kendra Perkins Norwood
    Firm Name: Fluet

Contact information for pro se plaintiff/petitioner or attorney of record:

Post Office Box:
Street Address: 1751 Pinnacle Drive, Suite 1000
City-State-ZIP: Tysons
Telephone Number: (703) 590-1234
E-mail Address: knorwood@fluet.law; e-file@fluet.law

Is the attorney of record admitted to the Court of Federal Claims Bar? ☑Yes ☐No

Nature of Suit Code: 140

Select only one (three digit) nature-of-suit code from the attached sheet.

Agency Identification Code: DOD
Number of Claims Involved: 1

Amount Claimed: $ N/A

    Use estimate if specific amount is not pleaded.

Bid Protest Case (required for NOS 138 and 140):
Indicate approximate dollar amount of procurement at issue: $ 10,309,884.00
    Is plaintiff a small business? ☐Yes ☑No
    Was this action proceeded by the filing of a ☑Yes ☐No   Solicitation No. SP0600-26-Q-0810
    protest before the GAO?
    If yes, was a decision on the merits rendered? ☐Yes ☑No

Income Tax (Partnership) Case:
Identify partnership or partnership group: N/A

Takings Case:
Specify Location of Property (city/state): N/A

Vaccine Case:
Date of Vaccination: N/A

Related case:
Is this case directly related to any pending or previously filed ☐Yes ☑No
case(s) in the United States Court of Federal Claims? If yes, you
are required to file a separate notice of directly related case(s). See RCFC 40.2.

194

## Nature-of-Suit Codes for General Jurisdiction Cases

100 Contract – Construction – (CDA)
102 Contract – Fail to Award – (CDA)
104 Contract – Lease – (CDA)
106 Contract – Maintenance – (CDA)
108 Contract – Renovation – (CDA)
110 Contract – Repair – (CDA)
112 Contract – Sale – (CDA)
114 Contract – Service – (CDA)
116 Contract – Supply – (CDA)
118 Contract – Other – (CDA)

120 Contract – Bailment
122 Contract – Bid Preparation Costs
124 Contract – Medicare Act
126 Contract – Realty Sale
128 Contract – Subsidy
130 Contract – Surety
132 Contract – Timber Sale
134 Contract – Other

136 Contract – Other – Wunderlich

138 Contract – Protest (Pre Award)
140 Contract – Protest (Post Award)

200 Tax – Allowance of Interest
202 Tax – Declaratory Judgment –
     28:1507
204 Tax – Estate

206 Tax – Excise
208 Tax – Gift
210 Tax – Income, Corporate
212 Tax – Income, Individual
213 Tax – Income, Individual
     (Partnership)
214 Tax – Informer's Fees
216 Tax – Preparer's Penalty
218 Tax – Railroad
     Retirement/Unemployment Tax Act
220 Tax – TEFRA Partnership – 28:1508
222 Tax – Windfall Profit Overpayment
     – Interest
224 Tax – 100% Penalty – 26:6672 –
     Withholding
226 Tax – Other

300 Civilian Pay – Back Pay
302 Civilian Pay – COLA
303 Civilian Pay – Disability Annuity
304 Civilian Pay – FLSA
306 Civilian Pay – Overtime
     Compensation
308 Civilian pay – Relocation Expenses
310 Civilian Pay – Suggestion Award
312 Civilian Pay – Other

340 Military Pay – Back Pay
342 Military Pay – CHAMPUS
344 Military Pay – Correct records
346 Military Pay – Correct/Reinstate
348 Military Pay – Reinstatement
350 Military Pay – Relocation Expenses
352 Military Pay – Retirement

354 Military Pay – SBP
355 Military Pay – CRSC
356 Military Pay – Other

500 Carrier – transportation
502 Copyright
504 Native American
506 Oil Spill Clean Up
507 Taking – Town Bluff Dam
508 Patent
509 Taking – Addicks & Barker
     Reservoirs
510 Taking – Personalty
512 Taking – Realty
513 Taking – Rails to Trails
514 Taking – Other
515 Unjust Conviction and Imprisonment
516 Miscellaneous – Damages
517 Miscellaneous – Affordable Care
     Act
518 Miscellaneous – Lease
520 Miscellaneous – Mineral Leasing
     Act
522 Miscellaneous – Oyster Growers
     Damages
524 Miscellaneous – Safety Off. Ben.
     Act
526 Miscellaneous – Royalty/Penalty
     Gas Production
528 Miscellaneous – Other
535 Informer's Reward
536 Spent Nuclear Fuel

## Nature-of-Suit Codes for Vaccine Cases

449 Injury – Hepatitis A
453 Injury – Pneumococcal Conjugate
456 Injury – DPT& Polio
457 Injury – D/T
458 Injury – DTP/DPT
459 Injury - Measles
460 Injury – M/M/R
461 Injury – Measles/Rubella
462 Injury – Mumps
463 Injury – Pertussis
464 Injury – Polio – inactive
465 Injury – Polio – other
466 Injury – Rubella
467 Injury – Tetanus & Diphtheria
468 Injury – Tetanus & Tox.
469 Injury – Other
484 Injury – Hepatitis B

485 Injury – Hemophilus Influenza
486 Injury – Varicella
490 Injury – Rotavirus
492 Injury – Thimerosal
494 Injury – Influenza (Flu)
496 Injury – Meningococcal
498 Injury – Human Papillomavirus

452 Death – Hepatitis A
454 Death – Pneumococcal Conjugate
470 Death – DPT & Polio
471 Death – D/T
472 Death – DTP/DPT
473 Death – Measles
474 Death – M/M/R
475 Death – Measles/Rubella
476 Death – Mumps

477 Death – Pertussis
478 Death – Polio – inactive
479 Death – Polio – other
480 Death – Rubella
481 Death – Tetanus & Diphtheria
482 Death – Tetanus & Tox.
483 Death – Other
487 Death – Hepatitis B
488 Death – Hemophilus Influenza
489 Death – Varicella
491 Death – Rotavirus
493 Death – Thimerosal
495 Death – Influenza (Flu)
497 Death – Meningococcal
499 Death – Human Papillomavirus

195

## AGENCY CODES

| | | | |
|---|---|---|---|
| **AGR** | Agriculture | **SBA** | Small Business Administration |
| **AF** | Air Force | **TRN** | Department of Transportation |
| **ARM** | Army | **TRE** | Department of Treasury |
| **AEC** | Atomic Energy Commission | **VA** | Department of Veterans Affairs |
| **COM** | Department of Commerce | **VAR** | Various Agencies |
| **DOD** | Department of Defense | **O** | Other |
| **DOE** | Department of Energy | | |
| **ED** | Department of Education | | |
| **EPA** | Environmental Protection Agency | | |
| **GPO** | Government Printing Office | | |
| **GSA** | General Services Administration | | |
| **HHS** | Health and Human Services | | |
| **DHS** | Department of Homeland Security | | |
| **HUD** | Housing and Urban Development | | |
| **DOI** | Department of the Interior | | |
| **ICC** | Interstate Commerce Commission | | |
| **DOJ** | Department of Justice | | |
| **LAB** | Department of Labor | | |
| **MC** | Marine Corps | | |
| **NAS** | National Aeronautical Space Agency | | |
| **NAV** | Navy | | |
| **NRC** | Nuclear Regulatory Commission | | |
| **PS** | Postal Service | | |
| **STA** | State Department | | |